John Persell (Utah # 17298)
Western Watersheds Project
P.O. Box 1770
Hailey, ID 83333
Tel: (503) 896-6472

Attorney for Plaintiff
Western Watersheds Project

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, SOUTHERN REGION OF THE CENTRAL DIVISION

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT,<br><br> Plaintiff,<br><br>v.<br><br>NATIONAL PARK SERVICE, UNITED STATES FISH AND WILDLIFE SERVICE, LARRY CRIST, in his official capacity as Utah Field Supervisor, Ecological Services, U.S. Fish and Wildlife Service, SUSAN L. FRITZKE, in her official capacity as Superintendent of Capitol Reef National Park, and KATE HAMMOND, in her official capacity as Acting Regional Director, Intermountain Region, National Park Service,<br><br> Defendants,<br><br>STATE OF UTAH,<br><br> Defendant-Intervenor. | **No. 4:19-cv-00065-DN-PK**<br><br><br>**SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

**INTRODUCTION**

1.      The dramatic landscapes of Capitol Reef National Park contain many spectacular and unique natural and cultural resources, including geological wonders, archaeological evidence of the region's ancient Fremont culture, and endemic populations of threatened and endangered cactus and other plants. Situated primarily in Wayne and Garfield counties, as well as smaller portions of Sevier and Emery counties, the Park also contains abundant wildlife and designated critical habitat for the threatened Mexican spotted owl. Congress entrusted the National Park Service (NPS) to protect and preserve these resources for current and future generations to enjoy. The agency also oversees on-going livestock activity within Capitol Reef National Park that adversely impacts the Park's native vegetation, fragile biological soil crusts, limited water resources, and other key elements of its cold desert ecosystems. By law, NPS must regulate livestock activity in the Park to prevent both "impairment" of and "unacceptable impacts" to these resources.

2.      Western Watersheds Project (WWP), a non-profit conservation organization, seeks to hold the federal government and associated officials accountable for failing to uphold their legislatively-mandated duties within Capitol Reef National Park and to halt their violations of federal laws. As Congress understood when establishing the Park, the resources found within it are too precious to let officials turn a blind eye toward their protection. NPS must regulate commercial interests and ensure private livestock use in the Park is consistent with its enabling legislation and all federal laws. Despite Congress's clear direction to the NPS to manage livestock in Capitol Reef National Park in a manner that protects and prevents impairment of Park resources, the agency has failed to do so.

3.       In October of 2018, NPS adopted a Livestock Grazing and Trailing Management Plan (LGTMP) that purports to provide a "comprehensive approach" to livestock activity in the Park. Yet instead of implementing management that measurably reduces livestock impacts, the LGTMP authorized increased numbers of livestock trailing on three existing routes through the Park, designated two new trailing routes through Endangered Species Act-listed plant populations, continued livestock trailing of over 1,000 cattle twice a year through heavily degraded Mexican spotted owl critical habitat, and instituted a pasture rotation system for livestock grazing that increases cattle densities in the Park and further damages native vegetation and soils.

4.       This lawsuit challenges the decisions by the National Park Service and Kate Hammond, Acting Regional Director of the Intermountain Region of the National Park Service, to issue a Finding of No Significant Impact (FONSI) and Non-Impairment Determination (NID) for the LGTMP for Capitol Reef National Park. The actions authorized in the LGTMP will cause significant and unacceptable impacts to Park resources.

5.       This lawsuit also challenges the issuance of special use permits for livestock grazing and trailing by NPS and Susan L. Fritzke, Superintendent of Capitol Reef National Park, pursuant to the LGTMP, the Environmental Assessment (EA) prepared for the LGTMP, and legislation establishing Capitol Reef National Park and providing for the Park's management. Congress provided clear criteria for the eligibility of livestock grazing and trailing in the Park that NPS has ignored.

6.       Finally, this lawsuit challenges the Biological Opinion (BO) prepared by the United States Fish and Wildlife Service (FWS) and signed by Larry Crist, FWS's Utah Field

Supervisor of Ecological Services, for the issuance of the special use permits, and the reliance on that BO by NPS to fulfill its obligations under Section 7 of the Endangered Species Act (ESA). The BO prepared by FWS does not properly evaluate the effects of livestock on ESA-listed species. Neither does the BO's analysis support conclusions that ESA-listed species' continued existence will not be jeopardized by livestock trailing, nor that that the designated critical habitat of the Mexican spotted owl will not be adversely modified or destroyed.

7.      Each of these decisions, individually and in toto, will cause harm to the resources within Capitol Reef National Park, which in turn will damage the rights and interests of WWP and its members. The decisions are fundamentally at odds with the level of protection Congress directed NPS provide to Park resources and species listed under the Endangered Species Act.

## JURISDICTION AND VENUE

8.      Jurisdiction is proper in this Court under 28 U.S.C. § 1331 because this action arises under the laws of the United States, including the National Environmental Policy Act (NEPA), the ESA, the Administrative Procedure Act (APA), legislation specific to Capitol Reef National Park, the NPS Organic Act, and the Equal Access to Justice Act, 28 U.S.C. § 2412 *et seq.* WWP seeks judicial review of final administrative actions of the National Park Service, Acting Regional Director Kate Hammond, Superintendent Susan L. Fritzke, the U.S. Fish and Wildlife Service, and Utah Field Supervisor Larry Crist. *See* 5 U.S.C. § 704 and 16 U.S.C. § 1540(g) (actions reviewable). An actual, justiciable controversy exists between the parties, and the requested relief is therefore proper under 28 U.S.C. §§ 2201-02, 16 U.S.C. § 1540(g), and 5 U.S.C. § 701-06.

9.      Venue is proper in the United States District Court for the District of Utah pursuant to 28 U.S.C. § 1391(e)(1) because nearly all the statutory violations alleged herein occurred within the state of Utah, defendants National Park Service, U.S. Fish and Wildlife Service, Utah Field Supervisor Larry Crist, and Superintendent Susan L. Fritzke reside in this district, and the public lands and resources and agency records in question are located in this district.

10.      The federal government has waived sovereign immunity in this action pursuant to 5 U.S.C. § 702 and 16 U.S.C. § 1540(g).

11.      As required by the ESA, WWP provided FWS and NPS notice of its intent to bring this action more than 60 days prior to filing this lawsuit.

## PARTIES

12.      Plaintiff WESTERN WATERSHEDS PROJECT (WWP) is a non-profit organization dedicated to protecting and conserving the public lands and natural resources in Utah and the West. Since its inception, WWP has advocated to curb ecological abuses of public lands from domestic livestock throughout the West, including in Utah. WWP undertakes a wide range of activities including education, advocacy, scientific study, and litigation in order to protect and restore natural ecosystems, often through reducing the effects of harmful livestock use, and to communicate to the public and policy-makers about the values of native biodiversity and associated landscapes in Utah. WWP and many of its members and supporters have long-standing interests in preserving and conserving native ecosystems, including native plants and animals and other park resources, in Capitol Reef National Park and across Utah.

13.     WWP is headquartered in Hailey, Idaho, and has members and supporters across the United States. WWP's members use and enjoy public lands in and throughout Utah, including Capitol Reef National Park, for a variety of purposes, including scientific study, recreation, wildlife viewing, and aesthetic appreciation. Mr. Jonathan B. Ratner, an employee and member of WWP, has visited the areas where livestock grazing and trailing take place in Capitol Reef National Park on many occasions over the past ten years, most recently in June of 2019. Mr. Ratner intends to return often to these areas and certainly within the next few months. While there, Mr. Ratner engages in many activities, including, but not limited to, habitat surveys, plant and wildlife observation, scientific study, and enjoyment of the natural qualities of the Park. *See* Attached Declaration of Jonathan B. Ratner. WWP brings this action on its own behalf and on behalf of its members.

14.     WWP and its members' recreational, scientific, inspirational, educational, aesthetic, and other interests have been directly and irreparably harmed, and continue to be affected and harmed, by NPS's issuance of special use permits for livestock grazing and trailing in the Park, as well as the FONSI and NID for the Livestock Grazing and Trailing Management Plan and FWS's Biological Opinion upon which the permits rely. These are actual, concrete injuries to WWP and its members that would be redressed by the relief sought herein. WWP has no other adequate remedy at law.

15.     Defendant NATIONAL PARK SERVICE is an agency of the United States within the Department of the Interior charged with managing Capitol Reef National Park and other NPS units according to federal statutes and regulations. NPS oversees livestock grazing and trailing on Capitol Reef National Park as well as the protection of Park resources.

16.     Defendant UNITED STATES FISH AND WILDLIFE SERVICE is an agency of the United States within the Department of the Interior charged with administering and enforcing the Endangered Species Act. FWS is responsible for preparing the Biological Opinion regarding the issuance of special use permits for livestock grazing and trailing in Capitol Reef National Park as part of its obligations under the Endangered Species Act.

17.     Defendant LARRY CRIST, Utah Field Supervisor for Ecological Services within the U.S. Fish and Wildlife Service, is responsible for signing the Biological Opinion for the issuance of special use permits for livestock grazing and trailing in Capitol Reef National Park.

18.     Defendant SUSAN L. FRITZKE, Superintendent of Capitol Reef National Park, a unit of the National Park Service, is responsible for signing the special use permits for livestock grazing and trailing on Capitol Reef National Park.

19.     Defendant KATE HAMMOND, Acting Regional Director of the Intermountain Region of the National Park Service, is responsible for signing the Finding of No Significant Impact and Non-Impairment Determination for the Livestock Grazing and Trailing Management Plan for Capitol Reef National Park.

20.     Plaintiff WWP has Article III standing to bring this action because it is directly injured by the procedural and substantive violations of federal laws alleged herein, which are redressable by this Court. WWP is directly injured by the National Park Service's failure to regulate livestock grazing and trailing in a manner that will protect the resources of Capitol Reef National Park and comply with relevant legislation for Capitol Reef National Park. WWP is directly injured by the U.S. Fish and Wildlife Service's and Larry Crist's failure to properly prepare a Biological Opinion according to applicable laws and regulations. WWP is directly

injured by the Acting Regional Director's unlawful findings and decisions that the LGTMP as adopted will have no significant impact on the environment, complies with applicable NPS Management Policies and other directives, and ensures no impairment of or unacceptable impacts to the resources of Capitol Reef National Park. WWP is directly injured by the Superintendent's unlawful decisions to issue special use permits pursuant to the LGTMP, in reliance on FWS's Biological Opinion, and in violation of relevant legislation for Capitol Reef National Park.

21.     The unlawful findings and decisions by NPS, FWS, the Utah Field Supervisor, the Acting Regional Director, and the Superintendent threaten irreparable harm to native plants and animals including the Winkler cactus, Wright fishhook cactus, Last Chance townsendia, and the Mexican spotted owl, all of which WWP and its members value and enjoy, further harming WWP's interests. The unlawful decisions by NPS, FWS, the Utah Field Supervisor, the Acting Regional Director, and the Superintendent also threaten irreparable harm to wilderness quality lands, biological soil crusts, and riparian and water resources, all of which WWP and its members value and enjoy, further harming WWP's interests. *See* Attached Declaration of Jonathan B. Ratner.

22.     WWP's injuries would be redressed if this Court (1) reversed and vacated the Acting Regional Director's findings and decisions regarding the Livestock Grazing and Trailing Management Plan, the Superintendent's decisions to issue special use permits for livestock grazing and trailing in the Park, and the FWS's Biological Opinion for the issuance of such special use permits, (2) declared the Superintendent's issuance of special use permits to individuals not authorized to graze or trail livestock in the Park under relevant legislation to be

unlawful, (3) ordered the NPS to complete a legally adequate NEPA analysis and LGTMP that addressed livestock's significant impacts to Park resources and the agency's obligations to prevent impairment and proactively protect Park resources, (4) ordered the FWS to complete a legally adequate Biological Opinion before NPS or the Superintendent issues any further special use permits for livestock grazing or trailing in the Park to individuals authorized to graze or trail livestock under relevant legislation, and (5) enjoined NPS and the Superintendent from allowing livestock grazing and trailing in the Park unless and until NPS and FWS have fully complied with NEPA, the ESA, the National Park Service Organic Act, legislation specific to Capitol Reef National Park, and associated regulations. Unless judicial relief is granted, WWP and its members will continue to suffer irreparable harm to their interests from unlawful livestock grazing and trailing under the special use permits issued by the Superintendent.

## **HISTORICAL AND PROCEDURAL BACKGROUND**

23.     President Franklin D. Roosevelt first set aside lands within present-day Capitol Reef National Park as a national monument to protect their "geological and scientific interest," pursuant to the Antiquities Act. 54 U.S.C. §§ 320301 to 320303 (originally codified at 16 U.S.C. §§ 431-433); Presidential Proclamation 2246 (Aug. 2, 1937). Subsequent presidents expanded the monument on two occasions for similar purposes. *See* Presidential Proclamation 3249 (July 2, 1958); *see also* Presidential Proclamation 3888 (Jan. 20, 1969).

24.     Before and after the creation of Capitol Reef National Monument, the Bureau of Land Management and predecessor agencies administered livestock grazing permits within the present-day Park boundaries. LGTMP EA, p. 1-2.

25.     On December 18, 1971, Congress abolished the national monument and established Capitol Reef National Park. Pub. L. 92-207 (Dec. 18, 1971), 16 U.S.C. § 273 *et seq.* At this time, Congress also provided specific direction regarding what type of livestock grazing could continue to occur within the Park boundaries: 1) Grazing was allowed to continue on designated allotments pursuant to fixed-term permits by those individuals (or their heirs) who held such permits prior to establishment of the Park; and 2) these permits were allowed to be renewed for one additional term period. *Id.* With this language, Congress laid out a plan for a phasing of livestock grazing out of the Park. *Id.*

26.     The 1971 enabling legislation for the Park also included specific language regarding livestock trailing, the practice of moving livestock across Park lands, such as moving from one allotment outside the Park to another. The legislation allowed for owners and operators who were authorized to do so immediately prior to the Park's establishment to continue trailing livestock across the Park on the traditional courses actually used by those same owners and operators prior to the Park's establishment, but did not permit trailing by new owners and operators. Pub. L. 92-207 § 4.

27.     Subsequent legislation enacted by Congress in 1982 extended the Park's grazing phase-out period through the end of 1994, and directed NPS to further study the impact of livestock on Park resources and visitor experiences, as well as the impact of the grazing phase-out on the local economy. Pub. L. 97-341 (Oct. 15, 1982).

28.     Based upon a 1987 legal opinion written by the Interior Department Regional Solicitor's office, NPS began buying out the Park's remaining grazing permits from willing sellers. *Grazing and Capitol Reef National Park: A Historic Study*, Ch. 12, p. 337 (Frye 1998).

SECOND AMENDED COMPLAINT - 10

29.     In 1988, Congress provided its final direction for grazing in Capitol Reef National Park. Repealing Public Law 97-341, Congress allowed grazing on allotments to continue for the lifetime of those who held permits (or their heirs) prior to establishment of the Park, as well as their direct descendants (sons or daughters) born before establishment of the Park. Pub. L. 100-446 (Sept. 27, 1988). In the 1988 legislation, Congress included specific direction to manage grazing to encourage protection of Park resources. *Id*

30.     NPS shared livestock management responsibilities within the Park with the BLM from the date of the Park's establishment until approximately 2010. LGTMP EA, p. 1-2.

31.     In addition to addressing livestock grazing and trailing, the enabling legislation for the Park also directed NPS to manage the Park pursuant to the Organic Act of 1916. Pub. L. 92-207. The Organic Act mandates that NPS provide the highest level of protection: to leave park resources unimpaired for future generations. 54 U.S.C. §100101 (originally codified at 16 U.S.C. § 1). This is distinctly different from the "multiple use" missions and mandates of other federal land management agencies, which NPS acknowledges "potentially conflict with those of Capitol Reef National Park." GMP EIS, p. 15 (1998).

32.     In 1998, NPS produced an EIS for a General Management Plan for Capitol Reef National Park to update its previous 1982 plan, but NPS deemed livestock grazing and trailing to be beyond the scope of the updated General Management Plan and did not analyze any new or existing actions regarding livestock use in the Park. GMP EIS, p. 24. However, the EIS for the 1998 General Management Plan did admit the "Endangered Species Act requires federal agencies to insure their activities do not negatively impact listed species or cause others to become listed." *Id.* p. 108. Of particular note, NPS clearly stated "[a]ny impact that may affect

listed or National Park Service sensitive species would be considered significant." *Id*. In the General Management Plan, NPS also committed to implementing recovery plans for ESA-listed species. *Id.* p. 120.

33.     In 2014, WWP and Cottonwood Environmental Law Center filed suit against NPS and the Secretary of the Interior, challenging NPS's issuance of a three-year special use permit for livestock activity in the Park under a Categorical Exclusion from environmental analysis, despite evidence before the agency that livestock in the Park significantly impacted plants listed under the Endangered Species Act.

34.     This court ultimately held that NPS's use of a Categorical Exclusion was not arbitrary or capricious. *Western Watersheds Proj. v. Jewell*, 221 F. Supp. 3d 1308, 1317 (D. Utah 2016). The District Court characterized the issue before it as "whether the Park Service violated NEPA by categorically excluding the Permit for the Hartnet Allotment from environmental analysis while the long-term EIS/Management Plan is prepared." *Id.* at 1311. Thus, this Court accepted NPS's position that no significant impacts to Park resources would occur from issuance of a three-year permit under the assumption a longer-term management plan and full Environmental Impact Statement were underway to address the breadth and depth of impacts from livestock grazing and trailing in Capitol Reef National Park.

35.     NPS began preparing a Livestock Grazing and Trailing Management Plan in 2015. Recognizing the livestock grazing and trailing activities to be authorized through the LGTMP would likely have significant impacts on the environment, NPS began a public scoping process in March of 2015 for an EIS for the LGTMP to satisfy its obligations under NEPA. 80 Fed. Reg. 13615 (Mar. 16, 2015).

36.     WWP provided substantive comments dated May 10, 2015, during the scoping period. WWP identified numerous park resources that needed protection and recovery from livestock impacts, including, but not limited to, species listed under the Endangered Species Act, native vegetation, water quality, riparian conditions, soils, and biological soil crusts. WWP also identified applicable laws, regulations, policies, orders, and manuals by which NPS must prepare an EIS and LGTMP that protects and prevents impairment of park resources.

37.     Approximately three years into the development of the EIS, one of the two remaining grazing allotments within the Park, the Hartnet Allotment, was retired from grazing use through a private agreement between Philip, Richard, and Doug Pace, the permit holders, and non-profit organizations. This agreement was intended to complete the "phase-out" of pre-Park grazing permit holders', heirs', and descendants' use of the allotment through a voluntary relinquishment of the permit.

38.     In March of 2018, prior to the relinquishment of their Hartnet Allotment grazing permit, and prior to any public notice or environmental analysis of new trailing routes through the retired allotment, Jeremy Curtis, the Acting Superintendent of Capitol Reef National Park, sent the Paces a letter assuring them "that the park will work towards identify [sic] reasonable trailing routes acceptable to you and the park." Administrative Record at FWS0000271. Similarly, Larry Crist from FWS sent the Paces a letter committing FWS to support the Paces' "request to trail cattle through the Park," and named Hartnet Road and Lower South Desert as trailing route examples. Administrative Record at FWS0007372.

39.     Shortly after the Paces relinquished their Hartnet Allotment grazing permit, NPS announced it had switched course to preparation of an Environmental Assessment because

"implementation of the LGTMP on the remaining allotment and trails throughout the park would not have significant impacts." *See* News Release (May 8, 2018),

https://www.nps.gov/care/learn/news/livestock-grazing-and-trailing-management-planning-process-for-capitol-reef-national-park.htm (last visited Feb. 7, 2020).

40.     In July of 2018, NPS released for public comment an Environmental Assessment in which NPS preferentially proposed designating two new livestock trailing routes through ESA-listed plant populations and habitat in the retired Hartnet Allotment, routes that had never before been permitted and thus were unknown to the public until their inclusion in the EA. NPS also proposed increasing the number of livestock permitted to use the Divide Canyon and Pleasant Creek livestock trailing routes, and proposed to double livestock densities in a new pasture rotation system for the Sandy 3 Allotment.

41.     WWP submitted comments on the EA both individually and as part of a coalition of conservation groups, dated August 15 and August 16, 2018, respectively. WWP's comments raised numerous concerns with the lack of appropriate analysis in the EA, the failure to examine impacts to park resources through the lens of the agency's own policies, directives, and operative statutes, and the unlawfulness of permitting livestock trailing on non-traditional routes contrary to the Park's enabling legislation.

42.     Upon Superintendent Susan L. Fritzke's recommendation, on October 3, 2018, Acting Regional Director Kate Hammond signed a Finding of No Significant Impact for the LGTMP Environmental Assessment, adopting Alternative 2. An attachment to the FONSI provided a Non-Impairment Determination. *See* FONSI, Attachment 1 (Oct. 3, 2018). An errata

attached to the FONSI admitted the selected alternative for the LGTMP would violate NPS

Management Policies. *See* FONSI, Attachment 2, Errata to the EA, p. ATT-2-6.

43.     In October of 2018, U.S. Fish and Wildlife Service produced a Biological

Opinion for the issuance of special use permits for livestock grazing and trailing in Capitol Reef

National Park. This BO, signed by Utah Field Supervisor Larry Crist, addressed three ESA-listed

plant species whose populations and habitat are directly crossed by established and newly-

designated livestock trailing routes in the Park: Winkler cactus, Wright fishhook cactus, and Last

Chance townsendia, a small flowering perennial species. The Biological Opinion concluded

livestock trailing through ESA-listed plant populations and habitat would not jeopardize the

species' continued existence.

44.     The BO also addressed the Mexican spotted owl and its designated critical

habitat, which the Oak Creek livestock trail directly crosses, and within which lies much of the

Sandy 3 Allotment. The BO concluded livestock trailing through Mexican spotted owl

designated critical habitat would not adversely modify or destroy that habitat. The Biological

Opinion included an Incidental Take Statement for the Mexican spotted owl allowing for the

"take" of up to one breeding pair and young each year.

45.     Between October of 2018 and February of 2019, citing statutory authority under

Public Law 100-446 and pursuant to the LGTMP and BO, Superintendent Fritzke issued special

use permits authorizing livestock grazing on the Sandy 3 Allotment through the fall, winter, and

into spring of 2018-19 to individuals and entities that fail to meet eligibility criteria to graze in

the Park under relevant legislation. *See* Administrative Record at NPS0000502, 516, 519, 522,

526, 547, 563, 567, and 571.

46.     Citing Public Law 92-207 § 4 as statutory authority, Superintendent Fritzke also issued special use permits authorizing livestock trailing in the Park between October of 2018 and June of 2019 pursuant to the LGTMP and BO, including to some individuals and entities and for at least one route that fail to meet eligibility criteria for trailing under relevant legislation. *See* Administrative Record at NPS0000493, 495, 497, 503, 505, 507, 509, 512, 514, 538, 540, 542, 554, 548, 550, 552, 557, and 559.

47.     Beginning in October of 2018, WWP submitted a series of Freedom of Information Act (FOIA) requests to NPS regarding the LGTMP and livestock grazing and trailing in the Park, seeking the underlying administrative records for the LGTMP and EA, records related to historic use of the newly designated trailing routes, documents related to grazing and trailing permittees' historic use and lawful status as permit holders under relevant legislation, records regarding unauthorized and trespass cattle in the Park, and documentation of implementation of the LGTMP.

48.     Of these requests, WWP received a "first partial release" of the administrative record for the LGTMP and EA, and responses regarding traditional livestock trailing routes and unauthorized cattle use of the Park. WWP's other requests have gone unanswered after many months.

49.      On May 15, 2019, WWP sent a notice letter to FWS and NPS of its intent to file suit to remedy ESA violations related to the October 2018 Biological Opinion produced by FWS and NPS's reliance on that BO to satisfy its ESA Section 7 duties.

## LEGAL BACKGROUND

**A.    Public Law 92-207**

50.    On December 18, 1971, Congress enacted enabling legislation for Capitol Reef

National Park. Congress included specific language relevant to livestock grazing in the newly-

designated Park boundaries:

> Where any Federal lands included within the park are legally occupied or utilized on the
> date of approval of this Act for grazing purposes, pursuant to a lease, permit, or license
> for a fixed terms of years issued or authorized by any department, establishment, or
> agency of the United States, the Secretary of the Interior shall permit the persons holding
> such grazing privileges or their heirs to continue in the exercise thereof during the term of
> the lease, permit, or license, and one period of renewal thereafter.

Pub. L. 92-207 § 3 (Dec. 18, 1971).

51.    The same legislation contained specific language relevant to livestock trailing in

the newly-designated Park boundaries:

> Nothing in this Act shall be construed as affecting in any way rights of owners and
> operators of cattle and sheep herds, existing on the date immediately prior to the
> enactment of this Act, to trail their herds on traditional courses used by them prior to such
> date of enactment, and to water their stock, notwithstanding the fact that the lands
> involving such trails and watering are situated within the park: *Provided*, That the
> Secretary may promulgate reasonable regulations providing for the use of such
> driveways.

Pub. L. 92-207 § 4.

**B.    Public Law 100-446**

52.    Congress later extended the initial livestock grazing phase-out established in the

Park's enabling legislation, instead authorizing renewal of livestock grazing "leases, permits, or

licenses under such terms and conditions as the Secretary of the Interior may prescribe, for the

lifetime of the permittee or any direct descendants (sons or daughters) born on or before the

enactment of Public Law 92-207 (December 18, 1971)." Pub. L. 100-446 (Sept. 27, 1988). This

Park-specific legislation made renewal of such leases, permits, or licenses subject to the condition that "Grazing will be managed to encourage the protection of the Park's natural and cultural resources values." *Id.*

**C.     NPS Organic Act of 1916**

53.     Congress created the National Park Service through the Organic Act of 1916. 54 U.S.C. § 100101(a) (originally codified at 16 U.S.C. § 1). Through the Organic Act and subsequent legislation, Congress requires the Park Service to

> promote and regulate the use of the National Park System by means and measures that conform to the fundamental purpose of the System units, which purpose is to conserve the scenery, natural and historic objects, and wild life in the System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations.

*Id.* This language is referred to as the Organic Act's "non-impairment mandate."

54.     Congress reaffirmed the Organic Act's non-impairment mandate through enactment of the NPS Act in 2014. 54 U.S.C. § 100101(a).

55.     NPS defines "impairment" as any authorized activity that "would harm the integrity of park resources or values, including the opportunities that otherwise would be present for the enjoyment of those resources or values." NPS Management Policies § 1.4.5 (2006).

56.     To ensure that an authorized activity will not violate the non-impairment mandate, NPS must determine the activity will not impair park values or resources prior to authorizing the activity. *See*, *e.g.*, *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 103 (D.D.C. 2006).

57.     In 2006, NPS updated its nation-wide Management Policies and established a precautionary approach to ensure no impairment of park resources. Rather than merely prevent the impairment of park resources, the 2006 Management Policies require NPS to prohibit "uses

that would cause unacceptable impacts." NPS Management Policies § 1.4.7.1 (2006). Under the

Park Service's policies,

> unacceptable impacts are impacts that, individually or cumulatively, would be inconsistent with a park's purposes or values, or impede the attainment of a park's desired future conditions for natural and cultural resources as identified through the park's planning process . . . or diminish opportunities for current or future generations to enjoy, learn about, or be inspired by park resources or values . . . .

*Id.*

58.     As an official interpretation of the Organic Act's non-impairment mandate, § 1.4

of the Park Service's Policies have been held to be enforceable against the agency. *Greater*

*Yellowstone Coal. v. Kempthorne*, 577 F. Supp. 2d 183, n. 1 (D.D.C. 2008).

59.     The "Introduction" page of the Policies says "This volume is the basic Service-

wide policy document of the National Park Service. Adherence to policy is mandatory unless

specifically waived or modified by the Secretary, the Assistant Secretary, or the Director." NPS

Management Policies, Introduction: Law, Policy, and Other Guidance (2006). The NPS

Management Policies (2006) are publicly available as a portable document format on the

Internet. *See* https://www.nps.gov/policy/MP_2006.pdf (last visited Feb. 7, 2020).

60.     NPS must fulfill the "fundamental purpose" of the National Park System, which is

to "conserve park resources and values" and provide "for the enjoyment of park resources and

values by the people of the United States." NPS Management Policies § 1.4.3 (2006).

61.     Even when a park's enabling legislation mandates particular uses, NPS has "the

authority to and must manage and regulate the use to ensure, to the extent possible, that impacts

on park resources from that use are acceptable." *Id.* § 1.4.3.1.

62.     Other sections of the Park Service's Management Policies lay out in detail how the agency must restore natural systems, manage and protect biological resources, conserve and protect species listed as threatened or endangered under the Endangered Species Act, manage and protect designated and recommended wilderness found within National Park System units, manage and protect water resources within National Park System units, issue of special use permits, and manage livestock use in National Park System units. *See id.* §§ 4.1.5, 4.4.1, 4.4.2.3, 4.6.4, 6.3.1, 8.6.1.1, and 8.6.8.2.

63.      Pursuant to authority granted to the Secretary of the Interior and the agency under the Organic Act, the Director of the National Park Service issued a number of Director's Orders and Reference Manuals to guide the agency's management of park resources, including Director's Order 41 (wilderness stewardship), Director's Orders 77-1 and 77-2 (wetlands and floodplains management), and Director's Order 53 and Reference Manual 53 (special use permits).

64.     Also pursuant to authority granted to the Secretary of the Interior and the agency under the Organic Act, NPS has promulgated a regulation governing the issuance of special use permits for activities within the National Park System. This regulation requires that any permit issued by NPS

> be consistent with applicable legislation, Federal regulations and administrative policies, and based upon a determination that public health and safety, environmental or scenic values, natural or cultural resources, scientific research, implementation of management responsibilities, proper allocation and use of facilities, or the avoidance of conflict among visitor use activities will not be adversely impacted.

36 C.F.R. § 1.6(a).

65.     Another regulation promulgated pursuant to agency authority under the Organic Act requires NPS to prohibit livestock use in National Park System units except:

(1)    As specifically authorized by Federal statutory law; or
(2)    As required under a reservation of rights arising from acquisition of a tract of land; or
(3)    As designated, when conducted as a necessary and integral part of a recreational activity or required in order to maintain a historic scene.

36 C.F.R. § 2.60(a).

**D.    National Environmental Policy Act**

66.    The National Environmental Policy Act is the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). Congress enacted NEPA with the objectives of "encouraging productive and enjoyable harmony between man and his environment" while "promoting efforts which will prevent or eliminate damage to the environment and biosphere stimulating the health and welfare of man; and enriching the understanding of the ecological systems and natural resources important to the Nation . . . ." 42 U.S.C. § 4321.

67.    To achieve these goals, NEPA contains "action-forcing" procedures, including the mandate that all federal agencies must prepare an environmental impact statement (EIS) to analyze and disclose the environmental consequences of major federal actions "significantly affecting the quality of the human environment." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989); 42 U.S.C. § 4332(2)(C).

68.    The Council on Environmental Quality (CEQ) was created to administer NEPA and has promulgated NEPA regulations that are binding on all federal agencies. *See* 42 U.S.C. §§ 4342 and 4344; 40 C.F.R. §§ 1500-1508.

69.    "Under NEPA, an agency generally prepares an EA [Environmental Assessment] of the proposed action to guide whether it should prepare an EIS" or issue a finding of no

significant impact. *Airport Neighbors All. v. United States*, 90 F.3d 426, 429 (10th Cir. 1996). If

the agency concludes in an EA that a project may have significant impacts on the environment,

then an EIS must be prepared. 40 C.F.R. § 1501.4. If an EA concludes there are no significant

impacts to the environment, then the federal agency must provide a detailed statement of reasons

explaining its conclusion that the project's impacts are insignificant and must issue a FONSI. 40

C.F.R. § 1508.13.

70.     An agency may only issue a FONSI for actions that have no significant impact on

the human environment. *Id.* § 1508.13. If an action "may" have a significant impact on the

environment, the agency must prepare an EIS. *See id.* § 1508.3.

71.     CEQ's regulations define "significance" in terms of "context" and "intensity." *Id.*

§ 1508.27. "Context" means the significance of the action must be analyzed in several contexts

(national, regional, and local), and include short- and long-term effects within the setting of the

proposed action. *Id.* § 1508.27(a). "Intensity" refers to the severity of the impact and requires

consideration of a number of factors listed in CEQ's regulations, including: (1) impacts that may

be both beneficial and adverse; (2) unique characteristics of the geographic area; (3) whether the

action is likely to be highly controversial; (4) whether the effects on the environment are highly

uncertain or involve unique or unknown risks; (5) whether the action establishes a precedent for

future actions; (6) whether the action may have cumulative significant impacts; (7) whether the

action may cause loss or destruction of scientific, cultural, and historical resources; (8) whether

the action may adversely affect species listed as threatened or endangered under the Endangered

Species Act; and (9) whether the action threatens a violation of Federal law. *Id.* §§ 1508.27(b)(1)

and (b)(3)-(b)(10).

72.     In an EA or EIS, an agency must fully analyze all direct, indirect, and cumulative impacts from a proposed action in its environmental analysis. *See id.* § 1502.16. "Direct effects" include those "which are caused by the action and occur at the same time and place." *Id.* § 1508.8(a). "Indirect effects" include those "which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. *Id.* § 1508.8(b). "Cumulative impacts" result from the "incremental impact of the action" on the environment "when added to other past, present, and reasonably foreseeable future actions regardless of what agency [] or person undertakes such other actions." 40 C.F.R. § 1508.7. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time. *Id.* Cumulative impact analyses include private, state, and federal action. *Id.* § 1508.7.

73.     NEPA requires that the information an agency uses in conducting its environmental review must be "of high quality," and agencies "must insure the professional integrity, including scientific integrity," of their discussions and analyses, and "shall identify any methodologies used" and "scientific and other sources relied upon for their conclusions. *Id.* §§ 1500.1(b) and 1502.24. "Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." *Id.* § 1500.1(b).

74.     Underlying all of NEPA's procedural requirements is the mandate that agencies take a "hard look" at all environmental impacts and risks of a proposed action. *See Natural Res. Def. Council v. Morton*, 458 F.2d 827, 383 (D.C. Cir. 1972). This review cannot be superficial, but rather agencies must take this "hard look" in light of comments submitted by the public as well as high-quality scientific information. This "hard look" standard ensures the agency gathers the needed factual information and provides sufficient information to support its conclusions.

E.      **Endangered Species Act**

75.      Congress enacted the Endangered Species Act, in part, to provide a "means whereby the ecosystems upon which endangered and threatened species depend may be conserved . . . [and] a program for the conservation of such endangered and threatened species." 16 U.S.C. § 1531(b). "The plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost," observed the Supreme Court. *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 174 (1978). In passing the ESA, Congress "intended endangered species to be afforded the highest of priorities." *Id.* at 184.

76.      Under Section 7 of the ESA, all federal agencies shall "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species . . . ." 16 U.S.C. § 1536(a)(2).

77.      The ESA establishes an interagency consultation process to assist federal agencies in complying with their substantive Section 7(a)(2) duty to guard against jeopardy to listed species or destruction or adverse modification of critical habitat. An agency must initiate consultation under Section 7 whenever its action "may affect" a listed species or critical habitat. 50 C.F.R. § 402.14(a). If the proposed action is "likely to adversely affect" listed species or their critical habitat, the federal agency must initiate formal consultation with the U.S. Fish and Wildlife Service. 50 C.F.R. § 402.14(c).

78.      Section 7 of the ESA requires a federal agency to consult with the FWS to insure proposed actions "are not likely to jeopardize the continued existence" of any listed species or

"result in the destruction or adverse modification" of designated critical habitat. 16 U.S.C. § 1536(a)(2).

79.     Section 7 directs action agencies to prepare a biological assessment to "facilitate compliance" with consultation requirements. *Id.* § 1536(c)(1). A biological assessment must include an analysis of cumulative effects on listed species and habitat, among other things. 50 C.F.R. § 402.12(f)(1)-(5).

80.     When listed species will be affected by a federal action, formal consultation is required with FWS unless FWS concurs with an action agency's determination that a federal action is not likely to adversely affect a listed species or designated critical habitat. *Id.* § 402.14(d).

81.     Formal consultation requires FWS to evaluate and provide a detailed discussion on proposed action's effects, including cumulative effects, on listed species and critical habitat. *Id.* §§ 402.14(g)(3) and (h)(2).

82.     The "action area" for Section 7 consultation purposes must include "all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action." *Id.* § 402.02(d).

83.     Once it has reviewed relevant information, evaluated listed species' and designated critical habitat's current status, and evaluated all effects of the requesting agency's actions, FWS must issue a "biological opinion as to whether the action, taken together with cumulative effects, is likely to" result in jeopardy to listed species' existence or destruction or adverse modification of critical habitat. *Id.* § 402.14(g)(1)-(4).

84.     "Destruction or adverse modification" is defined to include actions that "alter the physical or biological features" of habitat, as well as actions that "preclude or significantly delay development of such features." 50 C.F.R. § 402.02.

85.     FWS must also provide "a statement of incidental take, if such take is reasonably certain to occur." *Id.* § 402.14(g)(7). A biological opinion must address incidental take "in the context of other incidental take authorized by FWS." *Defenders of Wildlife v. Babbitt*, 130 F. Supp. 2d 121, 127 (D.D.C. 2001).

86.     An action agency cannot rely on a faulty biological opinion to fulfill its substantive Section 7 duties to ensure its actions do not jeopardize the continued existence or destroy or adversely modify critical habitat of ESA-listed species. *Defenders of Wildlife v. Envtl. Prot. Agency*, 420 F.3d 946, 976 (9th Cir. 2005) (rev'd on other grounds, *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644 (2007)).

87.     The Endangered Species Act itself provides a provision by which citizens may bring suit to enforce the Act against the federal government after providing written notice of at least 60 days. 16 U.S.C. §§ 1540(g)(1)(A) and (g)(2)(A)(i).

88.     "The APA governs judicial review of agency action challenged through the ESA citizen-suit provision." *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1105 n. 3 (10th Cir. 2010) (citations omitted).

89.     Failure by FWS to prepare an adequate biological opinion is reviewable under the APA. *Id.* (citations omitted).

**F.**     **Administrative Procedure Act**

90.     The Administrative Procedure Act provides for judicial review of final agency action for persons adversely affected or aggrieved by the agency action. 5 U.S.C. § 702. Final agency action exists that is subject to this Court's review under the APA, 5 U.S.C. § 702, NEPA, the CEQ regulations implementing NEPA, 40 C.F.R. § 1500.3 (judicial review of agency compliance with NEPA and the regulations is proper after an agency "has made a final finding of no significant impact (where such finding will result in action affecting the environment))," the NPS Organic Act, NPS regulations at 36 C.F.R. §§ 1.6 and 2.60, NPS Management Policies (2006), the ESA, ESA implementing regulations, Public Law 92-207 (Dec. 18, 1971), and Public Law 100-446 (Sept. 27, 1988).

91.     The APA requires a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A). An agency must "articulate[] a rational connection between the facts found and the decision made." *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1574 (10th Cir. 1994) (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Under this standard,

> [a]n agency's decision is arbitrary and capricious if the agency (1) entirely failed to consider an important aspect of the problem, (2) offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise, (3) failed to base its decision on consideration of the relevant factors, or (4) made a clear error of judgment.

*Superior v. U.S. Fish & Wildlife Serv.*, 913 F. Supp. 2d 1087, 1100-01 (D. Colo. 2012) (citing *New Mexico ex. rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 704 (10th Cir. 2009) (internal citations omitted)).

92.     Further, under the APA, agency action in excess of statutory authority must be set aside. 5 U.S.C. § 706(2)(C).

93.     Defendants NPS, Susan L. Fritzke, and Kate Hammond issued the FONSI and NID at issue here on October 3, 2018. Defendant FWS issued the Biological Opinion at issue here in October of 2018. Pursuant to the FONSI, NID, and BO, Defendant Susan L. Fritzke issued special use permits for livestock grazing and trailing in the Park beginning in October of 2018. Therefore, the FONSI, NID, Biological Opinion, and issuance of special use permits are subject to judicial review at this time.

## FACTS GIVING RISE TO WWP'S CAUSES OF ACTION

**A.     Selected Alternative for the Livestock Grazing and Trailing Management Plan**

94.     In addition to allowing continued livestock grazing in the Sandy 3 Allotment in Capitol Reef National Park, and continued livestock trailing on eight established routes, the selected alternative for the LGTMP also authorizes increased numbers of cattle trailing on three livestock trailing routes and designates two new livestock trailing routes. *See* LGTMP EA, pp. 2-5 to 2-9.

### i.     Livestock Stocking and Forage Utilization Rates for Sandy 3 Allotment

95.     In the LGTMP EA, NPS fails to examine whether the grazing allotment stocking rate carried forward in Alternative 2 from past practices is in fact appropriate. NPS states that "[c]ontinuous grazing methods can be sustainable if livestock are properly distributed across the landscape, appropriate stocking rates are applied, and the proper season of use is employed." LGTMP EA, p. 4-14 (citing Heady and Child 1994; Laycock et al. 1996).

96.     The selected alternative, Alternative 2, maintains the historic stocking rate for the Sandy 3 Allotment at 82 cow/calf pairs, or 410 animal unit months (AUMs), and the LGTMP EA undertakes no analysis of the appropriate stocking rate for the Sandy 3 Allotment based of forage production or condition.

97.     NPS similarly establishes a 45% upland vegetation utilization rate for the Sandy 3 Allotment, lowered to 25-30% during drought years despite evidence before NPS that stocking rates based on utilization over 25% "invariably leads to land degradation." LGTMP EA, Appendix C-5; *see also* Galt *et al.*, "Grazing Capacity and Stocking Rate," p. 8, *Rangelands*, (December 2000).

### ii.     Soils, Vegetation, and Other Park Resources

98.     NPS states that it developed Alternative 2 for the LGTMP EA "with recognition of the Bureau of Land Management's Utah Standards for Rangeland Health (BLM 1997) related to upland soils and vegetation" and other resources. LGTMP EA, p. 2-6. The Bureau of Land Management has an explicit multiple-use mission embedded in its operative statute, the Federal Land Policy and Management Act. Congress mandated a very different standard of care and protection for units of the National Park System: no impairment of park resources, interpreted further by NPS's own policies as a prohibition on "unacceptable impacts" to park resources.

99.     Key components of soils in Capitol Reef National Park are biological soil crusts (BSC). BSC reduces erosion, adds atmospheric nitrogen to soils, and helps soils retain moisture. LGTMP EA, p. 3-1. According to NPS, biological soil crusts "are slow to respond to management changes, with some studies showing that soil crusts can take more than 40 years to

recover." *Id.*, p. 4-4. Loss of BSC caused by livestock grazing "is an important mechanism of desertification." *Id.*

100.    NPS asserts the LGTMP "would have an overall beneficial cumulative impact that would be largely driven by the retirement of the Hartnet Allotment from grazing." *Id.* at 4-10. However, the Hartnet Allotment retirement occurred as a result of a prior private transaction, and is not part of the LGTMP decision at issue in this case.

101.    "Recovery of soils would be a long-term process, occurring over decades to centuries," according to NPS. *Id.*, p. 4-6. NPS asserts, however, "in the short term (10-50 years)," biological soil crusts will reestablish and soils will stabilize. *Id.*

102.    NPS estimates the life of the LGTMP to be 20 years. *Id.*, p. 4-1.

103.    NPS's preferred and selected alternative proposes a pasture rotation system for the Sandy 3 Allotment that would result in a higher concentration of cattle in each pasture at a given time. *Id.*, p. 2-6.

104.    According to the LGTMP EA, "direct benefits to vegetation from pasture rotation versus continuous grazing in arid ecosystems are debatable." *Id.*, p. 4-21.

105.    NPS states that the level of recovery of soils in the Sandy 3 Allotment under this pasture rotation system is uncertain and unknown. LGTMP EA, p. 4-11.

106.    NPS admits the "majority of soils in the recently retired Hartnet allotment are already in a state of departure from reference conditions." *Id.*, p. 4-9.

107.    Trailing across the newly-designated Hartnet and Lower South Desert routes in the retired Hartnet Allotment would cause "increased bare ground, decreased biological soil

crust, increased susceptibility of soil to and soil loss from wind and water erosion, and decreased ability of soils to infiltrate and retain moisture and nutrients." *Id.*

108.    The selected alternative also allows increases in the number of livestock trailing on Pleasant Creek, Highway 24, and Divide Canyon routes, and thus increases impacts to soils along those routes. *Id.*

### iii.    Wilderness

109.    NPS manages lands recommended for wilderness under the same prescriptions as designated wilderness. LGTMP EA, p. 3-34.

110.    The grazed portion of the Sandy 3 Allotment contains around 9,000 acres of recommended wilderness in Capitol Reef National Park. *Id.*, p. 4-67.

111.    The established Gray Bench-Cathedral Valley, Pleasant Creek, Oak Creek, Dry Bench, and Divide Canyon livestock trailing routes cross through recommended wilderness within the Park, as does the newly-created Lower South Desert route. *Id.*, pp. 3-34 and 3-35.

112.    The selected alternative for the LGTMP includes new fence construction, stock pond refurbishment, and herbicide use within recommended wilderness in the Park. *Id.*, pp. 4-67 and 4-68.

113.    The LGTMP EA makes no mention of NPS Policies or Director's Order 41 regarding wilderness management except for an acknowledgement in the Errata that the selected alternative is inconsistent with both. Errata to the EA, p. ATT-2-6.

### iv.    Monitoring and Adaptive Management

114.    The selected alternative for the LGTMP purports to rely on monitoring and adaptive management to achieve desired conditions for Park resources, including for ESA-listed

plant species, designated critical habitat for Mexican spotted owls, and vegetation and soil conditions. *See* LGTMP EA, pp. 2-9 to 2-13. Adaptive management, by definition, is reactionary, not proactively protective.

115.    The selected alternative proposes <u>no proactive measures</u> to protect Park resources, despite recognition that ESA-listed plant species are on downward population trends, the designated critical habitat for Mexican spotted owls has been in non-functioning status for at least five years, and native vegetation and soil conditions are already greatly degraded throughout the Park and especially in the Sandy 3 Allotment, the retired Hartnet Allotment, and livestock trailing routes. *See id.*, pp. 3-2, 3-3, 3-4, 3-7, 3-19, 3-22, and 4-27.

116.    NPS admits its proposed monitoring and adaptive management program is dependent on funding availability and not certain to be implemented. *Id.*, p. 4-9.

117.    NPS further admits in the EA that its impacts analysis for the chosen Alternative 2 for the LGTMP are

> based on the expectation that funding would be available for Capitol Reef National Park to hire a range management specialist (or similar position), to purchase and install infrastructure, and to implement the monitoring and adaptive management necessary to achieve the desired conditions described in Appendix C. If funding is not available . . . then impacts under Alternative 2 would be similar to those described for Alternative 1 until funding is available and actions are implemented to meet desired conditions.

LGTMP EA, p. 4-1. NPS makes no commitment to withhold authorization of any actions proposed in the selected alternative of the LGTMP Environmental Assessment in the absence of such funding.

**B.      Finding of No Significant Impact**

118.     NPS "determined there will be no significant direct, indirect, or cumulative

impacts for any of the resources" it analyzed in the EA, despite the high number of "intensity"

factors applicable to the Park Service's development of the LGTMP. FONSI, p. 4.

119.     The FONSI characterized impacts to sensitive species in terms of percentages of

habitat and known populations affected range-wide, despite the importance of National Park

System lands for the species' survival, and downplayed the significance of impacts from

livestock grazing and increased trailing on ESA-listed plant species. *Id.*, p. 7.

120.     The FONSI glosses over the continued degradation of Mexican spotted owl

designated critical habitat in Oak Creek despite at least five years of consistent ecological non-

function. The agency merely expresses a hope that Oak Creek "moves toward [] proper

functioning condition" after at least five years of consistent non-functional status. *Id.*

121.     In large part, NPS relied on the "collective beneficial effects" of the Hartnet

Allotment's independent retirement to reach its FONSI, despite the LGTMP's adverse impacts.

*Id.*, p. 9.

**C.      Non-Impairment Determination**

122.     Attached to the FONSI, NPS included a non-impairment determination (NID) for

six resources: soils, upland and riparian vegetation communities, water resources, special status

plant species, Mexican spotted owl, and migratory and resident birds. NID, p. ATT-1-1.

123.     NPS concluded that each of the resources "will continue to be present in the park

for the enjoyment of future generations, and there will be no impairment of" each resource

identified. *See* NID, pp. ATT-1-3, 1-4, 1-5, 1-6, 1-7, and 1-9. For most resources, NPS relied on

the "overall beneficial cumulative effect" of the Hartnet Allotment's retirement to support its

NID, despite the allotment retirement occurring independently from the LGTMP. *Id.*, pp. ATT-1-

2, 1-4, 1-5, 1-6, and 1-9.

124.    Although the NID purported to be "guided by the direction of NPS Management

Policies 2006," the NID made no mention of the Policies' prohibition against unacceptable

impacts to Park resources, or its direction to proactively conserve and protect threatened and

endangered species. The NID does not state whether the impacts to Park resources will impede

the attainment of desired conditions, are inconsistent with the Park's purposes or values, or

diminish current or future opportunities to enjoy Park resources.

125.    The NID contained no mention of a waiver or modification of the Policies by the

Secretary, Assistant Secretary, or Director of the Park Service, despite the Errata attached to the

FONSI admitting the selected alternative was not consistent with those Policies.

**D.      ESA-Listed Species**

**i.      ESA-Listed Plant Species**

126.    The selected alternative authorizes two newly-designated livestock trailing routes

through the retired Hartnet Allotment that affect federally-protected plant species: the Hartnet

trail, which follows the Hartnet Road, and the Lower South Desert trail, which leads northward

through the Lower South Desert from the Fremont River then veers sharply east toward the

Lower South Desert Overlook. LGTMP EA, pp. 2-8 to 2-9. The newly designated trailing routes

closely overlap with the areas cattle concentrated during grazing prior to the retirement of the

Hartnet Allotment due to natural geographic constraints. *See* Administrative Record at

NPS0002234.

127.    Both newly-designated trailing routes cross ESA-listed plant species populations and habitat, as does the previously established Gray Bench-Cathedral Valley livestock trailing route. LGTMP EA, p. 3-20.

128.    Under the selected alternative for the LGTMP authorizes up to 180 cattle to trail along the Gray Bench-Cathedral Valley route and up to 200 cattle to trail along the Lower South Desert route each fall and possibly in spring. *Id.*, pp. 2-3, 2-9, and 3-36. NPS permits up to 150 cattle to trail along the Hartnet route during fall and also during spring in some years. *Id.*, p. 2-9.

### a.    Winkler cactus (*Pediocactus winkleri*)

129.    FWS listed the Winkler cactus as threatened under the ESA in 1998. 63 Fed. Reg. 44587 (Aug. 20, 1988). The Winkler cactus is endemic to Wayne County, Utah, and a small portion of Sevier County, Utah. Biological Assessment, p. 6-6 (NPS 2018). The Winkler cactus appears above-ground in spring when it flowers and produces seeds. LGTMP EA, p. 3-21. It retracts underground during summer heat and through the winter. *Id.* Capitol Reef National Park contains 40 to 50% of its total range, with the remainder found primarily on lands administered by the BLM. Biological Assessment, p. 6-6.

130.    FWS identified livestock trampling as adversely affecting the species. Biological Opinion, p. 5 (FWS 2018). Cattle trampling destroys the physical components of the Winkler cactus that enable it to flower and reproduce. Biological Assessment, p. 7-7. Cattle also reduce suitable habitat for the cactus by compacting soil. *Id.* A lack of disturbance is key to the survival of the largest, most reproductive individuals to sustain a population. *Id.*, p. 7-8.

131.    Half of known Winkler cactus populations are small, with fewer than 500 individual plants. Draft Recovery Plan, Winkler Cactus and San Rafael Cactus, p. 73 (FWS

2015). The other half of Winkler cactus populations "may be at risk of being fragmented into small populations." Draft Recovery Plan, p. 73. FWS found it "likely that population sizes of at least 500 individuals per population are necessary to avoid extirpation." *Id.*

132.     NPS acknowledges that "every adult cactus in a population is critical, and any impact that increases adult mortality would adversely affect overall population survival." Biological Assessment, p. 7-9 (NPS 2018). Data shows Winkler cactus mortality exceeds survival, resulting in a downward population trend. *Id.*

133.     Extirpation, or local extinction, of Winkler cactus populations has already occurred within the retired Hartnet Allotment. Draft Recovery Plan, p. 60.

134.     The Gray-Bench Cathedral Valley, Hartnet, and Lower South Desert trailing routes all contain habitat for Winkler cactus. LGTMP EA, p. 3-20. There are documented individual cacti on the Hartnet and Lower South Desert routes. *Id.*

135.     NPS determined issuance of livestock trailing permits through these routes is likely to adversely affect the Winkler cactus. Biological Assessment, p. 8-8.

### b.     Wright Fishhook Cactus (*Sclerocactus wrightiae*)

136.     FWS listed the Wright fishhook cactus as endangered under the ESA in 1979. 44 Fed. Reg. 58868 (Oct. 11, 1979). Cattle are a primary threat to the species. Biological Opinion, p. 5 (FWS 2018); Biological Assessment, p. 7-3. About 9% of the plant's total range is in Capitol Reef National Park. Biological Assessment at 6-1. Around 90% of the plant's range occurs within active grazing allotments. Biological Opinion, p. 10. The oldest, largest individuals are the most reproductive. Biological Assessment at 6-4. Trampling destroys the reproductive components of the Wright fishhook cactus, and cattle also reduce suitable habitat by compacting

soil. Biological Assessment at 7-4. Larger individuals are "largely absent" in habitat with livestock disturbance, resulting in reduced population growth. Biological Opinion, p. 11. Data shows mortality exceeds recruitment and the Wright fishhook cactus is on a downward population trend. Biological Assessment at 6-5. Individual survival is key to population growth. LGTMP EA, p. 3-19.

137.    The Gray Bench-Cathedral Valley, Hartnet, and Lower South Desert trailing routes all contain habitat for and documented individuals of Wright fishhook cactus. *Id.*

138.    NPS determined issuance of livestock trailing permits through these routes is likely to adversely affect the Wright fishhook cactus. Biological Assessment, p. 8-7.

### c.    Last Chance Townsendia (*Townsendia aprica*)

139.    FWS listed the Last Chance townsendia as threatened under the ESA in 1985. 50 Fed. Reg. 33734 (Aug. 21, 1985). Last Chance townsendia is endemic to Emery, Sevier, and Wayne counties in Utah. Biological Assessment, p. 6-7. Capitol Reef National Park contains 25% of the occupied habitat of Last Chance townsendia. *Id.*

140.    FWS identified livestock as a high threat to the species. Biological Opinion, p. 13.

141.    The Gray Bench-Cathedral Valley and Hartnet trailing routes contain habitat for Last Chance townsendia. LGTMP EA, p. 3-20. Documented individuals occur along the Hartnet route. *Id*.

142.    NPS determined issuance of livestock trailing permits through these routes is likely to adversely affect the Winkler cactus. Biological Assessment, p. 8-9.

ii.    **Mexican Spotted Owl (*Strix occidentalis lucida*)**

143.    NPS also identified the Mexican spotted owl and its designated critical habitat as likely to be adversely affected by livestock trailing authorized pursuant to the LGTMP. Biological Assessment, pp. 8-11 and 8-17.

144.    FWS listed the Mexican spotted owl as threatened under the ESA in 1993. 58 Fed. Reg. 14248 (Mar. 16, 1993). FWS designated critical habitat for the owl in 2004. 69 Fed. Reg. 53181 (Aug. 31, 2004).

145.    FWS adopted a revised recovery plan for the owl in December of 2012. 77 Fed. Reg. 74688 (Dec. 17, 2012). The revised recovery plan identifies five Ecological Management Units (EMUs) for the owl. Recovery Plan, First Revision, p. 7 (FWS 2012). Capitol Reef National Park lies within the Colorado Plateau EMU. Biological Opinion, p. 22.

146.    Federal lands, and NPS lands in particular, are important for the Mexican spotted owl. Recovery Plan, First Revision, p. 10. 64% of documented owl sites in the Colorado Plateau EMU occur on NPS lands. *Id.* Livestock grazing occurs throughout the owl's range, and negatively affects the availability of cover and food for the owl's prey. Biological Opinion, p. 19. The revised recovery plan for the owl considers riparian habitats important to owl recovery. LGTMP EA, p. 3-25.

147.    Oak Creek and Pleasant Creek are within designated critical habitat and provide important foraging habitat for Mexican spotted owls in the Park. Biological Opinion, p. 23; LGTMP EA, p. 3-28.

148.    The selected alternative for the LGTMP authorizes approximately 250 cattle to trail along the Pleasant Creek route each fall, and approximately 1,100 cattle to trail along the Oak Creek route both in spring and fall. LGTMP EA, p. 2-3.

149.    NPS used a protocol known as "proper functioning condition" (PFC) to gauge the health streams in Capitol Reef National Park, including Oak Creek. *Id.*, p. 3-15. PFC is not specifically designed to assess Mexican spotted owl habitat function, but rather to assess the functioning of physical processes in riparian and wetland areas. *Id.*, p. C-3. Primarily used by the BLM, Forest Service, and Natural Resources Conservation Service, the protocol is most applicable toward a determination whether a stream possesses the minimal physical traits and function to withstand high-flow events. *See* Proper Functioning Condition Assessment for Lotic Areas, Technical Reference 1737-15, Second Edition, p. 2 (USFS, NRCS, BLM 2015).

150.    Oak Creek has been rated as "non-functional" riparian habitat since at least 2014 due to cattle impacts. LGTMP EA, p. 3-28. Of the portion of Oak Creek used for cattle trailing, only 20 to 25% supports riparian vegetation. *Id.* Only 10% supports herbaceous riparian vegetation. *Id.* This non-functional condition limits Oak Creek's ability to maintain an adequate prey base for Mexican spotted owls. *Id.*

151.    Both NPS and FWS acknowledge livestock trailing through Oak Creek contributes to its non-functional condition. LGTMP EA, pp. 3-34 and 4-27; Biological Opinion, p. 35.

152.    However, NPS lays primary blame for Oak Creek's non-functional status on unauthorized or trespass cattle use of Oak Creek, which is unfenced at the Park boundary. LGTMP EA, p. 3-17; 2014 Biological Assessment, p. 25 (NPS 2014).

153.    NPS only commits to taking further measures to protect this important foraging habitat for Mexican spotted owls if Oak Creek does not achieve proper functioning condition by 2023. LGTMP EA, p. 4-43.

**iii.    Biological Opinion for the Issuance of Special Use Permits**

154.    In October of 2018, FWS produced a "Biological Opinion for the Issuance of Special Use Permits for Livestock Grazing and Trailing in Capitol Reef National Park" with the assigned code FWS/R6/ES/UT 06E23000-2018-F-0477. Larry Crist, Utah Field Supervisor for Ecological Services within FWS, signed this Biological Opinion.

155.    The BO purported to evaluate livestock grazing and trailing impacts to the three listed plant species, as well as the Mexican spotted owl and designated critical habitat for the Mexican spotted owl.

156.    FWS limited the "action area" considered in its analysis to the boundaries of Capitol Reef National Park, even though livestock trailing facilitates livestock grazing on allotments on National Forest and BLM-managed lands adjacent to the Park, as well as nearby private parcels. Biological Opinion, p. 3.

157.    FWS limited its analysis to impacts occurring within the Park itself, not indirect and cumulative impacts occurring on adjacent non-Park lands facilitated by livestock trailing permits issued by NPS. *Id.*

158.    In reaching a "no jeopardy" opinion for the three listed plant species, FWS premised its conclusions on "Applicant Committed Conservation Measures" set forth by NPS. Biological Opinion, pp. 3, 4, and 35. These "conservation measures" do not require any proactive management to protect listed species or habitat from damage or disturbance.

159.   Instead, NPS proposed annual monitoring "one week after the trailing event to quantify trampling and disturbance to individual plants at selected localities." Biological Opinion, p. 3. "Corrective actions will be implemented along trailing routes" only in response to damage or disturbance above certain thresholds observed during post-trailing monitoring at the selected localities. *Id.*, pp. 3 and 4. For all three listed plant species, the damage threshold is equal to or greater than five percent of individuals showing damage at the selected localities actually monitored. Errata, p. ATT-2-2. For Winkler cactus and Last Chance townsendia, the disturbance threshold is also five percent; it is 15 percent for Wright fishhook cactus. *Id.*

160.   The "applicant committed conservation measures" include a stated intention to cease monitoring "in cactus occupied habitat that experience no livestock damage or disturbance for three consecutive years." Biological Opinion, p. 4.

161.   In its Biological Opinion, FWS cites the Park Service's "commitment to coordinate with Forest Service staff and the livestock grazing permit holders to eliminate cattle trespass in the Oak Creek drainage." *Id.*, p. 37.

162.   This exact same "commitment" by NPS has been relied upon in each of the two previous biological opinions prepared by FWS regarding livestock trailing special use permits for Oak Creek. *See* 2015 Biological Opinion, p. 43 (FWS 2015); *see also* 2017 Biological Opinion, p. 6 (FWS 2017). Yet, by NPS's own admission, "[d]espite repeated attempts through correspondence, meetings, and phone calls with the permit holder, the NPS has been unsuccessful at eliminating unauthorized cattle use of Oak Creek." Biological Assessment, p. 8-16 (NPS 2018).

163.     NPS states that trespass cows were found in Oak Creek in June of 2015, July,

September, October, and November of 2016, and May of 2017. 2017 Biological Assessment, p.

32 (NPS 2017). In July of 2018, trespass dying and dead cattle in Oak Creek made Utah state

news. *See* https://www.stgeorgeutah.com/news/archive/2018/07/27/jmr-cattle-found-dead-dying-

of-starvation-in-capitol-reef/#.XMIx0-hKjIV (last visited Feb. 7, 2020).

164.     NPS has conceded that its failure to eliminate unauthorized cattle use of Oak

Creek may continue indefinitely: "[G]iven the Park's unsuccessful attempts to remove

unauthorized cattle, the outcome is uncertain." Biological Assessment, p. 8-16 (NPS 2018).

165.     "Proper functioning condition" is a qualitative assessment of riparian-wetland

condition, using a checklist of standards. LGTMP EA, p. C-3. For Oak Creek, NPS has found its

riparian vegetation lacks age and composition diversity, the species present did not exhibit vigor,

and the species present did not exhibit the ability to maintain soil moisture characteristics or

withstand and dissipate high stream flows. Oak Creek PFC Form (NRCS 2014).

166.     NPS admits "[t]he nonfunctioning condition of Oak Creek also indicates

degradation of the MSO's designated critical habitat," as well as degradation of the "primary

constituent elements" to maintain an adequate prey base for the owl. Biological Assessment, p.

7-12.

167.     According to FWS, "[l]ivestock trailing within Oak Creek will <u>continue</u> to

negatively affect the density and abundance of native vegetation, water temperature, and habitat

for prey species" in Oak Creek. Biological Opinion, p. 35 (emphasis added).

168.     The BO did not mention or consider incidental take of Mexican spotted owl

authorized or anticipated through other biological opinions across the Colorado Plateau EMU,

but authorized the take of up to one breeding pair of owls and their young in an "Incidental Take Statement." *Id.*, pp. 36 and 37.

169.     The BO concluded the impacts from issuance of special use permits would not jeopardize the continued existence of listed species or adversely modify or destroy designated Mexican spotted owl critical habitat. *Id.*, p. 35.

**E.     Lower South Desert and Hartnet Trailing Special Use Permits**

170.     WWP submitted a FOIA request to NPS on October 6, 2018, seeking evidence of traditional use of the newly-created Lower South Desert route prior to December 19, 1971, as Congress expressly authorized in the Park's enabling legislation.

171.     NPS produced no documentation indicating that a traditional livestock trailing route existed at the time of the Park's establishment between Highway 24 and the Fremont River to the Lower South Desert Overlook, the approximate route described in the LGTMP Environmental Assessment for the newly-created Lower South Desert trailing route.

172.     Instead, NPS provided WWP with certain documents the agency had collected in 1980 in order to clarify what traditional livestock trailing routes existed in the Park. On April 2, 1980, NPS sent letters to Capitol Reef National Park livestock trailing permittees. Signed by the Park Superintendent at that time, Derek Hambly, the letter noted:

> There is little in the way of documentation showing which families were actively trailing stock through the Park at the time of the enabling legislation. Our request was an attempt to make such documentation so that rights included in the legislation could be protected.

Through this letter, then, the Park Superintendent specifically requested permittees to identify "the route(s) you use to take your stock through the park." Letter from Superintendent Hambly (April 2, 1980).

173.     Specific to the retired Hartnet Allotment, NPS provided a response from Richard

Pace describing the following livestock trailing routes in handwritten text:

> Torrey through Fruita to South Desert → Fall
> South Desert through Fruita to Torry [sic] → Spring
> Blue Flat to Thousand Lake Mt. → spring fall

174.     NPS also provided handwritten text from Don Pace describing the following

livestock trailing routes:

> Torrey through park hwy 24, through Grand Wash, to South Desert.
> Blue Flat to Alklain Spring [sic] up road to Thousand Lake Mt.
> Out of head South Desert to Thousand Lake Mt.

175.     The description, "Torrey through Fruita to South Desert" indicates use of

Highway 24 through the Park. The description, "Blue Flat to Thousand Lake Mt." indicates use

of the Hartnet Road (the newly-designated Hartnet trailing route) to connect grazing allotments

on National Forest lands to the west of the Park with grazing allotments on BLM lands to the

east of the Park.

176.     Similarly, the description "Torrey through park hwy 24, through Grand Wash, to

South Desert" indicates use of Highway 24 and the Grand Wash to reach the Lower South Desert

itself. The description by Don Pace, "Blue Flat to Alklain Spring[1] up road to Thousand Lake

Mt." appears to parallel Richard Pace's description of "Blue Flat to Thousand Lake Mt." The

description "Out of head South Desert to Thousand Lake Mt." may indicate Don Pace trailed

cattle from the South Desert to Thousand Lake Mountain. Thousand Lake Mountain is located to

the west of the Park. The Lower South Desert Overlook is on the east side of the Park. "Out of

---

[1] "Alklain Springs" likely refers to Ackland Spring, located along the Hartnet Road.

head South Desert to Thousand Lake Mt." does not correspond to the newly-created Lower South Desert livestock trailing route as described in the LGTMP Environmental Assessment.

177.    In an email exchange dated June 8, 2018, Sandy Borthwick, biologist for Capitol Reef National Park, asserts "the trail through the Lower South Desert we refer to as a new trailing route isn't really new. According to the Hartnet permit holders they have always used that route to get cattle to the BLM portion of their Hartnet Allotment."

178.    There is no evidentiary basis for this assertion aside from Ms. Borthwick's apparent acceptance of the statement by the Paces, the former permit holders. This assertion runs counter to the route descriptions provided by the Paces in response to the Park Superintendent's April 2, 1980, letter, which include a route that matches the newly-designated Hartnet trailing route, but do not include a route that matches the Lower South Desert trail route as described in the LGTMP Environmental Assessment.

179.    NPS also provided a chapter from Volume II of a document titled "From Barrier to Crossroads: An Administrative History of Capitol Reef National Park, Utah," authored by Bradford J. Frye on behalf of the Park Service. The document, dated 1998, appears to have been prepared near the time NPS released an Environmental Impact Statement for a General Management Plan for Capitol Reef National Park. The chapter provided by NPS, Chapter 12, is titled "Grazing and Capitol Reef National Park: A Historic Study."

180.    None of the descriptions contained in Chapter 12 nor the additional stock driveways noted by the author in the 1974 Wilderness Proposal correspond with the newly-created Lower South Desert livestock trailing route from Highway 24 north to Jailhouse Rock, then east out of the Park via the Lower South Desert Overlook.

181.    The Environmental Assessment for the LGTMP includes the following language:

[T]he National Park Service has recently received a request to [sic] for trailing permits on two additional routes through the recently retired Hartnet allotment from the permit holder that relinquished the rights to grazing on Capitol Reef. Both permits would be issued along traditional trails and are referred to as the Hartnet trail and the Lower South Desert trail.

*See* LGTMP EA, p. 1-5.

182.    The Environmental Assessment notes on several occasions "the exact trailing route up the southern part of the Lower South Desert is unknown." *See id.*, pp. 3-20 and 4-39.

**F.    Livestock Grazing and Trailing Special Use Permits**

183.    The National Park Service produced a document titled "Grazing Guide, Capitol Reef National Park, April 2011." In this document, NPS acknowledges that it has issued livestock trailing permits to Richard Fillmore for the Oak Creek and Notom Road routes and Boone Taylor for the Oak Creek route. Grazing Guide, p. 7. The same document notes that Richard Fillmore has been running cattle on the Sandy 3 Allotment within Capitol Reef National Park under Boone Taylor's permit, rather than his own permit. *Id.*, p. 2. On August 8, 2018, Mr. Fillmore submitted comments at a public meeting expressing concern about stock ponds, fencing, and conditions on the Sandy 3 Allotment described in the LGTMP EA, indicating his continued use of the allotment to graze cattle. Administrative Record at NPS0005032. Richard Fillmore was not an owner or operator, or an heir or direct descendant of permit holders, at the time of the Park's establishment, contrary to the eligibility criteria for livestock trailing and grazing Congress specified in Public Laws 92-207 and 100-446.

184.    In the same "Grazing Guide" document, the Park Service admitted that Boone Taylor signs permits for the Taylor Ranch. Grazing Guide, p. 2. Boone Taylor is the nephew of

Jean Gillespie, the current permit holder, not an heir or direct descendant of the Sandy 3

Allotment permit holders at the time of the Park's establishment. *See* Administrative Record at

NPS0031631; *see also* Grazing Guide, p. 2. Jean (LuJean Taylor) Gillespie is the daughter of

Don and Afton Taylor, the permit holders at the time of the Park's establishment. *Id.* To the best

of WWP's knowledge, Jean Gillespie lives in Blackfoot, Idaho, and is the sole remaining direct

descendant of Don and Afton Taylor. *See* https://www.springerturner.com/obituaries/Afton-B-

Taylor?obId=5666796#/obituaryInfo (last visited Feb. 7, 2020). All permit signatures, ranch

operations, and decisions are made by Boone Taylor. Grazing Guide, p. 2; Administrative

Record at NPS0031631.

### FIRST CAUSE OF ACTION
**Violation of 1988 Park-Specific Legislation, NPS Organic Act, and APA**
*(Unlawful Issuance of Livestock Grazing Permits to Parties Specifically Barred by Statute)*

185.    WWP incorporates by reference all preceding paragraphs.

186.    Under regulations promulgated pursuant to authority under the NPS Organic Act,

livestock use of a unit of the National Park System is prohibited except when "specifically

authorized by Federal statutory law," unless another exception applies. 36 C.F.R. § 2.60(a).

187.    Further, a superintendent may not issue a special use permit unless

> consistent with applicable legislation, Federal regulations and administrative
> policies, and based upon a determination that . . . environmental and scenic
> values, natural or cultural resources, scientific research, implementation of
> management responsibilities . . . or the avoidance of conflict among visitor use
> activities will not be adversely impacted.

36 C.F.R. § 1.6(a).

188.    Under the 1988 legislation relevant to Capitol Reef National Park, Congress

allowed continued livestock grazing within the Park during the lifetime of those persons who

prior to the establishment of the Park grazed "pursuant to a lease, permit, or license issued or authorized by any department, establishment, or agency of the United States." Pub. L. 100-446 (Sept. 27, 1988). Congress extended the privilege of grazing within the Park to "the heirs of such person or persons" during the heirs' lifetimes, as well as "any direct descendants (sons or daughters) born on or before the enactment" of the Park's enabling legislation (December 18, 1971). *Id.*

189.     In a document titled "Grazing Guide, Capitol Reef National Park, April 2011," the Park Service admitted that Boone Taylor signs permits for the Taylor Ranch. Grazing Guide, p. 2. Boone Taylor is the nephew of Jean Gillespie, the permit holder. *Id.*; *see also* Administrative Record at NPS0031631. Jean (LuJean Taylor) Gillespie is the daughter of Don and Afton Taylor, the permit holders at the time of the Park's establishment. *Id.* All permit signatures, ranch operations, and decisions are made by Boone Taylor. *Id.*

190.     Upon information and belief, WWP contends Boone Taylor is not a lawful permittee under the plain language of the 1988 legislation, as he is not a direct descendant (son or daughter) of a permit holder or heir, nor was he born on or before December 18, 1971.

191.     In the "Grazing Guide" document, the Park Service also notes that Richard Fillmore runs cattle on the Sandy 3 Allotment under the Taylor permit, a practice which appears to continue. *Id.*; *see* Administrative Record at NPS0005032. Upon information and belief, WWP contends Richard Fillmore is not a direct descendant of a Sandy 3 Allotment permit holder or heir.

192.     WWP asserts the Park Service has unlawfully issued special use permits for grazing on the Sandy 3 Allotment that allows use by non-eligible parties who did not hold

permits prior to the Park's establishment, are not heirs to permit holders, and are not direct descendants of permit holders born on or before December 18, 1971.

193.    Further, WWP asserts NPS has issued such permits in contravention to federal law and has failed to make determinations that environmental and scenic values, natural and cultural resources, scientific research, implementation of management responsibilities, and avoidance of conflict among visitor use activities will not be adversely impacted, in violation of 36 C.F.R. § 2.60(a)(1) and 36 C.F.R. § 1.6(a).

194.    As such, issuance of such special use permits for livestock grazing in the Sandy 3 Allotment are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," as well as in excess of statutory authority, and NPS and Superintendent Fritzke are in violation of Public Law 100-446 and the NPS Organic Act. WWP seeks declaratory and injunctive relief to prohibit NPS from issuing special use permits for livestock grazing in the Sandy 3 Allotment for non-eligible individuals and entities going forward.

## SECOND CAUSE OF ACTION
### Violation of Enabling Legislation, NPS Organic Act, and APA
*Unlawful Issuance of Livestock Trailing Permits Specifically Barred by Statute)*

195.    WWP incorporates by reference all preceding paragraphs.

196.    Under regulations promulgated pursuant to authority under the NPS Organic Act, livestock use of a unit of the National Park System is prohibited except when "specifically authorized by Federal statutory law," unless another exception applies. 36 C.F.R. § 2.60(a).

197.    Further, a superintendent may not issue a special use permit unless

consistent with applicable legislation, Federal regulations and administrative policies, and based upon a determination that . . . environmental and scenic values, natural or cultural resources, scientific research, implementation of management responsibilities . . . or the avoidance of conflict among visitor use activities will not be adversely impacted.

SECOND AMENDED COMPLAINT - 49

36 C.F.R. § 1.6(a).

198.    Under the 1971 enabling legislation for Capitol Reef National Park, Congress

limited livestock trailing to traditional routes in use prior to the establishment of the Park, and

further limited livestock trailing to specific parties who in fact used those traditional routes prior

to the establishment of the Park, using the following language:

> Nothing in this Act shall be construed as affecting in any way rights of owners and
> operators of cattle and sheep herds, existing on the date immediately prior to the
> enactment of this Act, to trail their herds on traditional courses used by them prior to such
> date of enactment, and to water their stock, notwithstanding the fact that the lands
> involving such trails and watering are situated within the park: *Provided*, That the
> Secretary may promulgate reasonable regulations providing for the use of such
> driveways.

Pub. L. 92-207 (An Act to establish the Capitol Reef National Park in the State of Utah) (Dec.

18, 1971).

199.    Prior to public disclosure of potentially permitted trailing routes through the

retired Hartnet Allotment, and prior to undertaking required environmental analysis, NPS and

FWS committed to support new livestock trails, with FWS specifically naming Hartnet Road and

the Lower South Desert as examples. *See* Administrative Record at FWS0000271 and

FWS0007372.

200.    Upon information and belief, WWP asserts the newly-created Lower South Desert

livestock trailing route is not a traditional route under the enabling legislation for the Park.

201.    Based on information received in response to WWP's FOIA request, as well as the

Park Service's lack of knowledge of the exact location of the Lower South Desert livestock

trailing route, WWP asserts the Lower South Desert trailing route as authorized in the LGTMP

and the use of which NPS authorized by special use permits are contrary to the express language of the enabling legislation for Capitol Reef National Park.

202.     Upon information and belief, WWP asserts the National Park Service has issued special use permits and intends to issue special use permits for livestock trailing across the Park to "owners and operators of cattle and sheep herds" not "existing on the date immediately prior to the enactment of" the enabling legislation for Capitol Reef National Park, nor trailing herds on "traditional courses used by them prior to such date of enactment."

203.     Given the information disclosed in the "Grazing Guide" document, WWP reasonably suspects Mr. Fillmore and Mr. Taylor were not "owner or operators . . . existing on the date immediately prior to the enactment of" the enabling legislation for Capitol Reef National Park, nor users of the traditional Oak Creek livestock trailing route "prior to such date of enactment" and thus are not eligible for special use permits to trail livestock through Oak Creek.

204.     In light of this revelation in the Park Service's "Grazing Guide" document, WWP reasonably suspects NPS has issued and intends to issue future livestock trailing special use permits to other individuals or entities who do not meet the criteria established by Congress to trail livestock across the Park.

205.     Further, WWP asserts such permits are not authorized by federal law nor based on determinations that environmental and scenic values, natural and cultural resources, scientific research, implementation of management responsibilities, and avoidance of conflict among visitor use activities will not be adversely impacted, as required by 36 C.F.R. § 2.60(a)(1) and 36 C.F.R. § 1.6(a).

206.    As such, issuance of such special use permits for livestock trailing are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law, as well as in excess of statutory authority, and NPS and Superintendent Fritzke are in violation of Public Law 92-207 and the NPS Organic Act. WWP seeks declaratory and injunctive relief to prohibit NPS from issuing special use permits for livestock trailing across the Park for non-eligible routes, and to non-eligible individuals and entities going forward.

### THIRD CAUSE OF ACTION
### Violation of NPS Organic Act and APA
*(Failure to Prevent Impairment or Unacceptable Impacts to Park Resources)*

207.    WWP incorporates by reference all preceding paragraphs.

208.    The National Park Service Organic Act of 1916, now codified at 54 U.S.C. § 100101, lays out a strict conservation mandate prohibiting the impairment of Park resources. Lands within the National Park System must be afforded the highest standard of protection and care of any federal land management designation. *Southern Utah Wilderness All. v. Nat'l Park Serv.*, 387 F. Supp. 2d 1178, 1191 (D. Utah 2005) (citing S. Rep. No. 95-528).

209.    Prior to authorizing actions within a National Park System unit, the Park Service's management policies require the decision-maker to "consider the impacts of the proposed action and determine, in writing, that the activity will not lead to impairment of park resources and values." NPS Management Policies § 1.4.7 (2006). This is called a "non-impairment determination" (NID).

210.    In addition to non-impairment, NPS Policies require the agency to avoid even "unacceptable impacts," defined as those impacts that would "be inconsistent with a park's purposes or values," "impede the attainment of a park's desired future conditions," and "diminish

opportunities for current or future generations to enjoy . . . park resources or values." NPS

Management Policies § 1.4.7.1 (2006).

211.     For each of the six special resources NPS identified (soils, vegetation, water

resources, special status plant species, Mexican spotted owls, and other birds), the brief NID

repeated, cursorily and nearly verbatim, that the resource "will continue to be present in the park

for the enjoyment of future generations, and there will be no impairment" of Park resources.

NID, ATT-1-3 to ATT-1-8. But mere continued presence within the Park does not equate to no

impairment of or no unacceptable impacts to Park resources.

212.     NPS completely failed to examine whether the grazing stocking and forage

utilization rates are appropriate, despite its mandate to protect Park resources and evidence of

diminished forage production on the Sandy 3 Allotment.

213.     NPS states the desired condition for federally listed species "is to improve habitat

for each species, to ensure their continued existence, and to promote their recovery." LGTMP

EA, p. C-3.

214.     But the LGTMP allows adverse impacts, including direct damage and disturbance

through livestock trampling, to three ESA-listed plant species, as well as important foraging

habitat for Mexican spotted owls. These impacts are inconsistent with the Park's values, impede

the attainment of desired future conditions, and diminish opportunities for current and future

generations to enjoy the species in the Park.

215.     The LGTMP allows adverse impacts through continued degradation of the

Mexican spotted owl's designated critical habitat. These impacts impede the attainment of

desired future conditions, and diminish opportunities for current and future generations to enjoy the Mexican spotted owl and fully-functioning habitat in the Park.

216.    The desired conditions of rangelands in the Park are "diverse and ecologically complex, dominated by native grass, grass-like plants, forbs, and shrub communities," with "stable, non-degraded soils, and properly functioning hydrologic and biotic processes that are vital to the persistence and resilience of the range." LGTMP EA, p. C-1.

217.    Yet NPS also states that "[e]fforts to return grazed rangelands to natural conditions (reference conditions) will not begin until livestock grazing has ceased in the park." *Id.*

218.    The LGTMP further allows continued damage to native vegetation, soils, and biological soil crusts through livestock grazing and increased livestock trailing in the Park. These continued adverse impacts impede the attainment of desired future conditions, and diminish the opportunity of current and future generations to enjoy the Park's resources.

219.    Contrary to its mandate to provide the highest level of protection to the resources it manages, NPS has indicated that it does not believe it is required to provide greater protection to listed species and other Park resources than agencies like the Bureau of Land Management. *See* Response to Substantive Public Comments, pp. ATT-3-14, 3-15, and 3-16.

220.    Because NPS has failed to prevent impairment of and unacceptable impacts to Park resources through adoption of the LGTMP and issuance of special use permits for livestock grazing and trailing, its actions are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law" and the LGTMP, Environmental Assessment, FONSI, non-impairment determination, and special use permits must be set aside. 5 U.S.C. § 706(2)(a).

## FOURTH CAUSE OF ACTION
### Violation of NPS Organic Act and APA
*(Failure to Consider Applicability of NPS Management Policies
and Other Directives to Livestock Grazing and Trailing)*

221.     WWP incorporates by reference all preceding paragraphs.

222.     An agency violates its operative statute and the APA "by completely disregarding its own policies" during decision-making and management "without discussion or analysis" in the accompanying NEPA documents. *See Western Watersheds Proj. v. Salazar*, 2011 WL 4526746, *17 (D. Idaho Sept. 28, 2011) (citing *Atchinson v. Wichita Bd. of Trade*, 412 U.S. 800, 808 (1973) for the proposition that "where [an] agency modifies or overrides its longstanding precedents or policies, it 'has the duty to explain its departure from prior norms.'"); *see also Cotton Petroleum Corp. v. U.S. Dep't of Interior*, 870 F.2d 1515, 1526 (10th Cir. 1989).

223.     "Agencies are under an obligation to follow their own regulations, procedures, and precedents, or provide a rational explanation for their own departure." *Utahns for Better Transp. v. U.S. Dep't of Transp,*, 305 F.3d 1152, 1165 (10th Cir. 2002).

224.     Where the purpose of an agency's policies is to ensure compliance with its operative legislation, it is arbitrary and capricious for the agency to ignore those policies while claiming its actions were developed in compliance with them. *Ecology Ctr. v. Austin*, 430 F.3d 1057, 1069-70 (9th Cir. 2005) (overruled on other grounds by *The Lands Council v. McNair*, 537 F.3d 981 (9th Cir. 2008); *see also Rocky Mountain Wild v. Vilsack*, 843 F. Supp. 2d 1188, 1196 (D. Colo. 2012).

225.     NPS failed to apply the text of its own Policies and other directives in the LGTMP Environmental Assessment regarding impairment and unacceptable impacts to Park

resources, ESA-listed species, wilderness qualities, water resources, special use permits, and livestock management.

226.    NPS stated the direction contained in the NPS Management Policies guided its non-impairment determination, yet admits the LGTMP as adopted is inconsistent with those Policies. *See* NID, p 1-9; *see also* Errata, p. 2-6.

227.    Nowhere within the LGTMP Environmental Assessment did NPS apply or consider its own Policies on preventing impairment and unacceptable impacts to Park resources, despite this forming the core mandate of the National Park Service.

228.    The LGTMP Environmental Assessment included minimal language from the NPS Management Policies regarding listed species. It states: "the National Park Service 'will survey for, protect, and strive to recover all species native to national park system units that are listed under the Endangered Species Act.'" EA, p. 3-18.

229.    Yet when asked directly by public commenters to survey for ESA-listed species along the entire length of livestock trailing routes, NPS responded that "[r]equiring the park to do so would be inconsistent with requirements made of other agencies," specifically noting that "the Bureau of Land Management is not required to do complete surveys . . . of livestock trails that cross listed species habitat." Response to Substantive Public Comments, p. ATT-3-16. NPS fails to recognize that Congress intended that NPS manage Park resources to a much higher standard than the Bureau of Land Management and other land management agencies.

230.    NPS failed to acknowledge that its own Policies direct the agency to "fully meet its obligations under the NPS Organic Act and the Endangered Species Act to both proactively

conserve listed species and prevent detrimental effects on these species." NPS Management Policies (2006), § 4.4.2.3.

231.    NPS failed to apply these Policies to its actions under consideration in the LGTMP Environmental Assessment. No connections are drawn between the actions proposed and whether they "proactively conserve and prevent detrimental effects on these species." To the contrary, NPS admits "[t]he damage and disturbance to listed plants would be inconsistent with NPS Management Policies 2006, which calls for restoring disturbed areas to natural conditions and processes, minimizing human impacts on plants, and protecting, recovering, and preventing detrimental effects to listed species." Errata, p. 2-6.

232.    In the LGTMP EA, NPS also makes no mention of Section 6.3.5 of its Policies regarding management of designated and recommended wilderness, nor Director's Order 41, which lays out the "minimum requirement concept" the Park Service must follow for all management decisions affecting wilderness, as also included in Section 6.3.5.

233.    NPS violated its own Policies when it provided no documentation or mention in the EA of any minimum requirement analysis regarding the impacts of the LGTMP to recommended wilderness.

234.    In the Errata to the EA, NPS finally acknowledges the existence of its own Policies regarding wilderness and Director's Order 41, but only to admit the adopted alternative for the LGTMP is inconsistent with both its own Policies and the Order. Errata, p. 2-6.

235.    NPS claimed in the Errata to the EA that Alternative 2 "would be consistent with NPS Management Policies 2006 and Director's Order 77-1 and 77-2," without any evaluation or analysis of how the LGTMP would meet the requirements of these policies and directives

regarding water resource management, wetlands protection, and floodplain management. Errata to the EA, p. ATT-2-5.

236.     NPS failed to mention or apply the text of NPS Management Policies § 8.6.1.1 on permit requirements, or Director's Order 53 and its accompanying Reference Manual 53 on "Special Park Uses," despite the entire purpose of the LGTMP to accommodate the issuance of special use permits in the Park for livestock grazing and trailing. In its Response to Substantive Public Comments, NPS contended § 8.6.1.1 "does not provide context for the EA analysis." Response to Substantive Public Comments, p. ATT-3-20.

237.     The EA provided no mention or discussion of NPS Management Policies § 8.6.2.2, despite this section covering livestock management. Instead, NPS again contended § 8.6.2.2 "does not provide context for the EA analysis." Response to Substantive Public Comments, p. ATT-3-20.

238.     NPS provided the public with no analysis of the agency's compliance with its own Policies or orders promulgated pursuant to the National Park Service Director's authority under the NPS Organic Act and applicable to park resources impacted by the LGTMP and special use permits for livestock grazing and trailing.

239.     NPS provided no evidence it received a waiver from mandatory adherence to its Policies from the Secretary, Assistant Secretary, or Director of the Park Service.

240.     NPS provided the public no rational explanation for its departure from its own Policies regarding wilderness and ESA-listed species, nor discussion or analysis as to why it chose to disregard its own Policies, Director's Orders, and other directives in the development of the LGTMP and evaluation of impacts to Park resources.

241.    By claiming to have followed NPS Management Policies to reach its non-impairment determination, but ultimately adopting a decision that is both inconsistent with those Policies and ignores them outright, NPS's and Acting Regional Director Hammond's findings and decisions are arbitrary and capricious. Because NPS has failed to provide any discussion, analysis, evaluation, or consideration of the applicability of multiple internal policies and other directives, NPS has failed to consider relevant factors regarding its obligations under the NPS Organic Act to protect Park resources. The LGTMP Environmental Assessment, FONSI, and non-impairment determination are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law" and must be set aside. 5 U.S.C. § 706(2)(A).

## FIFTH CAUSE OF ACTION
### Violation of ESA and APA, or in the Alternative, Violation of ESA
*(Failure to Prepare a Biological Opinion in Accordance with the ESA and Its Implementing Regulations)*

242.    WWP incorporates by reference all preceding paragraphs.

243.    As set forth in the preceding paragraphs, FWS failed to lawfully prepare a Biological Opinion by failing to analyze all effects of the issuance of special use permits for livestock grazing and trailing within an appropriately delineated action area.

244.    FWS further failed to analyze all indirect and cumulative effects the issuance of the special use permits will have on ESA-listed species and designated critical habitat on adjacent public and private land.

245.    FWS did not consider cumulative incidental takes of Mexican spotted owl in its evaluation of impacts to the species and its designated critical habitat, or in crafting an Incidental Take Statement for impacts from livestock trailing permits through Oak Creek.

246.    FWS's "no jeopardy" opinion for special use permits for livestock trailing through ESA-listed plant species populations relies solely on reactive measures after the damage is done, which will not protect the species or prevent their continued downward population trends. Allowing only post-damage and disturbance monitoring to constitute protection of listed plant species fails ESA's proactive conservation mandate and allows harm to listed plants to occur. FWS's acceptance of and reliance on these measures for its conclusions violate its obligations under Section 7 of the ESA.

247.    FWS issued a Biological Opinion concluding no adverse modification or destruction of designated critical habitat for the Mexican spotted owl will occur despite 1) NPS's admission that livestock trailing degrades Oak Creek; 2) at least five years of documented non-functional condition of Oak Creek; 3) no commitment from NPS to use "adaptive management" unless Oak Creek does not achieve proper functioning condition by 2023; and 4) NPS's admission that its commitment to prevent unauthorized cattle use in Oak Creek is uncertain.

248.    The level of degradation that has occurred in Oak Creek fits squarely inside the definition of "adverse modification or destruction" of designated critical habitat found in ESA implementing regulations. 50 C.F.R. § 402.02. FWS's conclusion that continued livestock trailing of 1,100 cattle through Oak Creek will not adversely modify or destroy designated critical habitat for Mexican spotted owl is contrary to the facts before it and a violation of Section 7 of the ESA.

249.    Because FWS failed to produce a lawful biological opinion for the issuance of special use grazing and trailing permits in Capitol Reef National Park that conforms to ESA implementing regulations and actually ensures no jeopardy or adverse modification or

destruction will occur, FWS violated the ESA, 16 U.S.C. § 1536(b)(3)(A) and the APA, 5 U.S.C. § 706(2)(A), and the Biological Opinion must be set aside.

## SIXTH CAUSE OF ACTION
### Violation of ESA or in the Alternative, Violation of ESA and APA
*(Unlawful Reliance on an Unlawfully Prepared Biological Opinion
to Satisfy Obligations under the Endangered Species Act)*

250.   WWP incorporates by reference all preceding paragraphs.

251.   As set forth in the preceding paragraphs, FWS failed to prepare a lawful biological opinion by failing to analyze all effects within the action area directly and indirectly affected by the proposed action, by failing to evaluate all direct, indirect, and cumulative effects to listed species in an appropriate action area, and by failing to consider other Incidental Take Statements issued for the Mexican spotted owl in the Colorado Plateau EMU.

252.   FWS unlawfully relied on uncertain and after-the-fact adaptive management measures and commitments from NPS that do not support a conclusion that no jeopardy to the continued existence of ESA-listed species and no adverse modification or destruction to designated critical habitat will occur.

253.   NPS and Superintendent Fritzke relied on the inadequate Biological Opinion in order to issue special use permits for livestock grazing and trailing within Capitol Reef National Park beginning in October of 2018 and continuing to the present. Upon information and belief, WWP expects NPS and Superintendent Fritzke will continue to rely on the same inadequate Biological Opinion to issue special use permits for livestock grazing and trailing.

254.   It is unlawful for an action agency to rely on an inadequate biological opinion to fulfill its obligations under Section 7 of the Endangered Species Act. *Defenders of Wildlife v. Environmental Prot. Agency*, 420 F.3d 946, 976 (9th Cir. 2005) (rev'd on other grounds, *Nat'l*

*Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644 (2007)). Because an agency may not rely on an inadequate biological opinion without violating its Section 7 obligations under the ESA, NPS and Superintendent Fritzke are in violation of the ESA, 16 U.S.C. § 1536(a)(2) and the APA, 5 U.S.C. § 706(2)(A), and no further permits should be issued until NPS reinitiates consultation with FWS that leads to a lawfully prepared biological opinion.

**SEVENTH CAUSE OF ACTION**
**Violation of NEPA and APA**
*(Failure to Prepare an Environmental Impact Statement*
*for the Livestock Grazing and Trailing Management Plan)*

255.    WWP incorporates by reference all preceding paragraphs.

256.    Under NEPA, a federal agency must prepare an EIS for major federal actions that may significantly affect the quality of the human environment. 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1502.4, 1508.3 ("*Affecting* means will or may have an effect on").

257.    NPS prematurely determined the LGTMP's impacts would not be significant before completion of the required environmental analysis, circumventing the process outlined in NEPA. *See* News Release, (May 8, 2018), https://www.nps.gov/care/learn/news/livestock-grazing-and-trailing-management-planning-process-for-capitol-reef-national-park.htm (last visited Feb. 7, 2020).

258.     The significance of impacts includes consideration of context and intensity and both short-term and long-term impacts are relevant. 40 C.F.R. § 1508.27.

259.    The intensity or severity of the impact must be evaluated in light of various factors such as: whether impacts are both beneficial and adverse; the unique characteristics of the geographic area including proximity to historic or cultural resources, parklands, wetlands, wild and scenic rivers or ecologically critical areas; whether the action is highly controversial;

whether it may have uncertain effects or unknown risks; the degree to which the action may

establish precedent for future similar actions; whether there are cumulatively significant impacts;

whether the action may adversely affect or cause loss or destruction of significant scientific,

cultural, or historic resources; the degree to which the action may adversely affect endangered or

threatened species and critical habitat; and whether the action threatens a violation of law

imposed for the protection of the environment. 40 C.F.R. §§ 1508.27(b)(1) and (b)(3)-(10).

Many of these factors are applicable here and show that the action may significantly affect

various environmental resources and an EIS should have been prepared. 42 U.S.C. § 4332(2)(C).

260.    The area affected by the LGTMP lies within Capitol Reef National Park, a

Congressionally-established unit of the National Park System, the land designation to which the

highest level of protection is afforded to ensure no impairment of resources occurs for the

enjoyment of future generations. The LGTMP also impacts recommended wilderness within the

Park. Impacts to Park resources and recommended wilderness from the LGTMP will be

significant and should have been evaluated in an EIS. 40 C.F.R. § 1508.27(b)(3).

261.    The LGTMP's impacts on the environment are highly controversial, as scientists

have warned NPS that any further impacts that increase mortality of certain ESA-listed species

threaten overall population survival, yet NPS continues to authorize livestock trailing directly

through known ESA-listed plant habitat and populations. *See* LGTMP EA, p. 4-37. NPS admits

any benefits to vegetation from its proposed pasture rotation system in the Sandy 3 Allotment are

"debatable." *Id.*, p. 4-21. Disagreement exists between NPS and FWS over the level of

degradation in Oak Creek attributable to livestock trailing versus trespass cattle. *See* Letter from

Superintendent Leah McGinnis to Utah Field Supervisor Larry Crist (Dec. 16, 2014). These controversial impacts on the environment warrant an EIS. 40 C.F.R. § 1508.27(b)(4).

262.     The LGTMP's impacts on the environment are uncertain and involve unknown risks, including the lack of knowledge regarding the exact location of the newly-created Lower South Desert livestock trailing route. NPS also acknowledges its past and likely future inability of the Park to control unauthorized cattle use of Oak Creek due to a lack of cooperation with permit holders and a lack of fencing across the west entrance to the Park through Oak Creek. Further, NPS admits improvements to vegetation and soils and recovery time of soils in the Sandy 3 Allotment are uncertain under the authorized pasture rotation system. These uncertain effects and unknown risks should have been evaluated in an EIS. 40 C.F.R. § 1508.27(b)(5).

263.     The LGTMP authorizes actions that establish a precedent for future actions with significant effects, especially the creation of new livestock trailing routes across Park lands. The effects of these precedent-setting actions should have been evaluated in an EIS. 40 C.F.R. § 1508.27(b)(6).

264.     The LGTMP authorizes actions that are cumulatively significant in light of related actions authorized on adjacent National Forest and BLM lands. Indeed, most of the livestock trailing authorized by the LGTMP facilitates livestock grazing on lands adjacent to the Park managed by other federal agencies, and the cumulatively significant impacts arising from this should have been evaluated in an EIS. 40 C.F.R. § 1508.27(b)(7).

265.     The LGTMP authorizes actions which threaten to cause loss or destruction of significant scientific and other resources in the Park. The LGTMP authorizes livestock trailing that will cause damage to and loss of biological soil crusts that take decades to recover,

trampling and other damage and disturbance to ESA-listed plant species that already exhibit downward population trends and are at risk of local extirpation, and significant harm to other Park resources. These impacts should have been evaluated in an EIS. 40 C.F.R. § 1508.27(b)(8).

266.    The LGTMP authorizes actions that will, by the Park Service's own admission, adversely impact four ESA-listed species, as well as designated critical habitat for the Mexican spotted owl. Listed species' continued existence need not be jeopardized for impacts to be significant. *See Cascadia Wildlands v. U.S. Forest Serv.*, 937 F. Supp. 2d 1271, 1282 (D. Ore. 2013); *see also Makua v. Rumsfeld*, 163 F. Supp. 2d 1202, 1218 (D. Haw. 2001).

267.    The measures proposed by the LGTMP to "protect" these listed species are all reactionary, as opposed to proactively protective. Further, most of the adaptive management measures proposed to protect these species are dependent on funding, staffing, and thus uncertain to occur. The impacts to multiple species and designated critical habitat protected by the Endangered Species Act should have been evaluated in an EIS. 40 C.F.R. § 1508.27(b)(9).

268.    The LGTMP authorizes actions that may have both beneficial and adverse impacts on the environment, but "[a] significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial." 40 C.F.R. § 1508.27(b)(1). The LGTMP EA states the retirement of the Hartnet Allotment will drive overall beneficial cumulative effects. The Hartnet Allotment's retirement occurred through a privately facilitated transaction independent from any NPS actions authorized through the LGTMP. Further, ecological recovery of the Hartnet Allotment is expected to take decades to centuries. The LGTMP is only expected to serve as guidance for 20 years. The LGTMP's reactive adaptive management measures may produce beneficial impacts to certain Park resources, but only after further adverse impacts have

occurred. The combination of beneficial and adverse effects that will result from the combination of additional livestock impacts and possible adaptive management should have been evaluated in an EIS. 40 C.F.R. § 1508.27(b)(1).

269.    The LGTMP authorizes actions that threaten violations of numerous federal laws aimed at protection of the environment, including the enabling legislation for Capitol Reef National Park, the NPS Organic Act, and the Endangered Species Act. Because of the high likelihood of violating federal environmental laws, the LGTMP's impacts should have been evaluated in an EIS. 40 C.F.R. § 1508.27(b)(10).

270.    NPS failed to provide a convincing statement of reasons why the LGTMP's impacts are insignificant in light of the LGTMP triggering at least nine "intensity" factors. Although each individual "intensity" factor might not trigger a requirement to produce an EIS, "when considered collectively, they do." *Cascadia Wildlands v. U.S. Forest Serv.*, 937 F. Supp. 2d 1271, 1283 (D. Ore. 2013).

271.    Because the LGTMP is a major federal action for the purpose of NEPA, *see* 42 U.S.C. § 4332(2)(C), that may have a significant impact on the environment, Acting Regional Director Hammond's adoption of a FONSI as an outcome of the EA is improper. Because NPS failed to prepare an EIS, the agency has failed to comply with NEPA, and the issuance of the FONSI is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" that must be "set aside," and NPS must prepare an EIS. 5 U.S.C. §§ 706(1) and (2)(A).

### EIGHTH CAUSE OF ACTION
### Violation of NEPA and APA
*(Failure to Take a Hard Look at Impacts to the Environment in the Environmental Assessment for the Livestock Grazing and Trailing Management Plan)*

272.    WWP incorporates by reference all preceding paragraphs.

273.    NEPA requires that agencies consider the direct, indirect, and cumulative impacts of their proposed actions in both environmental impact statements and environmental assessments. 42 U.S.C. § 4332(C)(i); 40 C.F.R. §§ 1502.16, 1508.7, 1508.8, and 1508.25(c).

274.    To comply with NEPA's hard look requirement, federal agency analysis must involve informed decision-making and informed public participation, along with specific, detailed study of possible effects and risks.

275.    The FONSI states that "[n]o mitigation measures beyond the design of the selected action (see Chapter 2 and Appendix C of the EA) were identified." FONSI, p. 4. However, similar to a "mitigated FONSI," the FONSI for the LGTMP relies extensively on adaptive management and monitoring to address anticipated impacts to Park resources.

276.    Like mitigation measures, adaptive management and monitoring "must be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated." *Neighbors of Cuddy Mtn. v. U.S. Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir. 1988). Such measures also "must be more than a possibility." *Wyoming Outdoor Council v. U.S. Army Corps of Eng'rs*, 351 F. Supp. 2d 1232, 1250 (D. Wyo. 2005). An agency cannot rely on measures that "are speculative without any basis for concluding they will occur." *Davis v. Mineta*, 302 F.3d 1104, 1125 (10th Cir. 2002) (abrogated on other grounds).

277.    NPS provided no analysis in the EA of the effectiveness of the monitoring and adaptive management techniques it relies upon to prevent significant impacts to Park resources, nor explanation of why such techniques are not implemented proactively to protect Park resources, particularly for ESA-listed species.

278.    Further, NPS admits that its impacts analysis for the selected alternative for the LGTMP is dependent on uncertain funding for the monitoring and adaptive management described in Appendix C of the EA. LGTMP EA, p. 4-1.

279.    Absent a thorough discussion of the effectiveness of proposed adaptive management and monitoring activities, as well as the likelihood of their actual occurrence and implementation, NPS has failed to take a hard look at the effects of actions authorized by the LGTMP.

280.    NPS failed to evaluate the appropriateness of the stocking rate and utilization levels authorized for the Sandy 3 Allotment. Although NPS claims the LGTMP provides a "comprehensive approach" to livestock management in the Park, without considering fundamental issues such as stocking rate and utilization level, NPS has failed to take the requisite hard look required by NEPA.

281.    NPS failed to thoroughly evaluate impacts to vegetation and soils from the selected alternative. NPS acknowledged numerous times that the outcome of its proposed pasture rotation system will have unknown or uncertain results related to vegetation and soils recovery, and yet the agency failed to take the requisite hard look at impacts to these park resources.

282.    NPS admits on multiple occasions it does not know the exact location of the Lower South Desert trailing route. *See* LGTMP EA, pp. 3-20 and 4-39. This indicates this newly-created route is not, in fact, a traditional route, and NPS's lack of knowledge here prevents it from taking the requisite "hard look" at impacts of designating and allowing livestock to trail along such an unknown route.

283.    NPS further failed to take a hard look at the indirect and cumulative effects of issuance of livestock trailing permits through the Park that facilitate livestock grazing on public and private lands adjacent to and outside the Park's boundaries. These non-Park lands also contain ESA-listed species populations and habitat, as well as soil and vegetation resources that will be impacted from continued livestock grazing on these lands facilitated by livestock trailing through the Park.

284.    Because NPS failed to take a hard look at the effectiveness and likelihood of the LGTMP's proposed monitoring and adaptive management, the proper stocking and utilization rates for the Sandy 3 Allotment, the uncertain impacts to vegetation and soils, the indirect and cumulative impacts on adjacent and nearby non-Park lands, and the impacts of the newly-created Lower South Desert trailing route, the location of which is unknown, the agency has failed to comply with NEPA, and its LGTMP Environmental Assessment and associated FONSI are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," and must be "set aside." 5 U.S.C. §§ 706(2)(A).

285.    To fulfill its NEPA duties, an agency must "discuss its own official policies that on their face apply directly to the review at issue." *Western Watersheds Proj. v. Salazar*, 2011 WL 4526746, *14 (D. Idaho Sept. 28, 2011) (citing *Oregon Natural Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1115-16 (9th Cir. 2010)).

286.    An agency fails to take a "hard look" when it "entirely fail[s] to consider an important aspect of the problem" before it. *Biodiversity Conservation All. v. U.S. Forest Serv.*, 756 F.3d 1264, 1271 (10th Cir. 2014) (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Here, NPS entirely failed to consider the applicability of its

own NPS Management Policies and other directives to Park resources impacted by the actions authorized in the LGTMP.

287.     Nowhere within the LGTMP Environmental Assessment did NPS discuss its own Policies' direction on preventing impairment and unacceptable impacts to Park resources, nor the requirements laid out in its own Policies for livestock management, nor the procedures and requirements laid out in its own Policies and Reference Manual 53 for special use permits.

288.     Nowhere within the LGTMP Environmental Assessment did NPS discuss its own direction on water resources found in Section 4.6.4 of its own Management Policies, nor the direction contained in Director's Orders 77-1 or 77-2 beyond a conclusory consistency statement added to the Errata.

289.     Nowhere within the LGTMP Environmental Assessment did NPS provide or reference a "minimum requirements analysis" for impacts associated with the LGTMP that will occur within the Park's recommended wilderness. Instead, the agency admits in the Errata that the LGTMP as adopted is not consistent with its own Policies regarding wilderness.

290.     Nowhere within the LGTMP Environmental Assessment did NPS discuss its own Policies' requirement of proactive conservation for ESA-listed species. Instead, the agency admits in the Errata that the LGTMP as adopted is not consistent with its own Policies regarding ESA-listed species.

291.     Because NPS has failed to provide any discussion, analysis, evaluation, or consideration of the applicability of multiple internal policies and other directives, NPS has failed to consider relevant factors regarding its obligations to protect Park resources. Thus, NPS has not satisfied its obligations under NEPA to provide the public with the requisite hard look at

the environmental impacts of the LGTMP and special use permits issued pursuant to the

LGTMP, and the LGTMP Environmental Assessment and FONSI must be set aside as "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. §

706(2)(A).

## PRAYER FOR RELIEF

Wherefore, WWP respectfully prays that this Court enter judgment in its favor and

against Defendants, the National Park Service, the United States Fish and Wildlife Service, Larry

Crist, in his official capacity as Utah Field Supervisor, Ecological Services, for the U.S. Fish and

Wildlife Service, Kate Hammond, in her official capacity as Acting Regional Director for the

National Park Service's Intermountain Region, and Susan L. Fritzke, in her official capacity as

Superintendent of Capitol Reef National Park, and that the Court:

1.      Declare that Defendant NPS's Livestock Grazing and Trailing Management Plan

is in violation of the NPS Organic Act and NPS Management Policies (2006);

2.      Declare that Defendant Hammond issued the Non-Impairment Determination in

violation of the NPS Organic Act and the APA;

3.      Declare that Defendant NPS's Environmental Assessment for the LGTMP is in

violation of NEPA and its implementing regulations and the APA;

4.      Declare that Defendant Hammond issued the FONSI for the Plan in violation of

NEPA and its implementing regulations and the APA;

5.      Declare that Defendant FWS issued the Biological Opinion for the issuance of

special use permits in violation of the ESA and its implementing regulations and the APA;

6.      Declare that Defendants NPS and Fritzke relied on that Biological Opinion in violation of the ESA and its implementing regulations;

7.      Declare the Defendants NPS and Fritzke issued special use permits for livestock grazing and trailing in violation of the NPS Organic Act, specific legislation for Capitol Reef National Park, the ESA, and the APA;

8.      Award injunctive relief directing Defendants NPS and Hammond to rescind adoption and approval of the Livestock Grazing and Trailing Management Plan, FONSI, and NID; and prohibiting Defendants NPS, Hammond, and Fritzke from relying on the LGTMP, FONSI and NID for the issuance of special use permits;

9.      Award injunctive relief requiring Defendant NPS to undertake comprehensive and legally valid NEPA and Organic Act analyses prior to adopting and implementing any iteration of the Livestock Grazing and Trailing Management Plan;

10.     Award injunctive relief directing Defendants FWS and Crist to rescind the Biological Opinion for the issuance of special use permits; and prohibiting Defendants NPS, Hammond, and Fritzke from relying on the Biological Opinion for the issuance of special use permits until FWS and Crist evaluate the effects of such permits in accordance with the ESA and its implementing regulations;

11.     Award injunctive relief directing NPS and Superintendent Fritzke to rescind and cease issuance of special use permits for any trailing route and to any individual or entity not meeting the eligibility criteria laid out by legislation and regulation for livestock grazing and trailing in the Park.

12.     Retain jurisdiction of this action to ensure compliance with the Court's decree;

13.    Award WWP the costs it has incurred in pursuing this action, including attorneys'

fees, as authorized by the Equal Access to Justice Act, 28 U.S.C. § 2412(d), and other applicable

provisions; and

14.    Grant such other and further relief as is proper.

Dated this 24th day of February, 2020.

Respectfully submitted,

s/John Persell

John Persell (Utah # 17298)
Western Watersheds Project
P.O. Box 1770
Hailey, ID 83333
Tel: (503) 896-6472
jpersell@westernwatersheds.org

Attorney for Plaintiff

SECOND AMENDED COMPLAINT - 73