John Persell (Utah # 17298)
Western Watersheds Project
P.O. Box 1770
Hailey, ID 83333
Tel: (503) 896-6472
Email: jpersell@westernwatersheds.org

Attorney for Plaintiff
Western Watersheds Project

---

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, SOUTHERN REGION OF THE CENTRAL DIVISION

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT, | |
| Plaintiff, | |
| v. | **Case No. 4:19-cv-00065-DN-PK** |
| NATIONAL PARK SERVICE *et al.*, | **PLAINTIFF'S OPENING BRIEF** |
| Defendants, | |
| STATE OF UTAH, | |
| Defendant-Intervenor. | |

**TABLE OF CONTENTS**

TABLE OF CONTENTS..................................................................................................i

TABLE OF AUTHORITIES..........................................................................................iv

GLOSSARY OF ACRONYMS AND TERMS...............................................................x

STATEMENT OF THE ISSUES....................................................................................1

STATEMENT OF THE CASE........................................................................................2

    I.      PROCEDURAL BACKGROUND AND FINAL AGENCY ACTIONS
         PRESENTED FOR REVIEW..................................................................2

    II.     FACTS RELEVANT TO THE ISSUES PRESENTED FOR REVIEW..................4

        A.    Livestock Grazing and Trailing in the Park.................................................4

        B.    Development of the Livestock Grazing and Trailing Management Plan......5

        C.    Finding of No Significant Impact and Non-Impairment Determination.......9

        D.    Relevant Species Listed Under the Endangered Species Act.....................10

            1.    Listed Plants..................................................................................10

            2.    Mexican Spotted Owl....................................................................12

        E.    Key Aspects of the Biological Opinion......................................................13

SUMMARY OF THE ARGUMENT.............................................................................14

    I.      ENABLING LEGISLATION AND APPLICABLE REGULATIONS.................14

    II.     NATIONAL PARK SERVICE ORGANIC ACT AND POLICIES.....................16

    III.    NATIONAL ENVIRONMENTAL POLICY ACT...............................................17

    IV.    ENDANGERED SPECIES ACT........................................................................17

ARGUMENT.................................................................................................................18

    I.      STANDARDS OF REVIEW.............................................................................18

II.     NPS LACKS STATUTORY AUTHORITY TO ALLOW GRAZING ON THE SANDY 3 ALLOTMENT BY NON-PERMIT HOLDERS..........................20

III.    NPS MAY NOT ISSUE TRAILING PERMITS OUTSIDE ITS STATUTORY AUTHORITY.................................................................................22

        A.     NPS Lacks Authority to Issue Trailing Permits for the New Lower South Desert Route.........................................................25

        B.     NPS May Not Issue Trailing Permits to Non-Historic Owners or Operators...............................................................................27

IV.    NPS ISSUED SPECIAL USE PERMITS IN VIOLATION OF APPLICABLE REGULATIONS...........................................................29

V.     THE LGTMP IS IRRECONCILABLE WITH NPS'S OVERRIDING CONSERVATION MANDATE.............................................................31

        A.     NPS Failed to Prevent Unacceptable Impacts to the Extent Possible........33

        B.     NPS Failure to Follow Its Policies Without Explanation Is Arbitrary and Capricious...........................................................36

VI.    NPS'S FAILURE TO PRODUCE AN EIS FOR THE LGTMP VIOLATED NEPA...........................................................................................38

        A.     NPS Failed to Properly Consider Relevant Intensity Factors....................40

                1.     Controversy.....................................................................40

                2.     Potential Precedent.........................................................42

                3.     Loss or Destruction of Scientific Resources..................43

                4.     Threatened Violations of Laws, Regulations, and Policies.............44

                5.     Intensity Factors Identified in the FONSI.......................45

        B.     Because Impacts May Be Significant, an EIS Is Required.........................46

VII.   NPS FAILED TO TAKE A HARD LOOK AT CUMULATIVE IMPACTS AND THE APPLICABILITY OF ITS POLICIES IN VIOLATION OF NEPA.................................................................................................47

      A.     NPS Failed to Take a Hard Look at Cumulative Impacts............................47

      B.     NPS Failed to Consider the Applicability of Its Policies in the EA.............49

VIII.   FWS FAILED TO PRODUCE A LAWFUL BIOLOGICAL OPINION
       UNDER OPERATIVE ESA REGULATIONS......................................................50

      A.     FWS Improperly Delineated an Overly Narrow Action Area....................51

      B.     FWS Improperly Determined Mexican Spotted Owl Critical Habitat
            Would Not Be Adversely Modified............................................................52

      C.     FWS Improperly Relied on Uncertain, Unspecific, and Ineffective
            Conservation Measures..............................................................................54

IX.    NPS INDEPENDENTLY VIOLATED ITS OWN ESA DUTIES........................57

CONCLUSION....................................................................................................................58

CERTIFICATE OF COMPLIANCE...................................................................................59

CERTIFICATE OF SERVICE............................................................................................59

# TABLE OF AUTHORITIES

**Cases**

*Airport Neighbors Alliance v. United States*, 90 F.3d 426 (10th Cir. 1996)....................................38

*Am. Wild Horse Preservation Campaign v. Jewell*, 847 F.3d 1174 (10th Cir. 2016).....................20

*Ardestani v. Immigration & Naturalization Serv.*, 502 U.S. 129 (1991)........................................27

*Atchison v. Wichita Bd. of Trade*, 412 U.S. 800 (1973)............................................................37-38

*Bicycle Trails Council of Marin v. Babbitt*, 82 F.3d 1445 (9th Cir. 1996).....................................31

*Blue Mountains Diversity Project v. Blackwood*, 161 F.3d 1208 (9th Cir. 1998)...........................46

*Cascadia Wildlands v. U.S. Forest Serv.*, 937 F. Supp. 2d 1271 (D. Or. 2013).....................46, 47

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*,
538 F.3d 1172 (9th Cir. 2008)..................................................................................................46

*Ctr. for Biological Diversity v. Rumsfeld*, 198 F. Supp. 2d 1139 (D. Ariz. 2002)..............54, 55, 56

*Ctr. for Biological Diversity v. U.S. Forest Serv.*, No. 2:17-cv-372,
2020 WL 1429569 (S.D. Ohio March 13, 2020).......................................................................49

*Chevron, U.S.A. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984)..............................20, 22

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971)........................................19

*Contreras-Bocanegra v. Holder*, 678 F.3d 811 (10th Cir. 2012)...................................21-22, 23, 27

*Cotton Petroleum Corp. v. U.S. Dep't of Interior*, 870 F.2d 1515 (10th Cir. 1989).................37-38

*Defenders of Wildlife v. Babbitt*, 130 F. Supp. 2d 121 (D.D.C. 2001).....................................51, 52

*Defenders of Wildlife v. Envt'l Prot. Agency*, 420 F.3d 946 (9th Cir. 2005)..................................57

*Ecology Ctr. v. Austin*, 430 F.3d 1057 (9th Cir. 2005)..................................................................36

*Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469 (1992)......................................................22

*Greater Yellowstone Coal. v. Kempthorne*, 577 F. Supp. 2d 183 (D.D.C. 2008)..........................32

*Grunewald v. Jarvis*, 930 F. Supp. 2d 73 (D.D.C. 2013)................................................30, 31

*In re Hamilton Creek Metro. Dist.*, 143 F.3d 1381 (10th Cir. 1998)...............................27

*Kleppe v. United States*, 427 U.S. 390 (1976).................................................................47

*Lands Council v. McNair*, 537 F.3d 981 (9th Cir. 2008).................................................36

*McCarthy v. Bronson*, 500 U.S. 136 (1991)....................................................................22

*Middle Rio Grande Conservancy Dist. v. Norton*, 294 F.3d 1220 (10th Cir. 2002).........40

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983).........19

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644 (2007)..................57

*Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722 (9th Cir. 2001)...................47

*Natural Res. Def. Council, Inc. v. Morton*, 458 F.2d 827 (D.C. Cir. 1972)......................47

*New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683 (10th Cir. 2009)............19

*New Mexico v. U.S. Dep't of Interior*, 854 F.3d 1207 (10th Cir. 2017)............................27

*Ocean Advocates v. U.S. Army Corps of Eng'rs*, 361 F.3d 1108 (9th Cir. 2004)...............46-47

*Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846 (9th Cir. 2005)................46-47

*Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560 (10th Cir. 1994).....................19, 38

*Or. Natural Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092 (9th Cir. 2010)........49

*Resources Ltd., Inc. v. Robertson*, 35 F.3d 1300 (9th Cir. 1993)....................................57

*Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096 (10th Cir. 2010).........18-19

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989)................................38

*Robinson v. Shell Oil Co.*, 519 U.S. 337 (1997)..........................................................22, 24

*Rocky Mountain Wild v. Vilsack*, 843 F. Supp. 2d 1188 (D. Colo. 2012)..........................36

*San Juan Citizens Alliance v. Stiles*, 654 F.3d 1038 (10th Cir. 2011).........................46, 48

*Sierra Club v. Mainella*, 459 F. Supp. 2d 76 (D.D.C. 2006)........................................32

*Sierra Club v. Marsh*, 816 F.2d 1376 (9th Cir. 1987)................................................54

*Sierra Club v. U.S. Forest Serv.*, 843 F.2d 1190 (9th Cir. 1988)...............................42

*S. Utah Wilderness Alliance v. Nat'l Park Serv.*, 387 F. Supp. 2d 1178 (D. Utah 2005)................31

*Tenn. Valley Auth. v. Hill*, 437 U.S. 153 (1978)......................................................50

*United States v. Goldbaum*, 879 F.2d 811 (10th Cir. 1989)......................................23

*United States v. Johnson*, 529 U.S. 53 (2000)........................................................27

*Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152 (10th Cir. 2002)..............19, 38

*W. Watersheds Project v. Salazar*, No. 4:08-cv-516-BLW,
2011 WL 4526746 (D. Idaho Sept. 28, 2011)..................................................37-38, 49

*Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457 (2001)............................................22

*WildEarth Guardians v. Bureau of Land Mgmt.*, 870 F.3d 1222 (10th Cir. 2017).............18-19

**Statutes**

5 U.S.C. § 702...........................................................................................18

5 U.S.C. § 706(2)(A)..................................................................................19

5 U.S.C. § 706(2)(C)..................................................................................19

16 U.S.C. § 1........................................................................................23, 31

16 U.S.C. § 1a-1.......................................................................................30

16 U.S.C. § 273 *et seq*..................................................................................4

16 U.S.C. § 273b....................................................................................4, 20

16 U.S.C. § 273c.................................................................4, 5, 22, 23, 24

16 U.S.C. § 273d.....................................................................................5, 23

16 U.S.C. § 1536(a)(2)......................................................................50, 51, 57

16 U.S.C. § 1540(g) ..................................................................................19

42 U.S.C. § 4332(2)(C) ............................................................................38

54 U.S.C. § 100101 ..............................................................................23, 31

54 U.S.C. § 100101(b)(2) .....................................................................30, 31

Pub. L. No. 92-207 (Dec. 18, 1971) ...........................................................4

Pub. L. No. 95-250 (Mar. 27, 1978) .........................................................31

Pub. L. No. 113-287 (Dec. 19, 2014) ..................................................23, 30

Pub. L. No. 100-446 (Sept. 27, 1988) ...................................................4, 20

**Regulations**

36 C.F.R. § 1.6(a) .....................................................................15, 29-30, 44

36 C.F.R. § 2.60(a)(1) ...............................................................15, 29, 44-45

40 C.F.R. § 1500.1(b) ..........................................................................49, 50

40 C.F.R. § 1501.4 ...............................................................................38-39

40 C.F.R § 1502.16 ...................................................................................47

40 C.F.R. § 1508.3 .....................................................................................39

40 C.F.R. § 1508.7 .....................................................................................47

40 C.F.R. § 1508.9(a)(1) ............................................................................38

40 C.F.R. § 1508.13 ...................................................................................39

40 C.F.R. § 1508.27 ...................................................................................39

40 C.F.R. § 1508.27(b) ....................................................................9, 39, 40

40 C.F.R. § 1508.27(b)(4) ..........................................................................40

40 C.F.R. § 1508.27(b)(6) ..........................................................................42

40 C.F.R. § 1508.27 (b)(7)..............................................................................................45

40 C.F.R. § 1508.27(b)(8)..............................................................................................43

40 C.F.R. § 1508.27(b)(9)..............................................................................................45

40 C.F.R. § 1508.27(b)(10)............................................................................................44

50 C.F.R. § 402.02..................................................................................................51, 53

50 C.F.R. § 402.14(b)(1)...........................................................................................50-51

50 C.F.R. § 402.14(g)(1)...............................................................................................51

50 C.F.R. § 402.14(g)(2)...............................................................................................51

50 C.F.R. § 402.14(g)(3)...............................................................................................51

50 C.F.R. § 402.14(g)(4)...............................................................................................51

50 C.F.R. § 402.14(h)(2)...............................................................................................51

50 C.F.R. § 402.15(a)....................................................................................................57

**Other Authorities**

NPS Management Policies (2006), Introduction...................................................10, 38

NPS Management Policies (2006), Underlying Principles..........................................36

NPS Management Policies (2006) § 1.4.3.........................................................32, 36

NPS Management Policies (2006) § 1.4.3.1.........................................32, 33, 35, 50

NPS Management Policies (2006) § 1.4.5.................................................................32

NPS Management Policies (2006) § 1.4.7.................................................................32

NPS Management Policies (2006) § 1.4.7.1.............................................10, 32, 35, 49

NPS Management Policies (2006) § 4.4.2.3.............................................10, 34, 37, 57

NPS Management Policies (2006) § 6.3.5.............................................................34, 36

44 Fed. Reg. 58868 (Oct. 11, 1979)...................................................................11

50 Fed. Reg. 33734 (Aug. 21, 1985)..................................................................12

58 Fed. Reg. 14248 (Mar. 16, 1993).................................................................12

63 Fed. Reg. 44587 (Aug. 20, 1998)..................................................................10

69 Fed. Reg. 53182 (Aug. 31, 2004)..................................................................12

80 Fed. Reg. 13615 (Mar. 16, 2015)....................................................................6

## GLOSSARY OF ACRONYMS AND TERMS

APA – Administrative Procedure Act

BO – Biological Opinion

EA – Environmental Assessment

EIS – Environmental Impact Statement

ESA – Endangered Species Act

FONSI – Finding of No Significant Impairment

FWS – U.S. Fish and Wildlife Service

GMP – General Management Plan

LGTMP – Livestock Grazing and Trailing Management Plan

NEPA – National Environmental Policy Act

NID – Non-Impairment Determination

NPS – National Park Service

Park – Capitol Reef National Park

Plan – Livestock Grazing and Trailing Management Plan

Policies – NPS Management Policies (2006)

**STATEMENT OF THE ISSUES**

(1)     Whether the National Park Service (NPS) exceeded its statutory authority by:

      (a)     allowing grazing by non-permit holders on the Sandy 3 Allotment within Capitol Reef National Park (Park);

      (b)     by issuing trailing permits for the newly-created Lower South Desert route within the Park; and

      (c)     issuing trailing permits to non-historic users of traditional routes within the Park.

(2)     Whether NPS violated applicable regulations at 36 C.F.R. §§ 1.6(a) and 2.60(a)(1) regarding issuance of special use permits and livestock use in the Park.

(3)     Whether NPS violated the Organic Act's non-impairment mandate and failed to consider relevant agency policies through its development and adoption of a Livestock Grazing and Trailing Management Plan (LGTMP or Plan) for the Park.

(4)     Whether NPS violated the National Environment Policy Act (NEPA) by:

      (a)     ignoring and failing to properly apply relevant intensity factors in reaching its Finding of No Significant Impact (FONSI) for the Plan;

      (b)     failing to produce an environmental impact statement (EIS) for the Plan despite likely significant impacts; and

      (c)     failing to take a hard look at cumulative impacts and the application of agency policies in the Environmental Assessment (EA) for the Plan.

(5)     Whether the Biological Opinion (BO) of the U.S. Fish and Wildlife Service (FWS) violated the Endangered Species Act (ESA) by:

(a)      improperly delineating an overly narrow action area for consideration of effects on listed species related to the LGTMP;

(b)      improperly determining that ongoing degradation and nonfunctional condition of Oak Creek does not amount to destruction or adverse modification of designated Mexican spotted owl critical habitat; and

(c)      improperly relying on unspecific, uncertain, and ineffective conservation measures to reach its "no jeopardy or adverse modification" conclusions.

(6) Whether NPS independently violated its ESA duties through reliance on FWS's flawed Biological Opinion and authorization of activities inconsistent with its own ESA policies.

## STATEMENT OF THE CASE

This case challenges final agency actions of NPS and FWS regarding the adoption of the LGTMP to govern management of grazing and trailing within Capitol Reef National Park, as well as NPS's issuance of permits pursuant to the Plan for those activities.

## I.    PROCEDERAL BACKGROUND AND FINAL AGENCY ACTIONS PRESENTED FOR REVIEW.

NPS produced an Environmental Assessment (EA) for the LGTMP in July 2018.[1] Plaintiff Western Watersheds Project (WWP) and others submitted comments on the EA.[2] On October 3, 2018, upon Park Superintendent Sue Fritzke's recommendation, Kate Hammond, then the Acting Regional Director for NPS, signed a Finding of No Significant Impacts (FONSI) for

---

[1] *See* NPS0000001.
[2] NPS0005045; NPS0005101.

the EA, adopting Alternative 2.[3] An attachment to the FONSI provided a Non-Impairment Determination (NID) regarding the level of impacts the Plan would have on Park resources.[4]

Also in October 2018, FWS produced a Biological Opinion (BO) for grazing and trailing permits issued by NPS pursuant to the LGTMP.[5] This BO, signed by FWS Utah Field Supervisor Larry Crist, addressed three ESA-listed plants' whose populations and habitat are crossed by trailing routes authorized in the Plan: Winkler cactus, Wright fishhook cactus, and Last Chance townsendia.[6] FWS concluded trailing through listed plant species' habitat would not jeopardize their continued existence.[7] The BO also addressed the ESA-listed Mexican spotted owl and its designated critical habitat, which two livestock trails directly cross.[8] FWS concluded trailing would not jeopardize the owl's continued existence or destroy or adversely modify its designated critical habitat.[9] On May 15, 2019, WWP sent written notice to FWS and NPS of its intent to file suit to regarding ESA violations in the 2018 Biological Opinion as well as NPS's reliance on that Biological Opinion to satisfy its ESA duties.

Since October 2018, Superintendent Fritzke has issued permits for grazing and trailing within the Park pursuant to the LGTMP and Biological Opinion.[10] On August 23, 2019, WWP filed the present suit against NPS, FWS, and associated officials.[11]

---

[3] *See* NPS0000275.
[4] NPS0000285-93.
[5] *See* FWS0000001.
[6] FWS0000019-22; FWS0000027-33
[7] FWS0000035.
[8] FWS0000023.
[9] FWS0000035.
[10] NPS0000493-526; NPS0033664-95.
[11] Docket no. 2 (Aug. 23, 2019).

## II.    FACTS RELEVANT TO THE ISSUES PRESENTED FOR REVIEW.

### A.    Livestock Grazing and Trailing in the Park.

On December 18, 1971, Congress established Capitol Reef National Park.[12] Livestock grazing and trailing previously occurred on and across the lands now within the Park's borders.[13] In the Park's enabling legislation, Congress provided specific direction regarding what grazing and trailing could continue to occur within the Park.[14] Section 3 of the legislation allowed individuals who held such permits prior to the Park's establishment to continue grazing for the remainder of their permit term, plus one additional period of renewal.[15] Later, in 1988, Congress legislatively extended grazing for the lifetime of original permit holders, as well as for the lifetimes of their direct descendants born before the Park's establishment.[16] Congress further directed NPS to manage grazing to "encourage the protection" of Park resources.[17]

Currently, one active grazing allotment remains in the Park, the Sandy 3 Allotment.[18] Jean Gillespie holds the permit for the Sandy 3 Allotment.[19] Gillespie is the last surviving direct descendant of Don and Afton Taylor, the Sandy 3 permit holders at the time of the Park's establishment.[20] In March 2019, Gillespie transferred permit authority to her nephew Boone Taylor, with NPS's acquiescence.[21] Boone Taylor has run cattle on the Sandy 3 Allotment since

---

[12] Pub. L. No. 92-207 (Dec. 18, 1971), codified at 16 U.S.C. § 273 *et seq.*
[13] NPS0000008.
[14] 16 U.S.C. §§ 273b-c.
[15] 16 U.S.C. § 273b.
[16] Pub. L. No. 100-446 (Sept. 27, 1988).
[17] *Id.*
[18] NPS0000008.
[19] NPS0031631.
[20] NPS0032032.
[21] NPS0031631.

at least 2011, previously while Gillespie's sister Julia Taylor held the permit.[22] Taylor's brother-in-law Richard Fillmore also currently grazes cattle on the Sandy 3 Allotment.[23]

The enabling legislation for the Park also included specific language regarding trailing. The legislation allowed owners and operators to continue trailing livestock across the Park on traditional courses used by them prior to the Park's establishment.[24] Congress further authorized the Interior Secretary to reasonably regulate the use of such traditional courses.[25] In addition to addressing grazing and trailing, the enabling legislation directed NPS to manage the Park pursuant to the Organic Act of 1916.[26]

Since October 2018, Superintendent Fritzke has issued permits pursuant to the unlawful LGTMP authorizing grazing on the Sandy 3 Allotment within the Park by persons other than the permit holder: namely, Boone Taylor and Richard Fillmore.[27] Also since October 2018, Superintendent Fritzke has issued permits pursuant to the unlawful Plan authorizing trailing across the Park, including for one newly-established route, the Lower South Desert Route, and to non-historic users of traditional routes, including Richard Fillmore, among others.[28]

**B.     Development of the Livestock Grazing and Trailing Management Plan.**

In 1998, NPS produced an environmental impact statement (EIS) for an updated General Management Plan (GMP) for the Park. NPS deemed grazing and trailing to be beyond the scope

---

[22] NPS0031630; NPS0032032.
[23] NPS0032032; NPS00005033.
[24] 16 U.S.C. § 273c.
[25] *Id.*
[26] 16 U.S.C. § 273d.
[27] *See* NPS0000499 and NPS0033686.
[28] *See*, *e.g.*, NPS0000495 and NPS0033666.

of the GMP and did not analyze any actions regarding livestock use.[29] However, the GMP EIS

stated the ESA "requires federal agencies to insure their activities do not negatively impact listed

species or cause others to become listed."[30] To that end, NPS found that "[a]ny impact that may

affect listed species . . . would be considered significant."[31]

NPS began a scoping process to develop a plan for and consider the impacts of grazing

and trailing in the Park via an EIS in 2015.[32] WWP provided comments during the scoping

period, and identified numerous Park resources that needed protection and recovery from

livestock impacts, including ESA-listed species.[33] WWP also identified applicable laws,

regulations, and policies by which NPS should prepare the EIS and plan in order to protect and

prevent impairment of park resources.[34]

Approximately three years into the development of the EIS, Phillip, Richard, and Doug

Pace, who historically grazed the Hartnet Allotment within the Park, relinquished their permit

through a private agreement, thus "retiring" the allotment from active grazing use.[35] A few

weeks earlier, the Acting Park Superintendent wrote to the Paces assuring them "the park will

work towards identify [sic] reasonable trailing routes acceptable to you and the park" through the

retired allotment.[36] Similarly, FWS wrote to the Paces supporting their "request to trail cattle

through the Park."[37]

---

[29] NPS0031670.
[30] NPS0031754.
[31] *Id.*
[32] 80 Fed. Reg. 13615 (Mar. 16, 2015).
[33] NPS0000497.
[34] *Id.*
[35] NPS0001186.
[36] NPS0033340.
[37] FWS0007372.

Shortly after the Paces relinquished their Hartnet permit, NPS announced its switch from completion of an EIS to preparation of a less comprehensive environmental assessment (EA) because "implementation of the LGTMP on the remaining allotment and trails throughout the park would not have significant impacts."[38] NPS released the EA in July 2018. NPS's preferred alternative proposed to double livestock densities in a new pasture rotation system for the remaining active Sandy 3 Allotment,[39] as well as construct fences, refurbish stock ponds, and apply herbicides within recommended wilderness.[40] NPS also proposed designating two trailing routes through the retired Hartnet Allotment: the Hartnet route and a new Lower South Desert route, previously unknown to the public.[41]

NPS further proposed to allow trailing along three routes through ESA-listed plant populations: the Lower South Desert, Hartnet, and Grey Bench-Cathedral Valley routes.[42] NPS proposed to evaluate damage and disturbance to these species in select locations *after* trailing.[43] NPS proposed responding to excessive damage and disturbance through adaptive management.[44] But, according to NPS, both monitoring and adaptive management are dependent on funding and not certain to be implemented.[45] If monitoring revealed no damage or disturbance at selected sites after three consecutive years, such monitoring would end, and at sites where thresholds were not exceeded, monitoring would be reduced.[46]

---

[38] NPS0004386.
[39] NPS0000020.
[40] NPS0000135-36.
[41] NPS0000023.
[42] NPS0000050.
[43] NPS0000026; NPS0000237; NPS0000296.
[44] NPS0000237-38.
[45] NPS0000069; NPS0000077.
[46] NPS0000237.

NPS proposed increased livestock numbers along three trailing routes,[47] including the Pleasant Creek route within Mexican spotted owl critical habitat.[48] NPS also allowed continued trailing of over 1,000 cattle twice yearly through Oak Creek,[49] Mexican spotted owl critical habitat that has been in nonfunctional condition due to livestock degradation since at least 2014.[50] NPS did not propose implementation of corrective measures to address Oak Creek's degradation until 2023.[51]

WWP comments on the EA expressed concerns with the lack of appropriate analysis of impacts to listed species throughout their limited ranges, the failure to examine impacts to Park resources through the lens of NPS's policies and operative statutes, and the unlawfulness of permitting trailing on a non-traditional route contrary to the Park's enabling legislation.[52] NPS also received comments from noted botanists Tom and Deb Clark,[53] whose research NPS cites extensively in the EA.[54] The Clarks were alarmed by the downgraded analysis of an EA, noting livestock impacts to Park resources would continue to be significant and unacceptable despite the Hartnet Allotment's retirement.[55] Daniela Roth, a former botanist for FWS, also submitted comments stating any continued damage to listed plants runs counter to NPS's ESA responsibilities to recover listed species and prevent their extinction.[56] Ms. Roth also disputed

---

[47] NPS0000022.
[48] NPS0000056.
[49] NPS0000017.
[50] NPS0000046; NPS0000056.
[51] NPS0000233.
[52] NPS0005045; NPS0005101.
[53] NPS0005021.
[54] NPS0000158-59.
[55] NPS0005021; NPS0005026.
[56] NPS0005030.

NPS's assertions that damage and disturbance thresholds would sufficiently protect listed plants, and advised against the discontinuation of monitoring.[57]

### C. Finding of No Significant Impact and Non-Impairment Determination.

NPS released a signed FONSI on October 3, 2018, selecting its preferred alternative for the LGTMP.[58] NPS identified five factors under 40 C.F.R. § 1508.27(b) it claimed to consider in reaching its conclusion: whether impacts are both beneficial and adverse; unique characteristics of the geographic area; the degree of uncertainty regarding impacts; the degree of adverse effects on listed species; and whether proposed actions relate to other actions that may lead to cumulatively significant impacts.[59] Consistent with its pre-decisional pronouncement after the Hartnet Allotment's retirement,[60] NPS determined there would be no significant impacts to any resources analyzed in the EA.[61]

NPS attached to its FONSI a Non-Impairment Determination (NID) for six resources, including ESA-listed plants and Mexican spotted owl.[62] NPS concluded that each of the resources "will continue to be present in the park for the enjoyment of future generations, and there will be no impairment of" them.[63] For listed plants, NPS relied on benefits flowing from the Hartnet Allotment's retirement to support its NID, despite the allotment's retirement independent from the LGTMP.[64]

---

[57] NPS0005031.
[58] NPS0000275.
[59] NPS0000278.
[60] NPS0004385.
[61] NPS0000278.
[62] NPS0000285.
[63] NPS0000286-93.
[64] NPS0000290.

Although the Non-Impairment Determination purported to be "guided by the direction of NPS Management Policies 2006" (Policies), it made no mention of the Policies' prohibition on unacceptable impacts to Park resources, nor their direction to proactively conserve and protect listed species.[65] The NID did not state whether authorized actions would impede the attainment of desired conditions of Park resources, the Policies' definition of "unacceptable."[66] Further, despite NPS's admission in Errata to the EA that the adopted Plan was inconsistent with its Policies regarding wilderness and listed plants,[67] the NID does not mention a valid waiver or modification of the Policies.[68]

      **D.     Relevant Species Listed Under the Endangered Species Act.**

          **1.     Listed Plants.**

FWS listed the Winkler cactus (*Pediocactus winkleri*) as threatened under the ESA in 1998.[69] The Winkler cactus is endemic to Wayne County and a small portion of Sevier County, Utah.[70] The Winkler cactus appears above-ground only in springtime when it flowers and produces seeds.[71] It retracts underground during summer heat and through the winter.[72] The Park comprises approximately 50% of the species' total range, which mostly occurs within the retired Hartnet Allotment; Bureau of Land Management (BLM) lands primarily comprise the remainder

---

[65] NPS Management Policies §§ 1.4.7.1 and 4.4.2.3 (2006). Hyperlinks for citations to NPS Management Policies provided to NPS website for convenience; also available at https://www.nps.gov/policy/MP_2006.pdf (last visited April 27, 2020).
[66] NPS Management Policies § 1.4.7.1.
[67] NPS0000300.
[68] *See* NPS Management Policies, Introduction.
[69] 63 Fed. Reg. 44587 (Aug. 20, 1998).
[70] NPS0000376.
[71] NPS0000051.
[72] *Id.*

of its range.[73] FWS identified livestock trampling as adversely affecting the species.[74] Trampling

destroys the physical components of the Winkler cactus that enable it to flower and reproduce.[75]

Cattle also reduce suitable habitat for the cactus by compacting the soil.[76] A lack of disturbance

is key to the survival of the largest, most reproductively-active plants which are necessary to

sustain a population.[77] According to NPS's experts, "every adult cactus in a population is

critical, and any impact that increases adult mortality would adversely affect overall population

survival."[78] Data show Winkler cactus mortality exceeds survival, resulting in a downward

population trend.[79]

     Half of all known Winkler cactus populations are small, with fewer than 500 individual

plants.[80] The other half "may be at risk of being fragmented into small populations."[81] FWS

found it "likely that population sizes of at least 500 individuals per population are necessary to

avoid extirpation."[82] Local extinction of populations, known as "extirpation," has already

occurred within the Hartnet Allotment in the Park.[83]

     FWS listed the Wright fishhook cactus (*Sclerocactus wrightiae*) as endangered under the

ESA in 1979.[84] Livestock trampling is a primary threat to the species.[85] Approximately 9% of

---

[73] NPS0000376.
[74] FWS0000005.
[75] NPS0000387.
[76] NPS0000387.
[77] NPS0000388.
[78] NPS0000105; NPS0000389; NPS0019842.
[79] NPS0000389.
[80] FWS0006068.
[81] *Id.*
[82] *Id.*
[83] FWS0006055.
[84] 44 Fed. Reg. 58868 (Oct. 11, 1979).
[85] FWS0000005; NPS0000383.

the plant's total range occurs in the Park, mostly within the retired Hartnet Allotment.[86] The oldest, largest individuals are the most reproductive.[87] Livestock trampling destroys the reproductive components of the cactus, and reduces suitable habitat by compacting soil.[88] Larger individuals are "largely absent" in habitat with livestock disturbance, resulting in reduced population growth.[89] Data show mortality exceeds recruitment, resulting in a downward population trend.[90] Individual survival is key to population growth.[91]

Additionally, in 1985 FWS listed the Last Chance townsendia (*Townsendia aprica*) as threatened under the ESA.[92] Last Chance townsendia is endemic to Emery, Sevier, and Wayne counties in Utah.[93] The Park contains 25% of the plant's occupied habitat.[94] FWS identified livestock as a major threat to the species.[95]

### 2. Mexican Spotted Owl.

FWS listed the Mexican spotted owl (*Strix occidentalis lucida*) as threatened under the ESA in 1993,[96] and designated critical habitat for the owl in 1994.[97] Federal lands, especially NPS lands, are important for the owl, according to FWS.[98] Riparian habitats are particularly

---

[86] NPS0000371.
[87] NPS0000374.
[88] NPS0000384.
[89] FWS0000011.
[90] NPS0000375.
[91] NPS0000049.
[92] 50 Fed. Reg. 33734 (Aug. 21, 1975).
[93] NPS0000377.
[94] *Id.*
[95] FWS0000013.
[96] 58 Fed. Reg. 14248 (Mar. 16, 1993).
[97] 69 Fed. Reg. 53182 (Aug. 31, 2004).
[98] FWS0005514.

important for owl recovery.[99] Livestock activity occurs throughout the owl's range, and negatively affects the availability of cover and food for the owl's prey.[100] Oak and Pleasant creeks are within Mexican spotted owl critical habitat and provide important foraging habitat for the species in the Park.[101]

NPS uses a protocol known as "proper functioning condition" to gauge the health of streams, including Oak Creek.[102] Oak Creek has been rated as nonfunctional due to cattle impacts since at least 2014.[103] NPS itself admits the "nonfunctioning condition of Oak Creek . . . indicates degradation of [the owl's] designated critical habitat," as well as degradation of the "primary constituent elements" necessary to maintain an adequate prey base for the owl.[104] Both NPS and FWS acknowledge trailing through Oak Creek contributes to its nonfunctional condition,[105] but NPS primarily blames trespass cattle, because Oak Creek is unfenced at the Park boundary.[106]

### E.  Key Aspects of the Biological Opinion.

In October 2018, FWS produced a Biological Opinion that purported to evaluate grazing and trailing effects on the three listed plants, as well as Mexican spotted owl and its critical habitat.[107] FWS limited the "action area" of its analysis to within the boundaries of the Park, even though trailing continues past the Park's borders and facilitates grazing on adjacent federal

---

[99] NPS0000055.
[100] FWS0000019.
[101] FWS0000023; NPS0000058.
[102] NPS0000045.
[103] NPS0000058; NPS0028900.
[104] NPS0000392.
[105] NPS0000054; NPS0000095; FWS0000035.
[106] NPS0000047; NPS0028927; NPS0032338.
[107] FWS0000001.

lands.[108] In reaching a "no jeopardy" opinion for the three listed plants, FWS relied on conservation measures set forth by NPS.[109]

Regarding Mexican spotted owl, FWS relied on NPS's "commitment to coordinate with Forest Service staff and the livestock grazing permit holders to eliminate cattle trespass in the Oak Creek drainage"[110] and the Park's intention to implement corrective actions after five years (in 2023) if Oak Creek continues to be impaired by livestock.[111] In the Biological Opinion, FWS found "[l]ivestock trailing within Oak Creek will continue to negatively affect the density and abundance of native vegetation, water temperature, and habitat for prey species" of the owl.[112] Nonetheless, FWS also reached "no jeopardy" and "no adverse modification" conclusions for Mexican spotted owl and its critical habitat in the BO.[113]

## SUMMARY OF THE ARGUMENT

## I.  ENABLING LEGISLATION AND APPLICABLE REGULATIONS.

The enabling legislation for Capitol Reef National Park and subsequent Park-specific legislation allow for limited grazing and trailing within the Park, subject to criteria expressed by Congress in plain language. First, Congress authorized NPS to continue to issue grazing permits to original permit holders or their direct descendants for their respective lifetimes. Nowhere did Congress grant NPS authority to allow grazing within the Park by non-permit holders, as

---

[108] FWS0000003; NPS0000011; NPS0000023.
[109] FWS0000003-04; FWS0000035.
[110] FWS0000037.
[111] FWS0000004.
[112] FWS0000035.
[113] *Id.*

currently occurs on the Sandy 3 Allotment. By allowing grazing by non-permit holders, NPS has exceeded its statutory authority, and permits that allow such grazing must be set aside.

Second, Congress authorized NPS to allow owners and operators who historically trailed cattle through the Park to continue such trailing only along traditional routes used by them prior to the Park's establishment. Congress further granted NPS authority to reasonably regulate the use of traditional routes. Here, NPS has issued permits for a newly-established route through the Lower South Desert in violation of the plain statutory language that limits trailing to traditional routes in use prior to the Park's establishment. Further, NPS has issued several trailing permits to owners and operators who did not use the routes for which they are now permitted prior to the Park's establishment. NPS has exceeded its statutory authority by issuing such trailing permits, and the permits must be set aside.

NPS's issuance of permits further violates its own regulations at 36 C.F.R. §§ 1.6(a) and 2.60(a)(1). Under 36 C.F.R. § 1.6(a), special use permits must be both consistent with applicable legislation and based upon a determination that Park resources will not be adversely impacted. Under 36 C.F.R. § 2.60(a)(1), livestock use may be allowed only if specifically authorized by federal law. NPS's authorization of grazing by non-permit holders under the Sandy 3 Allotment permit, trailing permits for the newly-created Lower South Desert route, and trailing permits issued to non-historic users are neither consistent with applicable legislation nor specifically authorized by federal law. Further, NPS admits that trailing through ESA-listed species habitat will cause adverse impacts contrary to 36 C.F.R. §§ 1.6(a). Because the NPS has not issued these permits according to its regulations, they are not in accordance with the law and must be set aside.

## II.     NATIONAL PARK SERVICE ORGANIC ACT AND POLICIES.

The Livestock Grazing and Trailing Management Plan authorizes livestock activity that violates the non-impairment mandate of the NPS Organic Act. NPS admits authorized trailing through ESA-listed plant habitat will likely adversely affect the plants, but no proactive conservation measures will be implemented until after damage and disturbance occurs. Further, NPS states it will cease monitoring for such damage and disturbance if none is detected after three years at selected sites. NPS also admits authorized trailing of over 1,000 cattle twice yearly through nonfunctional Oak Creek will continue to degrade and likely adversely affect Mexican spotted owl critical habitat. Yet, despite these admissions, NPS does not commit to any proactive conservation measures to restore or protect this important foraging habitat for the owl until 2023.

NPS's Non-Impairment Determination for listed plants lack justification based on the record, because the actions authorized under the LGTMP will impede, rather than attain, desired future conditions. NPS has not complied with its Policies to prevent unacceptable impacts to Park resources to the extent possible. In addition, the Plan authorizes actions that will degrade the untrammeled and undeveloped qualities of recommended wilderness within the Park, actions NPS admits is inconsistent with its Management Policies. NPS also admits the trailing authorized by the Plan is inconsistent with its Policies regarding listed plants. NPS's authorization of actions that impede the attainment of desired future conditions for listed species and that run counter to its Policies without explanation are arbitrary and capricious, and the Plan and NID must be set aside.

## III. NATIONAL ENVIRONMENTAL POLICY ACT.

Three years into the development of an EIS for the Livestock Grazing and Trailing Management Plan, NPS suddenly changed course to a less-thorough EA, pre-determining that impacts to Park resources would no longer be significant following the retirement of grazing on the Hartnet Allotment. Yet, in addition to the continuing impacts of ongoing and previously authorized trailing and grazing in the Park, the adopted Plan authorized new and additional impacts to Park resources that likely will be significant according to the agency's own analysis, thus requiring a full EIS.

In reaching its FONSI, NPS failed to properly consider and weigh multiple intensity factors under applicable NEPA regulations, and ignored other relevant information in the record indicating impacts from the LGTMP will be significant. Further, the EA failed to take a hard look at cumulative impacts from trailing within the Park's borders in conjunction with the interrelated grazing that occurs just outside the Park within ESA-listed species habitat. NPS also failed to acknowledge or consider the application of its Policies to the actions analyzed in the EA, thereby ignoring relevant factors. For these reasons, the EA and FONSI are arbitrary and capricious, must be set aside, and NPS must produce a full EIS for the Plan.

## IV. ENDANGERED SPECIES ACT.

In 2018, FWS produced a Biological Opinion examining the effects of livestock grazing and trailing within the Park on ESA-listed species. Yet FWS arbitrarily delineated an overly narrow action area in which it assessed effects on the species, excluding relevant and related impacts of grazing occurring just outside the Park's boundaries on adjacent federal lands, an activity facilitated by trailing through the Park. As such, FWS did not properly determine the

environmental baseline for listed species on these lands, and its Biological Opinion is arbitrary and capricious and must be set aside.

FWS also improperly concluded continued nonfunctional condition of Oak Creek for five more years would not adversely modify critical Mexican spotted owl foraging habitat, despite evidence that livestock trailing through the creek contributes to the habitat's degradation and prevents development of adequate cover for the owl's prey. FWS's conclusion that continued trailing of 1,000 cattle twice yearly through Oak Creek will not adversely modify the owl's critical habitat runs counter to the evidence before it, is arbitrary and capricious, and must be set aside.

FWS also improperly premised its "no jeopardy or adverse modification" conclusions on uncertain, unspecific, and ineffective conservation measures that do nothing to proactively address the currently nonfunctional condition of Mexican spotted owl critical habitat in Oak Creek, or to prevent damage and disturbance to listed plant populations along trailing routes. FWS's conclusions that rely on such measures are arbitrary and capricious and must be set aside. Because FWS failed to produce a lawful biological opinion, NPS's reliance on the 2018 Biological Opinion to satisfy its own duties is arbitrary and capricious, and its adoption of the LGTMP violates the ESA.

## ARGUMENT

### I.      STANDARDS OF REVIEW.

The Administrative Procedure Act (APA) provides for judicial review of final agency actions.[114] Courts in the Tenth Circuit apply the APA's "arbitrary and capricious" standard when

---

[114] 5 U.S.C. § 702.

reviewing challenges to such actions, including suits brought through the citizen-suit provision of the ESA.[115] Under the APA, a reviewing court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," as well as set aside agency action in excess of statutory authority.[116]

An agency's decision is arbitrary and capricious if the agency "(1) 'entirely failed to consider an important aspect of the problem,' (2) 'offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise,' (3) 'failed to base its decision on consideration of the relevant factors,' or (4) made 'a clear error of judgment.'"[117] Further, an agency must "[a]rticulate a rational connection between the facts found and the decision made."[118] A court's review under the "arbitrary and capricious" standard is deferential, but "searching and careful," "thorough, probing, and in-depth."[119] An agency's decisions may be upheld, if at all, based on "only the agency's reasoning at the time of decisionmaking," not "post hoc rationalizations concocted by counsel."[120]

---

[115] *WildEarth Guardians v. Bureau of Land Mgmt.*, 870 F.3d 1222, 1233 (10th Cir. 2017); *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1105 n.3 (10th Cir. 2010); *see* 16 U.S.C. § 1540(g).
[116] 5 U.S.C. §§ 706(2)(A) and (C).
[117] *WildEarth Guardians*, 870 F.3d at 1233 (quoting *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 704 (10th Cir. 2009)).
[118] *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1574 (10th Cir. 1994) (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).
[119] *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415-16 (1971).
[120] *New Mexico ex rel. Richardson*, 565 F.3d at 704 (quoting *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1165 (10th Cir. 2002)).

In the Tenth Circuit, courts resolve challenges to agency actions in excess of statutory authority under "the two-part standard of review outlined by the Supreme Court in *Chevron, U.S.A. . . .*"[121] First, a court "must determine 'whether Congress has directly spoken to the precise question at issue.'"[122] If the plain language of the statute is clear, "the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."[123] Only if "Congress has not determined the precise question at issue" should a court proceed to the second step of *Chevron* analysis and determine if the agency's interpretation "is based on a permissible construction of the statute."[124]

## II.    NPS LACKS STATUTORY AUTHORITY TO ALLOW GRAZING ON THE SANDY 3 ALLOTMENT BY NON-PERMIT HOLDERS.

On December 18, 1971, Congress established Capitol Reef National Park.[125] Section 3 of the enabling legislation directed the Interior Secretary to allow previously authorized grazing within the Park to continue for a specified amount of time: the length of the current permit term, plus "one period of renewal thereafter."[126] Congress later extended permitted grazing within the Park "for the lifetime of the permittee or any direct descendants (sons or daughters) born on or before the enactment of Public Law 92-207 (December 18, 1971)."[127]

---

[121] *Am. Wild Horse Preservation Campaign v. Jewell*, 847 F.3d 1174, 1187 (10th Cir. 2016) (citing *Chevron, U.S.A. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984)).
[122] *Id.*
[123] *Id.*
[124] *Id.*
[125] 16 U.S.C. § 273.
[126] 16 U.S.C. § 273b.
[127] Pub. L. No. 100-446 (Sept. 27, 1988).

Here, the record indicates Jean Gillespie currently holds the grazing permit for the Sandy 3 Allotment.[128] Jean Gillespie, née LuJean Taylor, is the daughter and last remaining direct descendant of Don and Afton Taylor, who held the Sandy 3 Allotment permit at the time of the Park's establishment.[129] Under the legislated permit termination plan, Jean Gillespie should be the final permittee for this allotment. However, NPS has accepted Ms. Gillespie's conveyance of permit authority to her nephew, Boone Taylor, "until such time as the permit is transferred to another person," even though no one else qualifies as a "direct descendant" of the original permit holders to whom such transfer would be valid.[130] The record also shows NPS has acquiesced to Boone Taylor's brother-in-law Richard Fillmore's cattle on the Sandy 3 Allotment since at least 2011 under the same improper permit,[131] a practice that continues according to Mr. Fillmore's public comments during the LGTMP NEPA process.[132]

By specifying precisely in Public Law 100-446 to whom NPS may issue grazing permits, Congress effectively defined *by* whom such permits may be used: original permit holders or their direct descendants. Neither Boone Taylor nor Richard Fillmore fit these criteria. Further, nothing in the record indicates Ms. Gillespie resides in the State of Utah or retains any obligations or benefits flowing from the Sandy 3 Allotment permit.

To the extent Congress did not place explicit restrictions on use by non-permit holders, a statute is not ambiguous merely because Congress did not "explicitly delineate everything an

---

[128] NPS0031631.
[129] NPS0032032.
[130] NPS0031631.
[131] NPS0032032.
[132] NPS0005033.

agency cannot do."[133] The underlying purpose of the language Congress expressly provided must be given its intended effect in light of both its specific and broader context.[134] Here, in the context of providing an orderly phase-out of grazing from the Park, Congress did not "hide elephants in mouseholes" within its legislated regulatory scheme.[135] The language of the statute does not support loopholes for continued grazing operations within the Park where the legitimate permit holder plays no active role, as here, nor use by non-descendants.

NPS's acquiescence to use by non-permit holders neither gives the intended effect to the plain language of Congress nor represents a permissible construction of the statute.[136] NPS exceeded its statutory authority by issuing grazing permits used[137] by both Boone Taylor and Richard Fillmore. Such permits must be set aside.

## III. NPS MAY NOT ISSUE TRAILING PERMITS OUTSIDE ITS STATUTORY AUTHORITY.

In Section 4 of the enabling legislation, Congress specifically addressed livestock trailing within the Park:

> Nothing in this Act shall be construed as affecting in any way the rights of owners and operators of cattle and sheep herds, existing on the date immediately prior to the enactment of this Act, to trail their herds on **traditional courses used by them** prior to such date of enactment, and to water their stock, notwithstanding the fact that the lands involving such trails and watering are situated within the park: *Provided*, That the Secretary may promulgate reasonable regulations providing for the use of such driveways.[138]

---

[133] *Contreras-Bocanegra v. Holder*, 678 F.3d 811, 818 (10th Cir. 2012).
[134] *See Robinson v. Shell Oil. Co.*, 519 U.S. 337, 341 (1997) (citing *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 477 (1992); also citing *McCarthy v. Bronson*, 500 U.S. 136, 139 (1991)).
[135] *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).
[136] *See Chevron, U.S.A.*, 467 U.S. at 842-43.
[137] NPS0000499; NPS0000516-26; NPS0033686.
[138] 16 U.S.C. § 273c (emphasis added).

With this language, Congress expressly allowed continued livestock trailing through the Park within certain limitations: such trailing is allowed by those owners and operators who had trailed livestock through the Park prior to its establishment, and along the routes those owners and operators used prior to the Park's establishment. Congress recognized the Organic Act's application to Park management would otherwise prohibit trailing, evident from its use of the phrase "notwithstanding the fact the lands . . . are situated within the park."[139] Because of this, Congress carved out an exception to allow specified trailing to continue post-establishment, subject to reasonable regulation.

"As a general principle of statutory interpretation, if a statute specifies exceptions to its general application, other exceptions not explicitly mentioned are excluded."[140] Here, Congress enumerated the livestock exceptions it intended to apply within the Park: grazing as specified in Section 3, and trailing as specified in Section 4. Further, Congress included a proviso to the trailing section of the act: "*Provided*, That the Secretary may promulgate reasonable regulations providing for the use of such driveways."[141] Thus, Congress authorized the Secretary to regulate "*such* driveways,"[142] which in this context, refers back to the description immediately preceding: "traditional courses used by *them* prior to such date of enactment."[143] In turn, the pronoun

---

[139] 16 U.S.C. § 273d; *see also* 16 U.S.C. § 1 (repealed and replaced by Pub. L. No. 113-287 (Dec. 19, 2014), 54 U.S.C. § 100101).
[140] *Contreras-Bocanegra*, 678 F.3d at 817 (citing *United States v. Goldbaum*, 879 F.2d 811, 813 (10th Cir. 1989)).
[141] 16 U.S.C. § 273c (emphasis in original).
[142] *Id.* (emphasis added)
[143] *Id.* (emphasis added).

"them" is clarified by the same sentence: "owners and operators . . . existing on the date immediately prior to" December 18, 1971.[144]

According to the Supreme Court, "[t]he plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole."[145] Here, the language of Congress identified with exact clarity who may trail livestock through the Park (owners and operators who pre-date the Park's establishment), as well as where (traditional courses used by them prior to the Park's establishment).[146] In the specific context of Section 4, Congress provided cues that it meant to address livestock trailing fully and completely: first, by noting that traditional courses' location within the Park would otherwise conflict with NPS's over-arching conservation focus; and second, by authorizing the Secretary to regulate "*such* driveways" as described in the preceding sentence of Section 4.[147] Finally, looking at Public Law 92-207 as a whole further supports the unambiguous nature of Section 4: Congress chose to address livestock use in the Park in Sections 3 and 4 before otherwise directing NPS to manage the Park according to the Organic Act. Had Congress intended other exceptions to the Organic Act's conservation focus, it had full opportunity to state them in the enabling legislation, and did not.

---

[144] 16 U.S.C. § 273c.
[145] *Robinson*, 519 U.S. at 341 (citations omitted).
[146] 16 U.S.C. § 273c.
[147] *Id.*

**A.      NPS Lacks Authority to Issue Trailing Permits for the New Lower South Desert Route.**

Through the LGTMP and associated trailing permits, NPS contends it has authority under Section 4 of Public Law 92-207 to establish a new route in the Lower South Desert for use by the Paces, the former Hartnet Allotment permit holders, in addition to permitting trailing by the Paces for the first time along the Hartnet route.[148] Neither NPS nor the Paces ever asserted a trailing route existed through the Lower South Desert before 2018. The record contains a 1977 stock driveway map clearly showing the Hartnet route, but nothing through the Lower South Desert.[149] In response to a 1980 request by the Park Superintendent to identify their traditional trailing routes, the Paces described the Hartnet route but mentioned nothing about trailing cattle along the new route designated in the LGTMP: northward from Highway 24 through the Lower South Desert, then veering east at Jailhouse Rock.[150] Nothing in the exhaustive Administrative History of the Park identified such a trailing route either.[151] NPS admits it does not even know the exact location of the Lower South Desert route.[152]

Likely sensing the vulnerability of its asserted authority to permit trailing on non-traditional routes, NPS later hedged. Drawing on a theory put forth by cooperating agencies (i.e., counties and the State) a few months before the release of the LGTMP EA,[153] NPS now contends that the Lower South Desert route, like the Hartnet route, is a traditional course because the Paces moved cattle through the area during permitted grazing prior to the retirement of the

---

[148] NPS0000017; NPS0000312; NPS0033672; NPS0033678.
[149] NPS0031628.
[150] NPS0000529; NPS0000535.
[151] NPS0032114-16.
[152] NPS0000324; NPS0000050; NPS0000107.
[153] NPS0001422.

Hartnet Allotment.[154] But had the Paces considered their grazing as inclusive of trailing in the Hartnet Allotment, there would have been no need to specifically describe the Hartnet route in their responses to the Superintendent's 1980 request, which they did.[155]

NPS's current position on this issue is quite new. First, just a few months before finalizing the Plan, NPS described the Lower South Desert trail as a "new route to be established," relative to the traditional Hartnet route.[156] Second, NPS had earlier rejected a trailing permit request through the retired Waterpocket Allotment by the former grazing permit holder because the proposed location, Halls Creek, "was not a recognized stock driveway."[157]

Nonetheless, NPS now conflates cattle turn-out and their gradual movement over the course of a seven-month permitted grazing season with trailing.[158] Nothing in the record indicates that deliberate, short-term herding and movement of cattle occurred historically through the Lower South Desert, unlike trailing use on all other previously permitted routes.[159] The record does not support NPS's position that the Lower South Desert route is traditional within the meaning of Section 4 of Public Law 92-207. Nor does Section 4 allow NPS to authorize trailing along non-traditional routes in the Park. NPS's issuance of permits for the Lower South Desert route is contrary to the law, exceeds its statutory authority, and must be set aside.

---

[154] NPS0000311.
[155] NPS0000529; NPS0000535.
[156] NPS0000807.
[157] NPS0032137.
[158] NPS0001190.
[159] *See* NPS0000150 (NPS definition of trailing); *see also* NPS0000017.

**B.    NPS May Not Issue Trailing Permits to Non-Historic Owners or Operators.**

NPS contends that the enabling legislation for Capitol Reef National Park allows it to permit trailing by applicants who did not use traditional courses prior to the Park's establishment.[160] The agency's interpretation runs counter to the statute's plain language. Congress precisely addressed both by whom (owners and operators who pre-date the Park's establishment) and where (traditional courses used by them prior to the Park's establishment) livestock trailing may continue in the Park.[161] As noted above, the language of Congress lacks ambiguity.

The Tenth Circuit warned against finding ambiguity in a statute simply because Congress did not "explicitly delineate everything an agency cannot do."[162] Instead, when Congress enumerates exceptions to an otherwise applicable regulatory scheme—the Organic Act in this instance—"[t]he proper inference . . . is that Congress considered the issue of exceptions and, in the end, limited the statute to the ones set forth."[163] And merely because Congress chose different language to characterize criteria for continued grazing in Section 3 than it uses regarding trailing in Section 4 does not mean the language used by Congress is ambiguous. As a matter of course, courts "presume the plain language of a statute expresses congressional intent."[164] Where the statutory language of Congress plainly addresses the question at the heart

---

[160] NPS0000017; NPS0000311; NPS0002164; NPS0002182.
[161] 16 U.S.C. § 273c.
[162] *Contreras-Bocanegra*, 678 F.3d at 818; *see also New Mexico v. U.S. Dep't of Interior*, 854 F.3d 1207, 1222-23 (10th Cir. 2017).
[163] *United States v. Johnson*, 529 U.S. 53, 58 (2000); *see also Contreras-Bocanegra*, 678 F.3d at 817 (citation omitted).
[164] *In re Hamilton Creek Metro. Dist.*, 143 F.3d 1381, 1385 (10th Cir. 1998) (citing *Ardestani v. Immigration & Naturalization Serv.*, 502 U.S. 129, 135-36 (1991)).

of this inquiry—by whom and where NPS may permit trailing in the Park—the statute's

language controls the answer.

Between 2018 and 2020, NPS issued several trailing permits to owners or operators who

do not meet the criteria laid out in Section 4, despite citing Section 4 of Public Law 92-207 as

statutory authority.[165] These owners and operators include Richard Fillmore, Castle Valley Cattle

Company, LLC, Jeffery Ranches, Stan Wood, and Sandy Ranch.[166] NPS has issued Richard

Fillmore trailing permits since at least 2011,[167] but the name Fillmore is absent from the 1994 list

of trailing permittees,[168] the records from historic owners and operators in response to the

Superintendent's 1980 letter,[169] or the Administrative History that discusses historic grazing and

trailing in the Park.[170]

NPS also issued Castle Valley a series of trailing permits for Jones Bench,[171] but the

name Castle Valley is not mentioned in the record prior to 2011.[172] Jeffery Ranches, meanwhile,

currently receives permits for the Grey Bench-Cathedral Valley route,[173] but the record does not

indicate any trailing by Jeffery Ranches prior to 1994.[174] Stan Wood's name appears in the

record at least back to 1980, but in response to the Superintendent's request to identify

historically used trailing routes, Wood indicated use of Oak Creek, Notom Road, Highway 24,

---

[165] NPS0000493; NPS0000495; NPS0000503; NPS0000505; NPS0000514; NPS0033664; NPS0033666; NPS0033670; NPS0033680; NPS0033694.
[166] *Id.*
[167] NPS0032036; NPS0000495; NPS0033669.
[168] NPS0031629.
[169] NPS0032277-303.
[170] NPS0032114-16.
[171] NPS0000514; NPS0033664.
[172] NPS0031626; NPS0031629; NPS0032036; NPS0032277-303; NPS0032114-16.
[173] NPS0000505; NPS0033670.
[174] NPS0031629; NPS0032114-16; NPS0032227-303.

and Capitol Gorge, *not* Pleasant Creek, the route for which NPS currently permits him to use.[175] Last, Sandy Ranch has been in existence since the 1880s,[176] but the record does not indicate use of Oak Creek for trailing by the Sandy Ranch under any owner prior to 1994.[177]

Absent documentation that these parties used the particular trailing routes for which they are currently permitted prior to December 18, 1971, NPS has no statutory basis to issue such permits. Because the plain language of the enabling legislation restricts trailing to historic users of traditional courses, permits outside these criteria exceed agency authority, are not in accordance with the law, and must be set aside.

## IV.   NPS ISSUED SPECIAL USE PERMITS IN VIOLATION OF APPLICABLE REGULATIONS.

Under current NPS regulations, the agency may issue special use permits only when

consistent with applicable legislation, Federal regulations, and administrative policies, *and* based upon a determination that . . . environmental or scenic values, natural or cultural resources, scientific research, implementation of management responsibilities . . . or the avoidance of conflict among visitor use activities *will not be adversely impacted*.[178]

Further, another NPS regulation prohibits livestock use in NPS units except "[a]s specifically authorized by Federal statutory law."[179]

Under the current status quo, NPS continues to allow grazing in the Park by Boone Taylor and Richard Fillmore that is not "specifically authorized by Federal statutory law," nor "consistent with applicable legislation," in violation of the agency's own regulations.[180] NPS did

---

[175] NPS0032294-95; NPS0000503; NPS0033694.
[176] NPS0032066.
[177] NPS0031629; NPS0032277-303.
[178] 36 C.F.R. § 1.6(a) (emphasis added).
[179] 36 C.F.R. § 2.60(a)(1).
[180] 36 C.F.R. § 2.60(a)(1); 36 C.F.R. § 1.6(a).

not issue grazing permits signed by Boone Taylor based upon a determination that Park

resources will not be adversely impacted.[181] To the contrary, NPS admits degradation will occur

in the Sandy 3 Allotment under authorized grazing.[182] Except where "directly and specifically

provided by Congress," NPS may not allow acts that harm Park resources.[183] NPS's

authorization of grazing on the Sandy 3 Allotment violates Public Law 100-446 and agency

regulations, is arbitrary and capricious, and must be set aside.

      Similarly, for the reasons stated in Part III of the Argument, trailing permits for the

Lower South Desert route and to non-historic users of other routes are not "specifically

authorized by Federal statutory law" in accordance with 36 C.F.R. § 2.60(a)(1). Further, NPS has

made no determinations that issuance of trailing permits will not adversely impact Park

resources, as required by 36 C.F.R. § 1.6(a). To the contrary, NPS admits Mexican spotted owls

and designated critical habitat are likely to be adversely impacted by trailing along the Oak

Creek and Pleasant Creek routes,[184] and listed plant species along the Grey Bench-Cathedral

Valley, Hartnet, and Lower South Desert routes will also likely be adversely affected.[185] Trailing

permits issued by NPS outside its statutory authority and contrary to its own regulations are

arbitrary, capricious, or otherwise not in accordance with the law, and must be set aside.

---

[181] 36 C.F.R. § 1.6(a).
[182] NPS0000076-78; NPS0000135-36; NPS0000231.
[183] *Grunewald v. Jarvis*, 930 F. Supp. 2d 73, 77 (D.D.C. 2013) (citing 16 U.S.C. § 1a-1 (repealed and replaced by Pub. L. 113-287 § 3 (Dec. 19, 2014), 54 U.S.C. § 100101(b)(2).
[184] NPS0000411.
[185] *Id.*

## V.   THE LGTMP IS IRRECONCILABLE WITH NPS'S OVERRIDING CONSERVATION MANDATE.

The Organic Act of 1916 laid out a bold mandate for the National Park Service to conserve park resources and ensure they remain "unimpaired for the enjoyment of future generations."[186] As such, "the highest standard of protection and care" applies to the natural resources within the National Park System,[187] and NPS must manage parks "with resource protection the overarching concern."[188] Congress reaffirmed this conservation mandate in 1978, and stressed that in all units, "the authorization of activities shall be construed and the protection . . . of these areas shall be conducted in light of the high public value and integrity of the National Park System."[189] As such, even when a park's enabling legislation appears to conflict with protection of park resources, the protection of park resources and values must be predominant, and "[n]o decision shall compromise these resource values except as Congress may have specifically provided."[190] As the agency acknowledges, NPS's management discretion is thus limited by its conservation mandate, and decisions about Park uses must necessarily bend toward protection.[191]

To further guide management decisions, NPS adopted policies in 2006 designed to uphold the Organic Act's mandate: first, its "fundamental purpose" to "conserve park resources and values," and second, to prevent impairment of park resources.[192] Through the NPS

---

[186] 16 U.S.C. § 1 (replaced by 54 U.S.C. § 100101).
[187] *S. Utah Wilderness Alliance. v Nat'l Park Serv.*, 387 F. Supp. 2d 1178, 1191 (D. Utah 2005) (citation omitted).
[188] *Bicycle Trails Council of Marin v. Babbitt*, 82 F.3d 1445, 1453 (9th Cir. 1996).
[189] Pub. L. No. 95-250 (Mar. 27, 1978) (replaced by 54 U.S.C. § 100101(b)(2)).
[190] *Grunewald*, 930 F. Supp. 2d at 77 (citation omitted).
[191] NPS0000285.
[192] NPS Management Policies § 1.4.3.

Management Policies, NPS must take a precautionary approach to ensure no impairment of park resources occurs by prohibiting actions that exceed the lower threshold of "unacceptable impacts."[193] The Policies define "impairment" as actions "that would harm the integrity of park resources or values."[194] "Unacceptable impacts," meanwhile, are those that "would be inconsistent with a park's purpose or values, or impede the attainment of a park's desired future conditions . . . ."[195] The Policies also address the challenge in the case at hand, where a park's enabling legislation mandates a particular use that would otherwise be prohibited: According to NPS's own Policies, the agency has "the authority to and *must* manage and regulate the use to ensure, *to the extent possible*, that impacts on park resources from that use are acceptable."[196]

In order to fulfill its non-impairment mandate, prior to authorization of any action NPS must "consider the impacts . . . and determine, in writing, that the activity will not lead to impairment of park resources and values."[197] Such a determination must be justified by the administrative record.[198] In the absence of supporting records, such decisions are arbitrary and capricious.[199] As an official interpretation of the Organic Act's mandate, section 1.4 of the Policies have been held to be enforceable.[200]

---

[193] NPS Management Policies § 1.4.7.1.

[194] *Id.* § 1.4.5.

[195] *Id.* § 1.4.7.1.

[196] *Id.* § 1.4.3.1 (emphasis added).

[197] *Id.* § 1.4.7.

[198] *See Greater Yellowstone Coal. v. Kempthorne*, 577 F. Supp. 2d 183, 195 (D.D.C. 2008).

[199] *See id.*; *see also Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 103 (D.D.C. 2006).

[200] *Greater Yellowstone Coal.*, 577 F. Supp. 2d at 195 n.1.

**A.      NPS Failed to Prevent Unacceptable Impacts to the Extent Possible.**

The recently adopted LGTMP does not strike an appropriate balance between the competing demands of livestock use and the NPS's obligations to conserve and prevent impairment of Park resources. NPS has failed to prevent unacceptable impacts to the extent possible, as required by its Policies.[201] Instead, NPS perpetuates resource degradation contrary to its Policies by declining to proactively implement available protective measures along trailing routes and within the Sandy 3 Allotment.

For example, NPS dismissed immediate implementation of the following possible resource protections that fall well within its authority:

- declining to authorize infrastructure and trammeling actions within recommended wilderness without first undertaking a minimum requirements analysis;[202]

- limiting use of Oak Creek until it regains proper functioning condition rather than waiting until 2023;[203]

- relocating Oak Creek trailing to the alternative Dry Bench route;[204]

- using temporary fences to protect ESA-listed plants rather than waiting until after damage and disturbance occurs;[205]

- declining to issue trailing permits through ESA-listed species habitat to non-historic users;[206]

---

[201] NPS Management Policies § 1.4.3.1.
[202] NPS0000239-42.
[203] NPS0000233.
[204] NPS0000027; NPS0000078; NPS0000113; NPS0000117; NPS0000128; NPS0000238.
[205] NPS0000077; NPS0000108-09.
[206] NPS0000295; NPS0000310.

- declining to issue trailing permits for a non-traditional route through ESA-listed plants.[207]

Although these measures are immediately available options to protect Park resources, NPS instead authorized actions the agency admits run *counter* to its own policies regarding wilderness and ESA-listed species,[208] and are likely to adversely affect four listed species and designated Mexican spotted owl critical habitat.[209]

In Oak Creek, NPS authorized continued livestock trailing by over 1,000 cattle twice yearly, despite its continuous nonfunctional condition since at least 2014 due to livestock.[210] Further, NPS committed to no corrective actions unless Oak Creek does not attain proper functioning condition by 2023.[211] With NPS's authorization, the designated Mexican spotted owl critical foraging habitat in Oak Creek may suffer at least a decade of non-function. According to NPS, the desired future conditions for ESA-listed species are to improve habitat, ensure their continued existence, and promote their recovery.[212] Continued degradation and failure to correct Oak Creek's nonfunctional condition until 2023 accomplish none of these desired conditions; they impede them. Declining to act sooner than 2023 to intervene in this ongoing degradation thus allows unacceptable impacts to occur, despite readily available options to remove or lessen them.

---

[207] NPS0000017; NPS0000023; NPS0000295; NPS0000310.
[208] NPS0000300; *see* NPS Management Policies §§ 4.4.2.3 and 6.3.5.
[209] NPS0000411.
[210] NPS0000017; NPS0000058; NPS0028900.
[211] NPS0000233.
[212] NPS0000233.

NPS also authorized trailing it admits will damage, disturb, and likely adversely affect listed plants.[213] NPS concedes such impacts are not consistent with its Policies meant to conserve and protect listed species.[214] Allowing such damage and disturbance with no proactive measures in place to prevent it does not improve listed species' habitat, ensure their continued existence, or promote their recovery. To the contrary, experts warned trailing in the Park may threaten species' existence and lead to local extinctions.[215] The attainment of NPS's identified desired future conditions for listed species will be impeded by such trailing.

Because NPS admitted actions authorized by the LGTMP are not consistent with its Policies regarding listed species or wilderness, and will also likely adversely affect four listed species and Mexican spotted owl critical habitat, and because authorized trailing will impede the attainment of identified desired future conditions for listed species, NPS's Non-Impairment Determination for these resources lacks justification in the record. The level of impacts that will occur over the twenty-year lifespan of the Plan surpasses the threshold of "unacceptable."[216] NPS has not prevented such impacts to the extent possible, as its Policies require.[217] The LGTMP and Non-Impairment Determination are arbitrary and capricious, in violation of the Organic Act, and must be set aside.

---

[213] NPS0000106; NPS0000411.
[214] NPS0000300.
[215] NPS0005021; NPS0005030-31.
[216] NPS Management Policies § 1.4.7.1.
[217] *Id.* § 1.4.3.1.

**B.** **NPS's Failure to Follow Its Policies Without Explanation Is Arbitrary and Capricious.**

When the purpose of an agency's policies is to ensure compliance with its operative legislation, like here, it is arbitrary and capricious for the agency to ignore those policies while claiming its actions were developed in compliance with them.[218] NPS adopted its Policies to carry out its conservation and non-impairment mandates, as established by the Organic Act.[219] NPS claims it developed and adopted the LGTMP pursuant to its Policies,[220] but ultimately admits that regarding wilderness and ESA-listed species, its decisions are *inconsistent* with those Policies, with no accompanying explanations as to why consistency could not be achieved.[221]

In a cursory statement in the Errata to the EA, NPS contends that allowing degradation of the Park's recommended wilderness through trammeling actions and infrastructure development "represents a tradeoff" supporting improvement of other wilderness characteristics.[222] But this points to the exact reason a "minimum requirements analysis" as required by the Policies should have been conducted for the Plan.[223] Such a tradeoff may not have been necessary had NPS undertaken the process outlined by its Policies. Compounding the agency's disjointed decision-making regarding wilderness, NPS stated in the EA that a minimum requirements analysis will be conducted for tamarisk removal near stock ponds.[224] Yet NPS offered no explanation why

---

[218] *Ecology Ctr. v. Austin*, 430 F.3d 1057, 1069-70 (9th Cir. 2005) (overruled on other grounds by *Lands Council v. McNair*, 537 F.3d 981 (9th Cir. 2008); *see also Rocky Mountain Wild v. Vilsack*, 843 F. Supp. 2d 1188, 1196 (D. Colo. 2012).
[219] NPS Management Policies, Underlying Principles; *id.* § 1.4.3.
[220] NPS0000011; NPS0000048; NPS0000109; NPS0000117; NPS0000285; NPS0000291; NPS0000293.
[221] NPS0000300.
[222] NPS0000300.
[223] NPS Management Policies § 6.3.5.
[224] NPS0000242.

construction of fences, application of herbicides, or refurbishment of stock ponds should not also be subject to minimum requirements analyses, nor why such analyses should not be conducted prior to such activities' authorization in the LGTMP.

Regarding listed plants, NPS offered no explanation why adoption of the Plan despite its inconsistency with the Policies is warranted. Section 4.4.2.3 of the Policies directs NPS to "fully meet its obligations under the NPS Organic Act and the Endangered Species Act to both proactively conserve listed species and prevent detrimental effects on these species."[225] Yet by acknowledging the LGTMP's inconsistency with its Policies, NPS concedes the Plan fails to meet its obligations under both the Organic Act and the ESA. And the record documents this failure: No proactive conservation measures are required before trailing through ESA-listed plant populations;[226] only after damage and disturbance occurs might NPS implement tools at its disposal, including temporary fencing.[227] Further, according to the adopted Plan, NPS will reduce or cease monitoring for damage or disturbance if impacts fall below certain thresholds or are not detected at "selected localities," opening the door for potentially devastating damage and disturbance to occur unmonitored and undetected over the twenty-year lifespan of the LGTMP.[228] These failures run further afoul of the NPS Policies' stated commitment to proactively conserve and prevent detrimental effects on listed species.[229]

An agency violates its operative statute and the APA "by completely disregarding its own policies" during decision-making and management "without discussion or analysis" in

---

[225] NPS Management Policies § 4.4.2.3.
[226] NPS0000237-38.
[227] *Id.*
[228] NPS0000237.
[229] NPS Management Policies § 4.4.2.3.

accompanying NEPA documents.[230] Here, to ensure internal NPS compliance, NPS may deviate

from the Policies only with a valid written waiver or modification, according to their

Introduction.[231] But the record contains no evidence of such a written waiver or modification,

despite NPS's admission the Plan does not align with the Policies' requirements for wilderness

or listed species.[232] "Agencies are under an obligation to follow their own regulations,

procedures, and precedents, or provide a rational explanation for their own departure."[233]

Because NPS failed to provide any substantive explanation for its deviation from agency Policies

regarding wilderness and listed species, it has not articulated a rational connection between the

facts found and its ultimate decision.[234] Thus, NPS's adoption of the Plan is arbitrary and

capricious, and must be set aside.

## VI. NPS'S FAILURE TO PRODUCE AN EIS FOR THE LGTMP VIOLATED NEPA.

NEPA requires federal agencies to prepare an EIS for all major federal actions

"significantly affecting the quality of the human environment."[235] Under NEPA, "an agency

generally prepares an EA," a more concise document, "to guide whether it should prepare an

EIS" or issue a finding of no significant impact (FONSI).[236] If the agency concludes in an EA

---

[230] *See W. Watersheds Project v. Salazar*, No. 4:08-cv-516-BLW, 2011 WL 4526746, at *17 (D. Idaho Sept. 28, 2011) (unpublished) (citing *Atchison v. Wichita Bd. of Trade*, 412 U.S. 800, 808 (1973)); *see also Cotton Petroleum Corp. v. U.S. Dep't of Interior*, 870 F.2d 1515, 1526 (10th Cir. 1989).
[231] NPS Management Policies, Introduction.
[232] NPS0000300.
[233] *Utahns for Better Transp.*, 305 F.3d at 1165.
[234] *See Olenhouse*, 42 F.3d at 1574 (citation omitted).
[235] *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989); 42 U.S.C. § 4332(2)(C).
[236] *Airport Neighbors Alliance v. United States*, 90 F.3d 426, 429 (10th Cir. 1996); 40 C.F.R. § 1508.9(a)(1).

that a project may have significant impacts on the environment, an EIS must be prepared.[237] If

not, it must provide a detailed statement of reasons explaining why there will be so significant

impacts to the environment, and must issue a FONSI.[238] Even if an action *may* have a significant

impact, an EIS must be prepared.[239]

NEPA regulations define "significance" in terms of "context" and "intensity."[240] The

regulations enumerate several "intensity" factors an agency must consider regarding the severity

of impacts, including whether impacts will be both beneficial and adverse; the unique

characteristics of the geographic area; whether the effects of the action will be highly

controversial; whether the action establishes a precedent or represents a decision in principle

about future considerations; whether the action will have cumulatively significant impacts;

whether the action may cause loss or destruction of scientific resources; the degree of impact to

ESA-listed species; and whether the action threatens a violation of law or requirements meant to

protect the environment.[241]

NPS contends that because of the Hartnet Allotment's retirement from grazing, impacts

from the LGTMP will no longer be significant.[242] But the adopted Plan imposes *new* impacts in

addition to impacts that will continue notwithstanding the retirement of the Hartnet Allotment.[243]

Based upon the number of intensity factors implicated and evidence in the record describing the

---

[237] 40 C.F.R. § 1501.4.
[238] *Id.* § 1508.13.
[239] *Id.* § 1508.3.
[240] *Id.* § 1508.27.
[241] *Id.* § 1508.27(b).
[242] NPS0004386.
[243] NPS0000058; NPS0000017.

severity of impacts the Plan will impose over its twenty-year lifespan, impacts may be and likely will be significant, requiring a full EIS.

### A. NPS Failed to Properly Consider Relevant Intensity Factors.

The FONSI indicates NPS considered certain "intensity" factors outlined in NEPA regulations.[244] NPS stated it took "into account the relevant considerations from 40 CFR 1508.27(b) *as follows*:" whether impacts are both beneficial and adverse, unique characteristics of the geographic area, the degree to which impacts are highly uncertain or unknown, the degree to which ESA-listed species will be impacted, and the degree to which impacts may be individually insignificant but cumulatively significant.[245] NPS's use of the phrase "as follows" indicates it limited its consideration of intensity factors to those enumerated in the FONSI.[246] But several other intensity factors that NPS did not enumerate in the FONSI also apply to the impacts that flow from the LGTMP.

#### 1. Controversy.

NPS did not consider whether the LGTMP's expected impacts are highly controversial in its FONSI,[247] despite early in the NEPA process identifying the impacts of grazing and trailing on Park resources as the source of controversy.[248] Controversy, for NEPA purposes, exists where there is "substantial dispute" about a proposed action's effects.[249] Here, a high degree of controversy exists between NPS and the scientists who have devoted much of their careers to

---

[244] NPS0000278.
[245] *Id.* (emphasis added).
[246] *Id.*
[247] 40 C.F.R. § 1508.27(b)(4).
[248] NPS0002075.
[249] *Middle Rio Grande Conservancy Dist. v. Norton*, 294 F.3d 1220, 1229 (10th Cir. 2002).

research on livestock impacts to listed cactus species. Tom and Deb Clark, former NPS scientists who have studied the subject extensively,[250] stated that "*any* factor increasing adult mortality will negatively impact population survival" of the listed Winkler cactus.[251] In response to NPS's reliance on the Hartnet Allotment's retirement as justification to downgrade its analysis to an EA, the Clarks felt so strongly they implored NPS to proceed with a full EIS in order to assess the severity and significance of the LGTMP's impacts on plants and other Park resources.[252]

Similarly, Daniela Roth, a former FWS botanist who conducted extensive field research on the listed cacti at issue, noted in comments to NPS that retirement of the Hartnet Allotment does not mitigate impacts to cacti from trailing,[253] and that grazing continues to impact cacti on much of the remainder of the plants' habitat outside the Park.[254] For this reason, according to Roth, "the responsibility of protecting plants from this primary threat falls largely on [NPS]."[255] Roth also expressed doubt about the validity and feasibility of NPS's damage and disturbance thresholds to prevent local extinctions of cactus populations.[256]

Lastly, Hope Hornbeck, another botanist with extensive field research on the listed cacti, made clear that "intense episodic disturbance" as well as chronic disturbance from livestock, contribute to the downward population trends of the listed cacti,[257] whereas the EA attempts to downplay studies connecting livestock to the plants' declines as focused on "chronic impacts

---

[250] NPS0000158-59.
[251] NPS0021310 (emphasis added); *see also* NPS0000105.
[252] *See* NPS0005021.
[253] NPS00005031.
[254] NPS00005030.
[255] NPS00005030.
[256] NPS00005031.
[257] NPS0005103.

from season-long grazing."[258] Hornbeck also stated that cactus populations can recover from drought and episodic disturbance only "if more favorable conditions follow these events."[259] Yet NPS admitted in the EA that due to climate change, increased temperatures and drought are likely to occur more frequently and negatively impact listed plant species.[260] Thus, cactus populations will have limited opportunity to recover from episodic disturbance.

The alarm raised by field researchers who built the body of science regarding these cacti constitutes substantial dispute about the significance of trailing impacts from the LGTMP. Where experts are highly critical of an EA and dispute an agency's position that impacts are insignificant, that "is precisely the type of 'controversial' action for which an EIS must be prepared."[261] "Otherwise," this intensity factor "is rendered a nullity."[262] The degree of controversy in the case at hand supports development of a full EIS. NPS's failure to address this intensity factor in its FONSI is arbitrary and capricious and violates NEPA.

## 2.    Potential Precedent.

NPS's FONSI does not account for the degree to which the actions analyzed in the LGTMP EA "may establish a precedent for future actions with significant effects or represent a decision in principle about a future consideration."[263] In fact, the Plan may well establish precedents. NPS's position that past permitted use of a now-retired grazing allotment establishes traditional trailing routes within the meaning of the enabling legislation[264] may be invoked by

---

[258] NPS0000100.
[259] NPS0031565.
[260] NPS0000054.
[261] *Sierra Club v. U.S. Forest Serv.*, 843 F.2d 1190, 1193 (9th Cir. 1988).
[262] *Id.*
[263] 40 C.F.R. § 1508.27(b)(6); NPS0000278.
[264] NPS0000311.

other former grazing permit holders in the future. If NPS planned to authorize the Lower South Desert route regardless of whether it qualified as traditional, as indicated just a few months before issuing the FONSI,[265] that too represents potential precedent. Prior to the finalization of the Plan, NPS appears to have limited trailing to traditional routes.[266] The degree to which the Plan may establish precedent supports the development of a full EIS. NPS's failure to take this intensity factor into account is arbitrary and capricious and violates NEPA.

### 3.    Loss or Destruction of Scientific Resources.

According to the "Purposes and Significance" section of the GMP, the Park contains "one of the largest collections of rare, threatened, and endangered plant species within the National Park System" and "provide[s] opportunities for scientific research and understanding of ecological systems."[267] Yet NPS does not indicate in the FONSI that it took into account the degree to which its actions "may cause loss or destruction of significant . . . scientific [] resources,"[268] despite warnings from scientists.

Experts warned NPS that "*any* factor increasing adult mortality will negatively impact population survival" of listed cacti species in the Park,[269] and that allowing damage and disturbance up to set thresholds "could render a local population extinct in the foreseeable future."[270] The trailing authorized by the Plan, according to one scientist, "will, in fact, contribute to the slow decline and eventual extinction of these endangered species already

---

[265] NPS0000807.
[266] NPS0000008; NPS0000017; NPS0001422; NPS0031626; NPS0031629; NPS0032036.
[267] NPS0031665.
[268] 40 C.F.R. § 1508.27(b)(8); NPS0000278.
[269] NPS0021310.
[270] NPS0005031.

beleaguered by a multitude of active threats."[271] The degree to which the LGTMP "may cause

the loss or destruction" of listed plants supports development of a full EIS. NPS's failure to

address this intensity factor in the FONSI is arbitrary and capricious and violates NEPA.

### 4. Threatened Violations of Laws, Regulations, and Policies.

NPS does not indicate in the FONSI it considered whether the Plan "threatens a violation

of Federal, State, or local law or requirements imposed for the protection of the environment."[272]

Elsewhere, NPS contended it reviewed "relevant laws, policies, guidance, and recovery plans . . .

and believes the LGTMP is consistent with those that are applicable to livestock grazing and

trailing management."[273] This cursory statement, buried in NPS's response to public comments,

does not constitute the "hard look" at this intensity factor NEPA requires. The record does not

show NPS grappled with genuine questions regarding the LGTMP's compliance with federal

laws and its own Policies.

For instance, NPS admits that the adopted Plan "is *inconsistent* with NPS Management

Policies" regarding impacts to ESA-listed plants and wilderness.[274] But NPS makes no mention

of its regulation that restricts issuance of special use permits except when "consistent with

applicable legislation, Federal regulations and administrative policies, *and* based upon a

determination that [Park resources] *will not be adversely impacted*."[275] Nor does NPS

acknowledge its regulation prohibiting livestock use except "[a]s specifically authorized by

---

[271] NPS0005030.

[272] NPS0000278; 40 C.F.R. § 1508.27(b)(10).

[273] NPS0000309.

[274] NPS0000300.

[275] 36 C.F.R. § 1.6(a) (emphasis added).

Federal statutory law."[276] These regulations, promulgated pursuant to the Organic Act, have the force of federal law, and its own Policies are "requirements imposed for the protection of the environment." Further, scientists warned the agency the Plan's impacts to ESA-listed plants would not promote recovery and would instead decrease the plants' overall likelihood of survival, in violation of the ESA,[277] and they urged NPS to complete a full EIS to meet its obligations under the ESA regarding Mexican spotted owl critical foraging habitat in Oak Creek.[278]

In light of the clearly difficult task of reconciling the mandates of the Organic Act and Park-specific legislation authorizing certain livestock use, and the host of applicable laws, regulations, and policies designed to protect the Park's resources, NPS's omission of this intensity factor from its enumerated considerations in the FONSI is particularly glaring. The actions authorized in the LGTMP threaten multiple violations of federal law and by NPS's own admission are inconsistent with its Policies regarding listed species and wilderness. This supports development of a full EIS. NPS's failure to take a hard look at this intensity factor is arbitrary and capricious and violates NEPA.

### 5. Intensity Factors Identified in the FONSI.

In its FONSI, NPS identified whether individual impacts might be cumulatively significant[279] and the degree of impacts on listed species[280] as intensity factors it considered.[281]

---

[276] 36 C.F.R. § 2.60(a)(1).
[277] NPS0005030.
[278] NPS0005026.
[279] 40 C.F.R. § 1508.27(b)(7).
[280] *Id.* § 1508.27(b)(9).
[281] NPS0000278.

Yet for the reasons stated in Part VIII.A of the Argument, by restricting its analysis solely to impacts within the Park, NPS did not identify "the overall impact that can be expected if the individual impacts are allowed to accumulate" on listed plants experience from chronic grazing on federal lands adjacent to the Park.[282] Absent such an analysis, the EA and FONSI are arbitrary and capricious.

The agency also admits the LGTMP is not consistent with NPS Policies requiring proactive conservation and protection of listed species.[283] Further, as explained in Parts VI.A.1, 3, and 4 of the Argument, the record shows experts forcefully contradicted NPS's conclusion that impacts on listed plants would not be significant or jeopardize their continued existence.[284] But listed species' continued existence need not be jeopardized for impacts to be significant.[285] In light of the grave concerns of experts and the level of chronic disturbance the listed plants will experience over the twenty-year lifespan of the Plan within and adjacent to the Park, NPS's FONSI is arbitrary and capricious, and the degree of impacts to listed plants requires development of an EIS

**B. Because Impacts May Be Significant, an EIS Is Required.**

If an agency's actions may be environmentally significant according to any one of the ten intensity factors, the agency must prepare an EIS;[286] a single factor may be sufficient to require an EIS.[287] But even if each individual intensity factor alone might not trigger the need for an

---

[282] *San Juan Citizens Alliance v. Stiles*, 654 F.3d 1038, 1056 (10th Cir. 2011) (citation omitted).
[283] NPS0000300.
[284] NPS0005021; NPS0005030-31.
[285] *Cascadia Wildlands v. U.S. Forest Serv.*, 937 F. Supp. 2d 1271, 1282 (D. Or. 2013).
[286] *Blue Mountains Diversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998).
[287] *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1220 (9th Cir. 2008); *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 361 F.3d 1108, 1124-25 (9th

EIS, here, "when considered collectively, they do."[288] The LGTMP implicates numerous

intensity factors, many of which NPS improperly failed to consider. Based on the record, the

degree of impacts is likely to be significant for several Park resources, particularly ESA-listed

species. NPS's failure to prepare an EIS for the Plan is arbitrary and capricious, and its FONSI

must be set aside.

## VII.    NPS FAILED TO TAKE A HARD LOOK AT CUMULATIVE IMPACTS AND THE APPLICABILITY OF ITS POLICIES IN VIOLATION OF NEPA.

In an EA or EIS, an agency must fully analyze all direct, indirect, and cumulative impacts

from a proposed action.[289] "Cumulative impacts" result from the "incremental impact of the

action" on the environment "when added to other past, present, and reasonably foreseeable future

actions regardless of what agency (Federal or non-Federal) or person undertakes such other

actions."[290] Underlying all of NEPA's procedural requirements is the mandate that agencies take

a "hard look" at all environmental impacts of a proposed action.[291]

### A.    NPS Failed to Take a Hard Look at Cumulative Impacts.

NPS failed to take a hard look at the cumulative impacts of trailing across ESA-listed

plant populations and habitat. The Grey Bench-Cathedral Valley and Hartnet routes continue into

---

Cir. 2004) (amended on other grounds and superseded by *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846 (9th Cir. 2005); *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 731 (9th Cir. 2001) (abrogated on other grounds).

[288] *Cascadia Wildlands*, 937 F. Supp. 2d at 1283.

[289] 40 C.F.R. § 1502.16.

[290] *Id.* § 1508.7.

[291] *Kleppe v. United States*, 427 U.S. 390, 410 n.21 (1976) (citing *Natural Res. Def. Council, Inc. v. Morton*, 458 F.2d 827, 838 (D.C. Cir. 1972).

listed plant species populations and habitat on BLM lands.[292] Yet NPS limited its cumulative

impacts analysis to the confines of the Park's borders.[293] According to the Tenth Circuit,

> [A] meaningful cumulative impact analysis must identify five things: (1) the area
> in which the effects of the proposed project will be felt; (2) the impacts that are
> expected in that area from the proposed project; (3) other actions—past, present,
> and proposed, and reasonably foreseeable—that have had or are expected to have
> impacts in the same area; (4) the impacts or expected impacts from these other
> actions; and (5) the overall impact that can be expected if the individual impacts
> are allowed to accumulate.[294]

Here, NPS failed to identify the entire area in which impacts from proposed trailing

would be felt. The cattle that trail along routes through listed species habitat do not stop at the

borders of the Park. They continue on along trails that extend into adjacent federal lands that are

then grazed by the very same cattle.[295] NPS further failed to identify the impacts trailing—

combined with the past, present, and reasonably foreseeable grazing such trailing facilitates—

has had and will have on listed species and habitat adjacent to the Park.

Ninety percent of the Wright fishhook cactus's range faces chronic grazing disturbance

on BLM lands,[296] and BLM lands adjacent to the Park provide nearly half of Winkler cactus

habitat.[297] But NPS did not evaluate the impacts these plants experience from trailing-facilitated

grazing. Ultimately, NPS failed to identify the "*overall* impact that can be expected if the

individual impacts" of trailing and connected grazing "are allowed to accumulate."[298] This

violates NEPA's hard look requirement, and further supports the need for an EIS.

---

[292] NPS0005841.
[293] NPS0000069.
[294] *San Juan Citizens Alliance*, 654 F.3d at 1056 (citation omitted).
[295] FWS0000531; NPS0000011; NPS0000023.
[296] FWS0000010.
[297] NPS0000376.
[298] *San Juan Citizens Alliance*, 654 F.3d at 1056 (citation omitted).

**B.      NPS Failed to Consider the Applicability of Its Policies in the EA.**

 "At the very least, NEPA requires [a federal agency] to discuss its own official policies that on their face apply directly to the review at issue."[299] Where an agency fails to provide information or analysis regarding the application of its own policies, the public cannot offer the "scrutiny [that is] essential to implementing NEPA," in violation of the statute.[300] And if an "agency does not show its work, the Court cannot evaluate whether its decision was reasonable," nor can the public, because relevant information has not been provided during the NEPA process.[301] A court "cannot defer to a void."[302]

Here, NPS Management Policies on their face apply directly to the review at issue and constitute relevant factors for NPS's consideration in the LGTMP EA.[303] They address the exact problem the Plan is meant to resolve: the conflicting mandates of the Organic Act and Park-specific legislation. But NPS did not acknowledge in the EA that its Policies require prevention of "unacceptable impacts" that impede attainment of desired future conditions.[304] NPS also failed to reveal that, according to its Policies, it "must ensure, to the extent possible, impacts on park resources are acceptable" through management and regulation of uses mandated by

---

[299] *W. Watersheds Project v. Salazar*, 2011 WL 4526746, at *14 (unpublished) (citing *Or. Natural Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1115-16 (9th Cir. 2010)).
[300] 40 C.F.R. § 1500.1(b).
[301] *Ctr. for Biological Diversity v. U.S. Forest Serv.*, No. 2:17-cv-372, 2020 WL 1429569, at *25 (S.D. Ohio, March 13, 2020) (unpublished); 40 C.F.R. § 1500.1(b).
[302] *Or. Natural Desert Ass'n*, 625 F.3d at 1121.
[303] *W. Watersheds Project v. Salazar*, 2011 WL 4526746, at *14 (unpublished) (citation omitted).
[304] NPS Management Policies § 1.4.7.1.

enabling legislation.[305] Instead, in response to public comments, NPS asserted such "determinations are made outside of the NEPA process," and not subject to public review.[306]

This runs counter to NEPA's requirement that agencies provide the public relevant information "before decisions are made and before actions are taken."[307] Aside from cursory admissions that the Plan is *inconsistent* with its Policies regarding wilderness and listed species after reaching its FONSI,[308] NPS did not discuss, let alone grapple with or apply, its Policies in a way that satisfies NEPA's hard look requirement. Absent substantive discussion or application of the Policies, NPS has not considered these relevant factors in the EA. The Court cannot defer to this void. NPS's failure to meaningfully address its Policies in the EA is arbitrary and capricious, in violation of NEPA.

## VIII. FWS FAILED TO PRODUCE A LAWFUL BIOLOGICAL OPINION UNDER OPERATIVE ESA REGULATIONS.

Congress "intended endangered species to be afforded the highest of priorities."[309] To that end, under section 7 of the ESA, all federal agencies must "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species . . . ."[310] When listed species are likely to be adversely

---

[305] NPS Management Policies § 1.4.3.1.
[306] NPS0000328.
[307] 40 C.F.R. § 1500.1(b).
[308] NPS0000300.
[309] *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 174 (1978).
[310] 16 U.S.C. § 1536(a)(2).

affected be a federal action, the action agency must formally consult with FWS to avoid jeopardy or destruction or adverse modification of critical habitat.[311]

Formal consultation requires FWS to evaluate and provide a detailed discussion of the proposed action's effects on listed species and critical habitat within the action area in light of the environmental baseline.[312] In order to establish the environmental baseline against which the proposed actions' effects will be evaluated,[313] the "action area" for consultation purposes must include "all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action."[314] To conclude the consultation process, FWS must issue its biological opinion as to whether the proposed action is likely to jeopardize listed species' existence or destroy or adversely modify critical habitat.[315]

### A.  FWS Improperly Delineated an Overly Narrow Action Area.

FWS must examine the effects of the proposed action within an appropriate action area in order to establish the proper environmental baseline.[316] FWS "cannot fulfill [its consultation duties] by narrowly defining the action area to exclude federal activities that are impacting" listed species.[317] Use of an "overly narrow definition of action area [] results in the exclusion of certain relevant impacts from the environmental baseline," in violation of the ESA.[318]

---

[311] 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(b)(1) (2018). All citations to Title 50 Part 402 of the Code of Federal Regulations refer to the 2018 published version in effect at the time FWS produced the Biological Opinion, available at https://www.govinfo.gov/content/pkg/CFR-2018-title50-vol11/pdf/CFR-2018-title50-vol11-chapIV.pdf (last visited April 27, 2020).

[312] 50 C.F.R. § 402.14(g)(1)-(3) and (h)(2).

[313] *See id.* §§ 402.02 and 402.14(g)(1)-(3).

[314] *Id.* § 402.02.

[315] *Id.* § 402.14(g)(1)-(4).

[316] *Id.* §§ 402.02 and 402.14(g)(1)-(3).

[317] *Defenders of Wildlife v. Babbitt*, 130 F. Supp. 2d 121, 126 (D.D.C. 2001).

[318] *Id.* at 128.

Here, FWS (and NPS) limited the action area to include only Park lands.[319] But by authorizing trailing through the Park, NPS facilitates federally-authorized grazing on adjacent public lands, which in turn impacts those lands' resources, including the same listed plants impacted in the Park.[320] FWS did not consider that the trailing routes in question exist for the purpose of facilitating federally-authorized livestock grazing on either side of the Park.

FWS claims to have incorporated by reference a 2010 consultation that included the BLM-managed portion of pertinent livestock trails, although the cited document does not appear in the record.[321] But assuming FWS considered the effects of *trailing* on those BLM lands, it ignored the effects of the grazing *facilitated by* the trailing. These listed plants' limited ranges extend beyond the Park, and notably into the heavily grazed federal allotments just beyond Park borders.[322] By narrowly defining the action area to end at the borders of Capitol Reef National Park, FWS "exclude[d] federal activities that are impacting" the listed plants outside the Park, and thereby excluded relevant impacts from the environmental baseline.[323] This violates the ESA.

### B. FWS Improperly Determined Mexican Spotted Owl Critical Habitat Would Not Be Adversely Modified.

Under ESA regulations in effect at the time FWS produced its 2018 Biological Opinion, "destruction or adverse modification" means "direct or indirect alteration that appreciably diminishes the value of critical habitat for the conservation of a listed species," including

---

[319] NPS0005842; NPS0000345.
[320] *See* FWS0000531; NPS0000011; NPS0000023.
[321] FWS0000531.
[322] *Id.*; NPS0000011; NPS0000023.
[323] *Defenders of Wildlife v. Babbitt*, 130 F. Supp. 2d at 126.

alteration of "the physical or biological features essential to the conservation of a species or that preclude or significantly delay development of such features."[324] Here, FWS admits trailing directly degrades and alters Oak Creek by "negatively affect[ing] the density and abundance of native vegetation . . . and habitat for prey species."[325] Such degradation eliminates the primary constituent elements (physical and biological features) of Mexican spotted owl critical habitat that would otherwise be present within Oak Creek.[326] Despite the documented nonfunctional condition of Oak Creek since 2014,[327] FWS acquiesced to another five years of such nonfunctional condition.[328] Only if proper functioning condition is "not attained by 2023" does NPS commit to corrective actions in Oak Creek.[329]

Not only does this longstanding and ongoing degradation appreciably diminish the value of this critical owl foraging habitat, but trailing over 1,000 cattle twice yearly through Oak Creek until 2023 will further delay its recovery and the development of primary constituent elements of the owl's habitat.[330] This falls well within the definition of "destruction or adverse modification."[331] FWS's conclusion to the contrary is not supported by the record, is arbitrary and capricious, and must be set aside.

---

[324] 50 C.F.R. § 402.02.
[325] FWS0000023; FWS0000035.
[326] FWS0000023; FWS0000035; NPS0000392.
[327] NPS0000046; NPS0028900.
[328] FWS0000004; FWS0000034-35; FWS0000037.
[329] FWS0000004.
[330] FWS0000004; FWS0000035.
[331] 50 C.F.R. § 402.02.

### C.  FWS Improperly Relied on Uncertain, Unspecific, and Ineffective Conservation Measures.

If a consulted wildlife agency relies upon mitigation or conservation measures to reach a conclusion of "no jeopardy or adverse modification," such "measures must be reasonably specific, certain to occur, and capable of implementation."[332] In addition, the conservation measures "must be subject to deadlines or otherwise-enforceable obligations."[333] Conservation measures "must address the threats to the species in a way that satisfies the jeopardy and adverse modification standards."[334] Measures that are not effective in protecting listed species cannot support a "no jeopardy or adverse modification" opinion.[335]

Here, FWS relied on NPS's "committed conservation measures" to support its "no jeopardy" and "no adverse modification" conclusions in the Biological Opinion.[336] But under these measures, only once damage or disturbance exceeds thresholds at selected monitoring sites does NPS commit to undertaking protective measures to prevent further harm from livestock trampling to listed plants.[337] This does not effectively address the threats to the plants from trampling; it delays action until after harm has already occurred.

And even if thresholds are exceeded, NPS commits to no specific measures.[338] FWS recites a number of corrective actions that NPS might potentially employ to protect listed species from trailing's detrimental effects, such as temporary fencing, increased numbers of riders,

---

[332] *Ctr. for Biological Diversity v. Rumsfeld*, 198 F. Supp. 2d 1139, 1152 (D. Ariz. 2002) (citing *Sierra Club v. Marsh*, 816 F.2d 1376 (9th Cir. 1987) (abrogated on other grounds)).
[333] *Ctr. for Biological Diversity v. Rumsfeld*, 198 F. Supp. 2d at 1152 (citation omitted).
[334] *Id.*
[335] *Id.*
[336] FWS0000003-04; FWS0000033; FWS0000035-36.
[337] FWS0000003-04.
[338] FWS0000004.

moving livestock more quickly, corralling cattle overnight, and "adjusting trailing practices."[339]

But these measures are not "certain to occur," and in the case of "adjusting trailing practices," far

from "reasonably specific."[340] NPS admits that its own effects analysis is premised "on the

expectation that funding would be available for [the] Park to hire a range management specialist

(or similar position) . . . to implement the monitoring and adaptive management . . . ."[341] Despite

this unresolved funding contingency, NPS makes no commitment to halt livestock trailing

through listed plants if such funding does not materialize.

Defying logic, NPS commits to, and FWS accepts, a "conservation measure" that states

monitoring of trailing impacts to listed plants will cease along trailing routes that "experience no

livestock damage or disturbance for three consecutive years" at selected sites.[342] NPS also

commits to reducing the frequency of monitoring "in localities that do not meet or exceed

damage and disturbance thresholds"[343] For a conservation measure to support a finding of "no

jeopardy," it must actually address the threats to the listed species.[344] A commitment to cease or

reduce monitoring does the opposite. If relatively early in the LGTMP's twenty-year lifespan the

selected sites escape cattle trampling for three consecutive years, a discontinuation of monitoring

could mean multiple years go by with unchecked damage and disturbance. Even at sites where

thresholds are not exceeded, reduced monitoring increases the likelihood that damage and

disturbance will go unnoticed and fail to prompt corrective actions on the part of NPS.

---

[339] FWS0000004.
[340] *Ctr. for Biological Diversity v. Rumsfeld*, 198 F. Supp. 2d at 1152 (citation omitted).
[341] NPS0000069; NPS0000077.
[342] FWS0000004.
[343] *Id.*
[344] *Ctr. for Biological Diversity v. Rumsfeld*, 198 F. Supp. 2d at 1152 (citation omitted).

FWS also lists as a conservation measure NPS's stated intention to implement corrective actions for Mexican spotted owl critical habitat in Oak Creek if proper functioning condition is not attained by 2023, five years after the adoption of the LGTMP.[345] A stated intention to delay proactive intervention during five years of nonfunctional condition does not constitute a conservation measure "that address[es] the threats to the species in a way that satisfies the jeopardy and adverse modification standards."[346]

Of further concern, FWS also cites NPS's "commitment" to address trespass livestock in Oak Creek, although this exact same commitment by NPS has gone unfulfilled despite FWS's reliance on it in each of the two previous biological opinions prepared by FWS regarding trailing through Oak Creek.[347] By NPS's own admission, "[d]espite repeated attempts through correspondence, meetings, and phone calls with the permit holder . . . NPS has been unsuccessful at eliminating unauthorized cattle use of Oak Creek."[348] Given this failure, NPS further admits future efforts' "outcome is uncertain," and trespass cattle use of Oak Creek may continue indefinitely.[349]  FWS's reliance on these uncertain, unspecific, and ineffective conservation measures to support its Biological Opinion conclusions is arbitrary and capricious and violates the ESA.

---

[345] FWS0000004.
[346] *Ctr. for Biological Diversity v. Rumsfeld*, 198 F. Supp. 2d at 1152 (citation omitted).
[347] FWS0000815; FWS0007416.
[348] NPS0000408.
[349] *Id.*

## IX. NPS INDEPENDENTLY VIOLATED ITS OWN ESA DUTIES.

"Consulting with the FWS alone does not satisfy an agency's duty under the Endangered Species Act."[350] To the contrary, the ESA independently requires each agency to ensure its actions will not jeopardize listed species' continued existence or destroy or adversely modify designated critical habitat.[351] NPS "cannot 'abrogate its responsibility to ensure that its actions will not jeopardize a listed species[].'"[352] Thus, NPS violates its ESA duties if it arbitrarily and capriciously relies on a FWS biological opinion.[353] NPS, as the action agency, must still "determine whether and in what manner to proceed with the action in light of its section 7 obligations *and* the Service's biological opinion."[354]

Here, NPS proceeded with the issuance of permits pursuant to the Livestock Grazing and Trailing Management Plan despite its own analysis sharing several flaws with FWS's 2018 Biological Opinion: an improperly delineated action area that excluded relevant impacts,[355] and reliance on uncertain, funding-dependent "conservation measures" that do not effectively address primary threats to the listed species at issue.[356] NPS further admits the Plan is inconsistent with its own Policies designed to ensure ESA compliance.[357] NPS has independently violated its own ESA obligations, and the Plan and permits issued pursuant thereto must be set aside.

---

[350] *Resources Ltd., Inc. v. Robertson*, 35 F.3d 1300, 1304 (9th Cir. 1993).
[351] 16 U.S.C. § 1536(a)(2).
[352] *Resources Ltd., Inc.*, 35 F.3d at 1304 (quotations and citations omitted); *see also Defenders of Wildlife v. Envtl. Prot. Agency*, 420 F.3d 946, 976 (9th Cir. 2005) (rev'd on other grounds, *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644 (2007)).
[353] *Resources Ltd, Inc.*, 35 F.3d at 1304 (quotations and citations omitted).
[354] 50 C.F.R. § 402.15(a) (emphasis added).
[355] NPS0000345.
[356] NPS0000069; NPS0000077; NPS0000237-38.
[357] NPS0000300; *see also* NPS Management Policies § 4.4.2.3.

## CONCLUSION

For the foregoing reasons, WWP respectfully requests that this Court declare unlawful and set aside the Livestock Grazing and Trailing Management Plan, Environmental Assessment, Finding of No Significant Impacts, Non-Impairment Determination, Biological Opinion, and associated special use permits for grazing and trailing within Capitol Reef National Park; and remand with instructions to NPS to cease issuance of permits that do not comply with agency regulations or that allow livestock use not specifically authorized by Park-specific legislation; remand to NPS with instructions to prepare a full EIS for a Grazing and Trailing Plan that complies with Park-specific legislation, the Organic Act, NEPA, and the ESA; and remand with instructions to FWS to prepare a biological opinion for the Plan and associated permits that complies with the ESA.

Respectfully submitted this 27th day of April, 2020.

/s/ John Persell

John Persell (Utah Bar # 17298)
P.O. Box 1775
Hailey, ID 83333
Tel: (503) 896-6472
Email: jpersell@westernwatersheds.org

Attorney for Plaintiff
Western Watersheds Project

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure Rule 32(g), District of Utah Local Rule 7-4(a), and the Court's Order granting Plaintiff up to 2,000 additional words (Docket No. 59), I hereby certify that this brief complies with the type-volume limitations of Rule 32(a)(7)(B)(i) and Local Rule 7-4 because it contains 14,648 words, excluding the parts of the brief exempted by Rule 32(f), calculated using the word count feature of the Microsoft Word software used to produce this document.

/s/ John Persell

John Persell
Attorney for Plaintiff
Western Watersheds Project

## CERTIFICATE OF SERVICE

I hereby certify that on April 27, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of this filing to all counsel of record.

/s/ John Persell

John Persell
Attorney for Plaintiff
Western Watersheds Project