John Persell (Utah # 17298)
Western Watersheds Project
P.O. Box 1770
Hailey, ID 83333
Tel: (503) 896-6472
Email: jpersell@westernwatersheds.org

Attorney for Plaintiff
Western Watersheds Project

---

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, SOUTHERN REGION OF THE CENTRAL DIVISION

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT, | |
| Plaintiff, | |
| v. | **Case No. 4:19-cv-00065-DN-PK** |
| NATIONAL PARK SERVICE *et al.*, | **PLAINTIFF'S REPLY BRIEF** |
| Defendants, | |
| STATE OF UTAH, | |
| Defendant-Intervenor. | |

# TABLE OF CONTENTS

TABLE OF CONTENTS...................................................................................i

TABLE OF AUTHORITIES.........................................................................iii

GLOSSARY OF ACRONYMS AND TERMS...........................................vii

INTRODUCTION..........................................................................................1

ARGUMENT.................................................................................................2

I.     NPS's Issuance of Grazing Permits for the Sandy 3 Allotment Violates Public Law 100-446.............................................................................2

II.    The Lower South Desert Route Is Not a "Traditional" Trailing Course..................3

III.   The Plain Language of Section 4 Limits Trailing on Traditional Courses to Historic Users...................................................................................6

      A.    Congress Used Different Language in Sections 3 and 4 Based on Past Differences in Management..........................................................6

      B.    Neither NPS's Interpretation nor the Solicitor's Opinion Warrant *Chevron* Deference..............................................................7

           1.    The Solicitor's Opinion Is Unpersuasive.........................................8

      C.    Utah Asks the Court to Adopt an Extreme Interpretation of Section 4 Not Shared by NPS........................................................10

      D.    The Plain Language of Section 4 Does Not Result in an "Absurd Outcome"...................................................................11

IV.   NPS's Issuance of Grazing and Trailing Permits Violates Its Regulations.............12

V.    NPS Has Not Taken a Hard Look at Cumulative Impacts or Its Policies.................13

      A.    WWP Has Not Forfeited Its Claim Regarding Cumulative Impacts to Listed Plants............................................................13

      B.    NPS Did Not Properly Analyze Cumulative Impacts to Listed Plants..............................................................................14

C.     NPS's Policies Apply "On Their Face" to the EA.........................15

VI.    The Number of Intensity Factors Triggered Requires Development of a Full EIS.......................................................................................................16

     A.     A Legitimate Controversy Exists Between Botanists and NPS.................16

     B.     NPS Has Created Legal Precedent Through Its Novel Interpretation of Section 4................................................................................................18

     C.     NPS Failed to Consider Threatened Violations of Laws, Regulations, and Policies...............................................................................................19

     D.     Under the Tenth Circuit's Reasoning, an EIS Is Required for the LGTMP................................................................................................20

VII.   The Degree of Impacts to Park Resources Allowed by NPS Violates the NPS Organic Act and Agency Policies...................................................22

     A.     NPS's Unexplained Failure to Follow Its Wilderness Policy Is Arbitrary..............................................................................................23

VIII.   FWS's Unlawful Biological Opinion Must Be Set Aside.......................25

     A.     The Action Area Must Include Adjacent Federal Lands Affected by Trailing...............................................................................................25

     B.     Degradation of Critical Habitat in Oak Creek Constitutes Adverse Modification..........................................................................................26

     C.     FWS Arbitrarily Relied on Uncertain, Unspecific, and Ineffective Conservation Measures..........................................................................27

CONCLUSION..................................................................................................28

CERTIFICATE OF COMPLIANCE...................................................................30

CERTIFICATE OF SERVICE............................................................................30

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. U.S. Dep't of Labor*, 422 F.3d 1155 (10th Cir. 2005)....................................6

*Ark Initiative v. U.S. Forest Serv.*, 660 F.3d 1256 (10th Cir. 2011)...............................14

*Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124 (9th Cir. 2011)...................................19

*Barnhart v. Thomas*, 540 U.S. 20 (2003)............................................................10

*Butte Envtl. Council v. U.S. Army Corps of Engr's*, 620 F.3d 936 (9th Cir. 2010)........................26

*Cascadia Wildlands v. U.S. Forest Serv.*, 937 F. Supp. 2d 1271 (D. Or. 2013)................................22

*Ctr. for Biological Diversity v. Rumsfeld*, 198 F. Supp. 2d 1139 (D. Ariz. 2002)...........................27

*Chevron, U.S.A. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984)................................3, 7

*Clarke v. Securities Industry Ass'n*, 479 U.S. 388 (1987)................................................8

*Forest Guardians v. U.S. Forest Serv.*, 495 F.3d 1162 (10th Cir. 2007).............................13

*Grand Canyon Trust v. Fed. Aviation Admin.*, 290 F.3d 339 (D.C. Cir. 2002)...............................14

*Greater Yellowstone Coal. v. Kempthorne*, 577 F. Supp. 2d 183 (D.D.C. 2008)..........................22

*Hillsdale Envtl. Loss Prevention, Inc. v. U.S. Army Corps of Engr's*, 702 F.3d 1156 (10th Cir. 2010)....................................................................16

*Humane Soc'y of the United States v. U.S. Dep't of Commerce*, 432 F. Supp. 2d 4 (D.D.C. 2006)...........................................................................18

*Kientz v. Commissioner, Social Sec. Admin.*, 954 F.3d 1277 (10th Cir. 2020)................................7

*Manning v. United States*, 146 F.3d 808 (10th Cir. 1998)..................................................8

*McGraw v. Barnhart*, 450 F.3d 493 (10th Cir. 2006).....................................................7-8

*Middle Rio Grande Conservancy Dist. v. Norton*, 294 F.3d 1220 (10th Cir. 2002).................16-17

*Navajo Nation v. Dalley*, 896 F.3d 1196 (10th Cir. 2018)................................................10

*Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560 (10th Cir. 1994)..........................1

*Or. Natural Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092 (9th Cir. 2010).......16

*San Juan Citizens Alliance v. Stiles*, 654 F.3d 1038 (10th Cir. 2011)...........................15

*San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971 (9th Cir. 2014)............25

*Sierra Club v. Bureau of Land Mgmt.*, 786 F.3d 1219 (9th Cir. 2015)..........................25

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944)...........................................................8, 9

*S. Utah Wilderness Alliance v. Nat'l Park Serv.*, 387 F. Supp. 2d. 1178 (D. Utah 2005)................1

*Stewart v. Kempthorne*, 593 F. Supp. 2d 1240 (D. Utah 2008)......................................5

*Tenn. Valley Auth. v. Hill*, 437 U.S. 153 (1978)...........................................................1

*U.S. Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752 (2004)......................................14, 15

*Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152 (10th Cir. 2002).....................24

*Volkswagenwerk Aktiengesellschaft v. Fed. Maritime Comm'n*, 390 U.S. 261 (1968)....................9

*W. Watersheds Project v. Salazar*, No. 4:08-cv-516-BLW,
2011 WL 4526746 (D. Idaho Sept. 28, 2011)................................................................16

*WildEarth Guardians v. Conner*, 920 F.3d 1245 (10th Cir. 2019)...........................20, 21

*Wilderness Soc'y v. Morton*, 479 F.2d 842 (D.C. Cir. 1973)......................................9-10

**Statutes**

5 U.S.C. § 706(2)....................................................................................................1

16 U.S.C. § 273b....................................................................................................7

16 U.S.C. § 273c....................................................................6, 7, 8, 12, 13, 22-23

16 U.S.C. § 273d(c)...............................................................................................24

16 U.S.C. § 1531 *et seq.*.......................................................................................18

16 U.S.C. § 1536(a)(2)..........................................................................................27

54 U.S.C. § 100101(a)..............................................................................23

Pub. L. No. 92-207 (Dec. 18, 1971).....................................................6, 7, 9, 24

Pub. L. No. 93-205 (Dec. 28, 1973)............................................................18

Pub. L. No. 100-446 (Sept. 27, 1988)..............................................2, 3, 11, 12, 13

**Regulations**

36 C.F.R. § 1.6(a)...........................................................................12, 19

36 C.F.R. § 2.60(a)(1).................................................................12, 13, 19, 20

40 C.F.R. § 1508.7...............................................................................15

40 C.F.R. § 1508.27(b)(4)........................................................................16

40 C.F.R. § 1508.27(b)(6)........................................................................18

40 C.F.R. § 1508.27(b)(7)........................................................................20

40 C.F.R. § 1508.27(b)(9)........................................................................21

40 C.F.R. § 1508.27(b)(10)......................................................................20

50 C.F.R. § 402.02 (2018)..............................................................25, 26, 27

**Other Authorities**

1971 U.S.C.C.A.N. 2272 (Sept. 30, 1971).......................................................2, 3, 9

NPS Management Policies (2006) § 1.4.3.........................................................23

NPS Management Policies (2006) § 1.4.3.1....................................................15, 23

NPS Management Policies (2006) § 1.4.5.........................................................24

NPS Management Policies (2006) § 1.4.6.........................................................24

NPS Management Policies (2006) § 1.4.7.1.......................................................15

NPS Management Policies (2006) § 4.4.2.3.......................................................23

NPS Management Policies (2006) § 6.3.5..................................................................23-24

44 Fed. Reg. 58868 (Oct. 11, 1979)..........................................................................18

50 Fed. Reg. 33734 (Aug. 21, 1985).........................................................................18

63 Fed. Reg. 44587 (Aug. 20, 1998).........................................................................18

# GLOSSARY OF ACRONYMS AND TERMS

BLM – Bureau of Land Management

EA – Environmental Assessment

EIS – Environmental Impact Statement

ESA – Endangered Species Act

FONSI – Finding of No Significant Impairment

FWS – U.S. Fish and Wildlife Service

LGTMP – Livestock Grazing and Trailing Management Plan

NEPA – National Environmental Policy Act

NID – Non-Impairment Determination

NPS – National Park Service

Park – Capitol Reef National Park

Policies – NPS Management Policies (2006)

## INTRODUCTION

This Court has held that "the highest standard of protection and care" applies to the natural resources of the National Park System.[1] Further, Congress intended species listed under the Endangered Species Act (ESA) "to be afforded the highest of priorities."[2] WWP asks the Court to set aside agency actions intended to guide management of Capitol Reef National Park for the next twenty years,[3] but which do not meet these high standards.

Although an agency decision enjoys a "presumption of regularity," that "is not to shield [the] action from a thorough, probing, in-depth review."[4] Close examination of the record in this case reveals multiple failures by the National Park Service (NPS) and U.S. Fish and Wildlife Service (FWS) to uphold and enforce the laws enacted by Congress. At nearly every turn in the development of the Livestock Grazing and Trailing Management Plan (LGTMP) for the Park, the agencies offered far less than even the minimum analysis and protection due under Park-specific legislation, the NPS Organic Act, agency regulations and policies, the National Environmental Policy Act (NEPA), and the ESA. The LGTMP and accompanying Environmental Assessment (EA), Finding of No Significant Impact (FONSI), Non-Impairment Determination (NID), Biological Opinion, and associated grazing and trailing permits, are arbitrary and capricious, in excess of statutory authority, or otherwise not in accordance with the law,[5] and must be set aside.

---

[1] *S. Utah Wilderness Alliance v. Nat'l Park Serv.*, 387 F. Supp. 2d 1178, 1191 (D. Utah (2005) (citation omitted).
[2] *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 174 (1978).
[3] NPS0000069.
[4] *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1574 (10th Cir. 1994) (citation omitted).
[5] 5 U.S.C. § 706(2).

**ARGUMENT**

**I.    NPS's Issuance of Grazing Permits for the Sandy 3 Allotment Violates Public Law 100-446.**

The legislative history for the Park's enabling legislation shows Congress intended only to allow "existing permittees or members of *their immediate families*" the option to renew grazing permits for a limited time, because "continued grazing use is *not compatible* with optimum protection and interpretation of the park."[6] Although Congress extended this period of permit renewal in 1988,[7] Congress never wavered from its restriction of continued grazing privileges within the Park to historic permit holders and *their immediate families*. Under the plain language of Public Law 100-446, the "immediate family" of original Sandy 3 Allotment permit holders Don and Afton Taylor includes Jean Gillespie, their last surviving child, but does not include Boone Taylor or Richard Fillmore.[8] NPS's issuance of grazing permits signed and used by Boone Taylor—as well as Gillespie's non-involvement in any Taylor Ranch operations and her residing hundreds of miles away outside the state[9]—run counter to the intent of Congress to protect the local interests of historic grazing permit holders and their direct descendants.

Defendants fail to address Richard Fillmore's additional unlawful use of the Sandy 3 Allotment for grazing his personal cattle.[10] Fillmore is not a descendant of the original permit holders, he runs cattle under his own brand separate from the Taylor Ranch,[11] and NPS also

---

[6] 1971 U.S.C.C.A.N. 2272 (Sept. 30, 1971) at 2276 (emphasis added).
[7] Pub. L. No. 100-446 (Sept. 27, 1988).
[8] *Id.* ("direct descendants (sons or daughters) born on or before the enactment of Public Law 92–207 (December 18, 1971)").
[9] Docket No. 50-5 (Feb. 24, 2020).
[10] NPS0032032; NPS0005033.
[11] NPS0032037.

separately issues him permits to trail cattle through Oak Creek.[12] Acquiescence to Fillmore grazing cattle on the Sandy 3 Allotment because he is married to Boone Taylor's sister[13] blatantly circumvents Congress's restriction of grazing privileges within the Park to historic permit holders and their direct descendants, and represents an impermissible construction of Public Law 100-446.[14] Neither Gillespie nor NPS has authority under Public Law 100-446 to allow a non-descendant to graze cattle under the Sandy 3 Allotment permit. Any grazing in the Sandy 3 Allotment not contemplated by Congress must be set aside as unlawful.

## II.    The Lower South Desert Route Is Not a "Traditional" Trailing Course.

After the adoption of the LGTMP, NPS issued new permits to the Paces (the former Hartnet grazing permittees) to trail cattle along two routes through the retired Hartnet Allotment: the Hartnet route and the Lower South Desert route.[15] The Hartnet route has long been recognized as a "traditional course" within the meaning of Section 4 of the enabling legislation.[16] To the contrary, the Lower South Desert route had never in the nearly 47-year history of the Park been recognized by NPS or anyone else, including the Paces, as a "traditional course" used for cattle trailing.[17] Indeed, NPS did not know its location[18] and until just a month before the release of the EA considered it "a new route to be established."[19]

---

[12] NPS0000495; NPS0033666.
[13] NPS0032032.
[14] Pub. L. No. 100-446; 1971 U.S.C.C.A.N. 2272 at 2276; *see also Chevron, U.S.A. v. Natural Res. Def. Council, 467 U.S. 837, 842-43 (1984).*
[15] NPS0000024; NPS0000508; NPS0000512.
[16] *See* NPS0000530-31; NPS0032115; NPS0031626.
[17] *See* NPS0000530-31; NPS0032115; NPS0000807.
[18] NPS0000050.
[19] NPS0000807.

Defendants concede trailing through the Park is allowed only along "traditional courses" under Section 4.[20] Yet Defendants incorrectly contend NPS properly determined the Lower South Desert route constitutes a "traditional course."[21] Defendants' record citations are unpersuasive, and Defendants make no attempt to explain NPS's sudden determination that grazing is the equivalent of trailing for purposes of the enabling legislation.[22]

The Administrative History of the Park does *not* refer to a trailing route through the Lower South Desert from Highway 24 to Jailhouse Rock and exiting the Park at the Lower South Desert Overlook.[23] Instead, in the Administrative History's section "Stock Driveways in Capitol Reef National Park," *nothing* is mentioned about a Lower South Desert route between Jailhouse Rock and Highway 24, yet other routes are identified in detail.[24] The maps cited by Defendants merely show the previously grazed portions of the Hartnet Allotment[25] and the new Lower South Desert route in the final EA—neither of which demonstrates traditional use as a trailing route.[26] A month prior to the EA's public release, NPS referred to the Lower South Desert as "a new route to be established" in contrast to the "traditional route" along the Hartnet Road.[27]

Contrary to Defendants' claim, NPS never determined "traditional" status of the Lower South Desert route with the Paces.[28] NPS merely said it would "evaluate *possible* trailing routes

---

[20] Federal Defendants' Answer Brief (Fed. Br.) 21, Docket No. 63 (June 18, 2020); Utah Answer Brief (Utah Br.) 40, Docket No. 66 (June 29, 2020).
[21] Fed. Br. 21.
[22] *See* NPS0001422; NPS00000311.
[23] NPS0032118; Fed. Br. 21.
[24] NPS0032114-16.
[25] NPS0002234.
[26] Fed. Br. 21; NPS0000024.
[27] NPS0000807.
[28] NPS0005044; NPS0032507.

across the park" and "work toward identify [sic] reasonable trailing routes acceptable to you and the park."[29] NPS characterized the objective of its meeting with the Paces as an attempt "to gain information . . . on *their desired trailing routes*," not to determine whether those "desired" routes had been traditionally used prior to the Park's establishment.[30] NPS's only justification for its determination the Lower South Desert route is "traditional" is found in the agency's response to public comments on the EA,[31] where the agency conflates past grazing use of the Hartnet Allotment with past trailing use,[32] an explanation at odds with the EA's definition of trailing: "Herding and moving livestock from one pasture or allotment to another."[33] Indeed, NPS elsewhere rejected this construction of "traditional use" when asked by a former grazing permit holder to trail cattle in the southern end of the Park.[34]

Defendants thus assert, unbeknownst to NPS, trailing had occurred through the Lower South Desert for over 47 years, despite the Paces' earlier failure to identify such a route when asked directly.[35] NPS's determination is not supported by substantial evidence that "a reasonable mind might accept as adequate to support [its] conclusion."[36] Because NPS and the Paces never identified the Lower South Desert route as a "traditional course" prior to 2018, and NPS instead manufactured its "traditional" status in response to public comments,[37] the permits to trail cattle along the route exceed the agency's statutory authority, and must be set aside.

---

[29] NPS0005044 (emphasis added).
[30] NPS0032507 (emphasis added).
[31] NPS0000311.
[32] NPS0000311.
[33] NPS0000150.
[34] NPS0032137.
[35] NPS0000530-31.
[36] *Stewart v. Kempthorne*, 593 F. Supp. 2d 1240, 1247 (D. Utah 2008) (citations omitted).
[37] NPS0000311.

**III.    The Plain Language of Section 4 Limits Trailing on Traditional Courses to Historic Users.**

    **A.    Congress Used Different Language in Sections 3 and 4 Based on Past Differences in Management.**

When the Park was still a national monument, "grazing" and "trailing" were managed quite differently.[38] Superintendent Hambly's 1980 letter indicated NPS had "little in the way of documentation showing which families were actively trailing stock through the Park at the time of the enabling legislation."[39] The federal government failed to consistently document or authorize trailing in the monument. Thus, the same "phase-out" language Congress used in Section 3 regarding grazing permit renewals would not accomplish Congress's goal to allow "owners and operators . . . existing on the date immediately prior to" the Park's establishment to continue to trail livestock along the "traditional courses *used by them*."[40] Utah concedes this: "it would have been difficult for Congress or NPS to delineate each trail being used" at the time of the Park's establishment because the federal government lacked a consistent permit process or recordkeeping for trailing.[41]

For this reason, Defendants' reliance on *Anderson v. U.S. Department of Labor* is misplaced.[42] True, "where Congress includes particular language in one section of a statute but omits it in another section . . . it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."[43] But because the federal government had not

---

[38] NPS0000533.

[39] *Id.*

[40] Pub. L. No. 92-207 § 4 (Dec. 18, 1971) (emphasis added), codified at 16 U.S.C. § 273c.

[41] Utah Br. 37-38.

[42] Fed. Br. 23; Utah Br. 40.

[43] *Anderson v. U.S. Dep't of Labor*, 422 F.3d 1155, 1177 (10th Cir. 2005).

managed grazing and trailing the same way in the monument, use of the particular "phase-out" language in Section 3—i.e., "continue in the exercise thereof during the term of the lease, permit, or license, and one period of renewal thereafter"—would make no sense applied to trailing, because trailing had not been consistently leased, permitted, or licensed in ways that could simply be continued and renewed.[44] Instead, in Section 4, Congress used language relevant to historic practices to identify both where and by whom trailing could continue through the Park: by "owners and operators" in existence before December 18, 1971, and along the "traditional courses *used by them*" before December 18, 1971.[45]

### B. Neither NPS's Interpretation nor the Solicitor's Opinion Warrant *Chevron* Deference.

The substantial deference afforded agency interpretations of ambiguous statutory provisions under *Chevron*[46] is not warranted here for several reasons. First, the statutory provision at issue is unambiguous, so no deference to NPS's contrary interpretation is due.[47] Congress spoke plainly when it allowed continued trailing along those "traditional courses" used by historic owners and operators prior to the Park's establishment.[48] Second, even if the Court finds ambiguity in Section 4, neither the informal interpretations of officials nor the Solicitor's opinion warrant *Chevron* deference. Under Supreme Court and Tenth Circuit precedent, "opinion letters" and other instances where a "statutory interpretation . . . has never undergone the formal rulemaking process . . . remain[] informal interpretation[s] not entitled to [*Chevron*]

---

[44] Pub. L. No. 92-207 § 3, codified at 16 U.S.C. § 273b; NPS0006812.
[45] 16 U.S.C. § 273c (emphasis added).
[46] *See Chevron, U.S.A.*, 467 U.S. at 842-43.
[47] *Kientz v. Comm'r, Social Sec. Admin.*, 954 F.3d 1277, 1280-81 (10th Cir. 2020) (citation omitted).
[48] 16 U.S.C. § 273c.

deference."[49] "[S]uch informal interpretations 'are entitled to respect'" under the Supreme

Court's *Skidmore* opinion "'only to the extent that those interpretations have the power to

persuade.'"[50] Accordingly, a solicitor's opinion receives, at most, *Skidmore* deference.[51]

Similarly, the superintendents' letters expressing NPS's intention to issue trailing permits to non-

historic users are not "deliberative conclusions" warranting even *Skidmore* deference.[52]

### 1. The Solicitor's Opinion Is Unpersuasive.

Defendants rely on a 1993 Solicitor's opinion to support NPS's decision to allow non-

historic operators to use traditional routes through the Park.[53] There, in response to a very

selectively framed question ("whether Congress intended . . . a de facto phase-out of stock

trailing within" the Park),[54] the Solicitor hastily concluded that the use of different language in

Section 3 and Section 4 of the enabling legislation demonstrated Congress's intention to phase

out only grazing from the Park.[55] The Solicitor ignored the fact that grazing and trailing were

managed very differently prior to the Park's establishment,[56] making the use of Section 3's

"renewal period" language in Section 4 inapt and illogical. Rather than acknowledge the

cessation of trailing that the plain language of Congress foretells, the Solicitor unnecessarily

delved into the statute's legislative history and agency interpretations.[57]

---

[49] *McGraw v. Barnhart*, 450 F.3d 493, 500-01 (10th Cir. 2006) (citation omitted).
[50] *Id.* at 501 (citation omitted).
[51] *Manning v. United States*, 146 F.3d 808, 814 n.4 (10th Cir. 1998) (citations omitted).
[52] *Clarke v. Securities Industry Ass'n*, 479 U.S. 388, 403-04 (1987).
[53] Fed. Br. 23.
[54] NPS0011446.
[55] NPS0011451.
[56] NPS0006812; NPS0011451.
[57] NPS0011448-55; 16 U.S.C. § 273c.

The Solicitor focused on the legislative history describing those individuals addressed in Section 4: "It is extremely important to *residents of the area* to be able to *continue* to use established crossings."[58] But this phrase, stated in the present tense, indicates Congress understood the use of "established crossings" to be important to *contemporaneous* residents of the area. Further, the words "to *continue* to use" logically imply past use by residents who seek on-going use "established crossings."[59] The Solicitor then cited comments made by the Interior Department and Secretary on legislative drafts written well before finalization and passage of Public Law 92-207.[60]

Under *Skidmore*, the Solicitor's opinion receives deference limited to the "thoroughness evident in its consideration" and the "validity of its reasoning."[61] Here, the opinion lacks the power to persuade: It ignored the plain language of Congress, disregarded important context regarding past management that necessitated different language between Sections 3 and 4, and placed undue weight on statements made about earlier versions of bills and not the final legislation.

Ultimately, "courts are the final authorities on issues of statutory construction . . . and 'are not obliged to stand aside and rubber-stamp their affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute.'"[62] Indeed, "a line must be drawn between according administrative

---

[58] NPS0011448 (emphasis added).
[59] 1971 U.S.C.C.A.N. 2272 at 2273 (emphasis added).
[60] NPS0011448-50.
[61] *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).
[62] *Volkswagenwerk Aktiengesellschaft v. Fed. Maritime Comm'n*, 390 U.S. 261, 272 (1968) (citations omitted).

interpretations deference and the proposition that administrative agencies are entitled to violate the law if they do it often enough."[63] Simply because NPS has long ignored Section 4's restriction of trailing[64] does not mean continued circumvention of Congress's plain language may be judicially excused.

    **C.**    **Utah Asks the Court to Adopt an Extreme Interpretation of Section 4 Not Shared by NPS.**

    Utah goes even farther afield, asking the Court to ignore the phrase "existing on the date immediately prior to the enactment of this Act."[65] Utah alternatively argues the "set off" clause in Section 4 refers to trailing rights that existed prior to the Park's establishment, not "owners or operators,"[66] and contends "[n]ew owners of livestock are equally entitled to use 'traditional courses' across the Park" as historic owners and operators.[67] The Court must reject these misinterpretations.[68]

    Superintendent Hambly's 1980 letter to permittees indicated because "[t]here is little in the way of documentation showing which families were actively trailing stock through the Park at the time of the enabling legislation," he was "attempt[ing] to make such documentation so that rights indicated in the legislation could be protected."[69] NPS thus understood in 1980 that

---

[63] *Wilderness Soc'y v. Morton*, 479 F.2d 842, 865 (D.C. Cir. 1973).
[64] Fed. Br. 23.
[65] Utah Br. 36.
[66] Utah Br. 37.
[67] Utah Br. 40.
[68] *See Navajo Nation v. Dalley*, 896 F.3d 1196, 1215 (10th Cir. 2018) (citations omitted) ("[t]he canon against surplusage indicates that we generally must give effect to all statutory provisions, so that no part will be inoperative or superfluous—each phrase must have distinct meaning."); *see also Barnhart v. Thomas*, 540 U.S. 20, 26 (2003) ("a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows.").
[69] NPS0006812.

Section 4 protected rights held only by specific "families . . . actively trailing stock through the Park *at the time of the enabling legislation*,"[70] i.e., "owners and operators" existing immediately prior to the Park's establishment. Similarly, Superintendent Ott pointed out this stipulation in a 1987 letter: Section 4 applies to "owners and operators of cattle and sheep herds existing on the date immediately prior to the enactment of this Act."[71] Neither NPS nor Federal Defendants stretch the plain language of Congress to the extreme extent Utah does;[72] nor should the Court.

      **D.**      **The Plain Language of Section 4 Does Not Result in an "Absurd Outcome."**

Utah contends that if the Court finds Section 4 unambiguous, application of the plain language will lead to an absurd result.[73] Utah's concern is unwarranted. WWP has not argued that Ms. Gillespie or the Taylor Ranch are not historic users of the Oak Creek trailing route. All parties agree Gillespie holds the only remaining permit to graze cattle within the Park.[74] A plain language reading of Section 4 would not prohibit Gillespie from trailing cattle through Oak Creek to reach the Sandy 3 Allotment. Trucking these cattle, rather than trailing, is also a "common practice" and "viable option," according to Federal Defendants.[75] Further, if the Court agrees with WWP that NPS exceeds its authority under Public Law 100-446 by allowing Fillmore or Boone Taylor to graze cattle on the Sandy 3 Allotment, neither Fillmore nor Boone Taylor has any right to graze in the Park, so any restrictions on associated trailing would be irrelevant.

---

[70] NPS0006812 (emphasis added).
[71] NPS0033339.
[72] NPS0006812; NPS0033339; Fed. Br. 22.
[73] Utah Br. 41-42.
[74] Fed. Br. 20; Utah Br. 30.
[75] Fed. Br. 44 (citing NPS0000068; NPS0000137; NPS0032114).

**IV.     NPS's Issuance of Grazing and Trailing Permits Violates Its Regulations.**

Defendants acknowledge 36 C.F.R. §§ 1.6(a) and 2.60(a)(1) apply to the NPS permits issued for livestock operations within the Park.[76] Grazing and trailing are "restricted activit[ies]" that may only occur within the confines of Public Law 100-446 and Section 4 of the enabling legislation.[77] Defendants attempt to counter WWP's claim that NPS violated 36 C.F.R. § 1.6(a) by deeming it "derivative of WWP's other arguments" regarding the permits' consistency with applicable legislation.[78] Yet Defendants offer no evidence that NPS appropriately determined "that . . . environmental or scenic values, natural or cultural resources, scientific research . . . or the avoidance of conflict among visitor use activities will not be adversely impacted" by authorizing livestock use.[79] Instead, NPS admits that environmental values—four listed species, plus critical habitat for the Mexican spotted owl—are likely to be adversely affected by trailing,[80] and that authorized grazing will degrade the Sandy 3 Allotment.[81] Thus, the agency's issuance of permits for such activities is antithetical to 36 C.F.R. § 1.6(a).[82]

Defendants offer no rebuttal to WWP's claim that certain activities—trailing along the new Lower South Desert route, trailing by non-historic users, and grazing by non-permit holders— are not "specifically authorized by Federal statutory law" in accordance with 36 C.F.R. § 2.60(a)(1).[83] The enabling legislation and Public Law 100-446 make plain what is

---

[76] Fed. Br. 24-25; Utah Br. 31-32.
[77] *See* 36 C.F.R. § 1.6(a); Pub. L. No. 100-446; 16 U.S.C. § 273c.
[78] Fed. Br. 24-25.
[79] 36 C.F.R. § 1.6(a).
[80] NPS0000411.
[81] NPS0000076-78; NPS0000135-36; NPS0000231.
[82] 36 C.F.R. § 1.6(a).
[83] 36 C.F.R. § 2.60(a)(1).

"specifically authorized," and NPS's authorizations to the contrary violate these laws and 36

C.F.R. § 2.60(a)(1).[84]

## V.    NPS Has Not Taken a Hard Look at Cumulative Impacts or Its Policies.

### A.    WWP Has Not Forfeited Its Claim Regarding Cumulative Impacts to Listed Plants.

WWP raised the specific issue of cumulative livestock impacts to listed plants during the

NEPA process, contrary to Defendants' assertions.[85] As Defendants quote, WWP expressed

concern that the "EA cumulative impacts assessment fails to examine population trends, range

wide impacts etc."[86] WWP did not "merely mention broad categories of potential impacts."[87]

Instead, WWP used specific terminology ("cumulative impacts," "population trends," and "range

wide impacts") to alert NPS to its flawed analyses of livestock impacts to listed plants within

their limited ranges, as the surrounding paragraphs in WWP's comments on the EA indicate.[88]

Further, an agency response to an issue is "normally considered highly probative"

evidence that an issue was properly presented.[89] Here, NPS responded to WWP's comment, but

wrongly dismissed WWP's concern as unconnected to "human actions attributable to specific

individuals or entities."[90] NPS ignored WWP's references to grazing and trailing damage and

disturbance to listed plants across the plants' ranges—"human actions" authorized by federal

agencies.[91]

---

[84] Pub. L. No. 100-446; 16 U.S.C. § 273c; 36 C.F.R. § 2.60(a)(1).
[85] Fed. Br. 33; Utah Br. 55-56.
[86] Fed. Br. 33; NPS0005065.
[87] Fed. Br. 33 (citation omitted).
[88] NPS0005064-65.
[89] *Forest Guardians v. U.S. Forest Serv.*, 495 F.3d 1162, 1172 (10th Cir. 2007).
[90] NPS0000334-35.
[91] NPS0005064-65.

Regardless, WWP provided "sufficient detail to allow the agency to rectify" its NEPA violation."[92] WWP need not conduct the required NEPA analysis; "the agency bears the primary responsibility to ensure that it complies with NEPA."[93] WWP identified NPS's failure "with sufficient clarity to allow the decision maker to understand and rule on the issue raised,"[94] and provided NPS the opportunity to reexamine its analysis before finalization of the LGTMP. Under Supreme Court and Tenth Circuit precedent, this is sufficient to preserve WWP's claim for judicial review.[95]

**B.      NPS Did Not Properly Analyze Cumulative Impacts to Listed Plants.**

Defendants offer no reason why NPS did not consider lands adjacent to the Park in its analysis of livestock impacts to listed plants. Instead, Defendants' discussion of the EA's cumulative impacts analyses only underscores the arbitrariness of NPS's failure to look at impacts to listed plants just beyond the Park's borders: "for soils, archaeological resources, water resources, and wilderness qualities, the geographic scope [considered by NPS in the EA] included land adjacent to the Park."[96]

An agency "cannot treat the identified environmental concern in a vacuum,"[97] and a proper cumulative impacts analysis under NEPA may not be limited solely to impacts "caused" by the action agency, contrary to Defendants assertion.[98] Defendants' inappropriately rely on

---

[92] *Ark Initiative v. U.S. Forest Serv.*, 660 F.3d 1256, 1261 (10th Cir. 2011).
[93] *U.S. Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 765 (2004).
[94] NPS0005064-65.
[95] *Pub. Citizen*, 541 U.S. at 764-65.
[96] Fed. Br. 34; NPS0000069.
[97] *Grand Canyon Trust v. Fed. Aviation Admin.*, 290 F.3d 339, 346 (D.C. Cir. 2002).
[98] Fed. Br. 34-35.

*U.S. Department of Transportation v. Public Citizen*,[99] in which the Supreme Court held that an agency need not consider effects it cannot prevent "when determining whether its action is a 'major Federal action.'"[100] But in the same opinion, the Court stated that under relevant NEPA regulations, "cumulative impacts" include "other past, present, and reasonably foreseeable future actions *regardless of what agency* . . . undertakes such other actions."[101]

Under Tenth Circuit precedent, *all* impacts within "the area in which the effects of the proposed project will be felt" must be considered.[102] The impacts of "other actions—past, present, and proposed, and reasonably foreseeable" in the affected area must be analyzed in a "meaningful cumulative impact analysis."[103] Here, the impacts of livestock extend beyond the Park boundary and onto Bureau of Land Management (BLM) lands where the trailing livestock are brought to graze, but NPS has not provided the proper cumulative impacts analysis nor articulated a satisfactory explanation why such analysis need not be completed. This violates NEPA, and the EA, FONSI, and LGTMP must be set aside.

**C.     NPS's Policies Apply "On Their Face" to the EA.**

Defendants offer a cursory defense of NPS's failure to adhere to the Management Policies requiring the agency to prevent "unacceptable impacts" and "ensure, to the extent possible" that statutorily-mandated uses' "impacts on park resources are acceptable."[104] Instead, Defendants' string of page citations claiming NPS "discussed and applied applicable policies"[105]

---

[99] Fed. Br. 35.
[100] *Pub. Citizen*, 541 U.S. at 770.
[101] *Id.* at 769 (citing 40 C.F.R. § 1508.7).
[102] *San Juan Citizens Alliance v. Stiles*, 654 F.3d 1038, 1056 (10th Cir. 2011) (citation omitted).
[103] *Id.*
[104] NPS Management Policies §§ 1.4.3.1 and 1.4.7.1; Fed. Br. 35.
[105] Fed. Br. 35.

highlights the EA's glaring omission of any mention or consideration of the agency's Policies regarding "unacceptable impacts."

Defendants erroneously assert the Policies stated in sections 1.4.3.1 and 1.4.7.1 "do not 'on their face' apply directly to the EA analysis."[106] But the whole purpose of developing the LGTMP and EA is to address the impacts of grazing and trailing in the Park. Such impacts are precisely the subject of § 1.4.3.1 and more broadly of § 1.4.7.1. Defendants' contention that these particular Policies need not be considered in the EA because they "apply to a different law" than NEPA[107] is unsupported and contrary to other courts' opinions on the relationship between NEPA and agency policies.[108] Here, without consideration during the NEPA process of its policy against "unacceptable impacts," NPS ignored relevant factors and withheld relevant information and context. This renders the EA arbitrary and capricious, and it must be set aside.

## VI. The Number of Intensity Factors Triggered Requires Development of a Full EIS.

### A. A Legitimate Controversy Exists Between Botanists and NPS.

Defendants incorrectly assert that an action is only "highly controversial" if opposition "cast[s] substantial doubt on the agency's methodology and data."[109] No such bright-line requirement exists for demonstrating "controversy" as a NEPA intensity factor.[110] The key

---

[106] Fed. Br. 35.
[107] *Id.*
[108] *W. Watersheds Project v. Salazar*, No. 4:08-cv-516-BLW, 2011 WL 4526746, at *14 (D. Idaho Sept. 28, 2011) (unpublished) (holding BLM Special Status Species Policy required discussion in NEPA analysis); *Or. Natural Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1091, 1116 (9th Cir. 2010) (examining BLM Land Use Planning Handbook to determine adequacy of NEPA analysis).
[109] Fed. Br. 29 (citing *Hillsdale Envtl. Loss Prevention, Inc. v. U.S. Army Corps of Engr's*, 702 F.3d 1156, 1181-82 (10th Cir. 2010)).
[110] 40 C.F.R. § 1508.27(b)(4).

inquiry is whether there is "substantial dispute" about a proposed action's effects.[111] Such

"substantial dispute" exists here. Tom and Deb Clark, former NPS scientists and experts on the

listed plants,[112] told the agency that despite the retirement of the Hartnet Allotment, livestock

impacts were still significant and the LGTMP required the preparation of an environmental

impact statement (EIS).[113] Daniela Roth, a former FWS botanist, "cast substantial doubt" on the

validity of NPS's damage and disturbance thresholds to prevent local population extinction of

listed cacti.[114] In addition, botanist Hope Hornbeck's research contradicts NPS's claim that listed

plants recover between "intense episodic" trailing events; such recovery is only possible "if more

favorable conditions follow these events"—an unlikely prospect as increased temperatures and

drought due to climate change occur more frequently.[115]

      Defendants only offer irrelevant and erroneous justifications for NPS's failure to examine

the "highly controversial" intensity factor. For instance, the fact that livestock impacts have

previously occurred is irrelevant to whether substantial dispute exists over the significance of

impacts that will occur in the future under the LGTMP.[116] Further, Defendants incorrectly

purport that "Congress expressly allowed for these impacts to continue."[117] Nothing at the cited

page indicates Congress authorized continued adverse and significant effects to ESA-listed

plants in the Park.[118] In fact, Congress *could not* consider impacts to ESA-listed species in the

---

[111] *Middle Rio Grande Conservancy Dist. v. Norton*, 294 F.3d 1220, 1229 (10th Cir. 2002).
[112] NPS0000158-59.
[113] NPS0005021.
[114] NPS0005031.
[115] NPS0031565; NPS0000054.
[116] Fed. Br. 30.
[117] *Id.*
[118] *Id.*; NPS0000008.

enabling legislation, because the ESA was not enacted until two years after the Park's

establishment,[119] and the plants in question did not gain ESA protection until 1979, 1985, and

1998.[120]

Without evidence, Defendants contend "the record demonstrates that NPS considered,

and rejected, the contention that the [LGTMP] was highly controversial."[121] Utah, meanwhile,

claims the FONSI demonstrates NPS duly considered the controversy over impacts to listed

plants.[122] No such consideration can be gleaned from the record. There is a sole reference to the

issue in the record from 2014, over a year prior to the public scoping period for the LGTMP and

over four years before the EA became public.[123] This can hardly be considered due

consideration. NPS failed to appropriately weigh or justify the controversial nature of its

decisions regarding impacts to listed plants. The agency has not taken the requisite hard look at

this relevant intensity factor,[124] and the LGTMP, EA, and FONSI must be set aside.

**B.      NPS Has Created Legal Precedent Through Its Novel Interpretation of Section 4.**

NPS's authorization of trailing through the Lower South Desert establishes precedent as a

new interpretation of Section 4 of the Park's enabling legislation, and the agency failed to give

due consideration to this intensity factor.[125] Utah claims NPS's decision to authorize trailing

---

[119] *See* Pub. L. No. 93-205 (Dec. 28, 1973), codified at 16 U.S.C. §§ 1531 *et seq.*
[120] 44 Fed. Reg. 58868 (Oct. 11, 1979); 50 Fed. Reg. 33734 (Aug. 21, 1985); 63 Fed. Reg. 44587 (Aug. 20, 1998).
[121] Fed. Br. 29.
[122] Utah Br. 51-52 (citing NPS0000278).
[123] NPS0002075.
[124] *See Humane Soc'y of the United States v. U.S. Dep't of Commerce*, 432 F. Supp. 2d 4, 20 (D.D.C. 2006).
[125] 40 C.F.R. § 1508.27(b)(6).

through a retired allotment is "extremely specific" and not applicable to the other remaining

allotment in the Park.[126] Yet the record shows that NPS and Utah discussed the implications of

just such a decision for the Sandy 3 Allotment prior to the EA's release.[127] Utah is disingenuous

to claim that such consideration is not "reasonably foreseeable."[128]

Defendants misconstrue the holding of *Barnes v. U.S. Department of Transportation*.[129]

In that case, the Ninth Circuit held that an agency's decision not to prepare an EIS for an airport

runway expansion "creat[ed] no binding precedent" regarding whether any future expansions

would require an EIS.[130] This is not the situation here, where NPS's decision to authorize new

trailing as "traditional" because of past grazing in the Lower South Desert represents a wholly

new interpretation of the Park's enabling legislation to be cited during future trailing requests.[131]

NPS's failure to account for having set this precedent in the EA and FONSI is arbitrary and

capricious and violates NEPA.

C. **NPS Failed to Consider Threatened Violations of Laws, Regulations, and Policies.**

Defendants offer no rebuttal to WWP's assertion that NPS failed to consider its

regulations at 36 C.F.R. §§ 1.6(a) or 2.60(a)(1) in the development of the EA and FONSI. There

is no record evidence that NPS determined that the issuance of grazing and trailing permits in the

Park would not result in adverse impacts.[132] Rather, NPS determined that four listed species and

---

[126] Utah Br. 53-54.
[127] NPS0001423-24.
[128] Utah Br. 53 (citing NPS NEPA Handbook 1.6).
[129] Fed. Br. 32.
[130] *Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1140-41 (9th Cir. 2011) (citation omitted).
[131] *See* NPS0001423-24.
[132] 36 C.F.R. § 1.6(a).

designated critical habitat *would* likely be adversely affected.[133] Further, NPS has not shown and cannot show the issuance of trailing permits for the non-traditional Lower South Desert route or to non-historic users is "specifically authorized by Federal statutory law."[134] When these regulatory violations are added to the inconsistency of the LGTMP with NPS Management Policies[135] and the conservation mandates of both the ESA and the Organic Act, the intensity factor at 40 C.F.R. § 1508.27(b)(10)[136] has not been given due consideration by NPS.

### D. Under the Tenth Circuit's Reasoning, an EIS Is Required for the LGTMP.

Utah wrongly cites *WildEarth Guardians v. Conner* as support for NPS's failure to complete an EIS for the LGTMP.[137] Instead, the reasoning of *Conner* supports development of an EIS for the Park's LGTMP. In *Conner*, the Tenth Circuit deferred to the Forest Service's conclusions that a timber project's impacts would be insignificant under several of the same intensity factors at issue here.[138] But the facts in this case are markedly distinguishable from those at issue in *Conner*. First, the *Conner* court examined whether the proposed timber project would have cumulatively significant impacts,[139] and accepted the Forest Service's conclusion that "worst case scenario" cumulative impacts would not significantly hurt a listed species.[140] Here, by contrast, NPS has not yet even considered the cumulative impacts that flow from

---

[133] NPS0000411.
[134] 36 C.F.R. § 2.60(a)(1).
[135] NPS0000300.
[136] 40 C.F.R. § 1508.27(b)(10).
[137] Utah Br. 45.
[138] *WildEarth Guardians v. Conner*, 920 F.3d 1245, 1262-63 (10th Cir. 2019).
[139] *Id.* at 1262; *see* 40 C.F.R. § 1508.27(b)(7).
[140] *Conner*, 920 F.3d at 1262.

twenty years of trailing through the Park's ESA-listed plant habitat onto adjacent federal lands, which facilitates chronic grazing disturbance within the listed plants' limited ranges.[141]

Second, the substantial dispute present here is much different from the purported uncertainty and controversy at issue in *Conner*. In *Conner*, plaintiffs alleged timber harvest impacts were uncertain and controversial because the Forest had not disclosed the exact location of harvest units in relation to listed species habitat.[142] But the *Conner* court found that because the agency had determined the project was unlikely to harm the listed species regardless of harvest unit location, the agency "could properly conclude there was no legitimate controversy."[143] In contrast, NPS has concluded here that trailing *is* likely to adversely affect three listed plant species, the severity of which is in substantial dispute between plant experts and the agency.[144]

Last, the *Conner* court noted that under the intensity factor regarding the degree of impact to listed species,[145] the Forest Service had concluded the timber project was *unlikely* to adversely affect a listed species.[146] Here, by contrast, NPS has concluded the LGTMP is *likely* to adversely affect four listed species, as well as designated critical habitat for the Mexican spotted owl.[147] In contrast to *Conner*, a proper cumulative impacts analysis has not been completed here, a legitimate scientific controversy exists regarding the severity of the LGTMP's impacts, and the

---

[141] *See supra* Part V.B; *see also* Plaintiff's Opening Brief Part VII.A, Docket No. 60 (April 27, 2020).

[142] *Conner*, 920 F.3d at 1263.

[143] *Id.*

[144] NPS0005021; NPS00005030-31.

[145] 40 C.F.R. § 1508.27(b)(9).

[146] *Conner*, 920 F.3d at 1263.

[147] NPS0000411.

proposed actions will adversely affect listed species. When these factors are weighed in

combination with the other intensity factors triggered by the LGTMP, the FONSI must be set

aside, because a full EIS is required.[148]

## VII. The Degree of Impacts to Park Resources Allowed by NPS Violates the NPS Organic Act and Agency Policies.

Defendants attempt to retract NPS's previous concession in federal court "that § 1.4

serves as NPS's official interpretation of the Organic Act and is therefore enforceable against

NPS."[149] Defendants still offer no answer to WWP's claim that NPS failed to prevent

unacceptable impacts to Park resources to the extent possible, and provide no explanation why

consistency with the agency's policies on ESA-listed species and wilderness could not be

achieved. Defendants' assertion that "NPS did not need a waiver from its Policies . . . because it

followed its Policies" is directly contradicted by NPS's admissions that adoption of the LGTMP

did not follow Sections 4.2.3 and 6.3.5.[150]

Defendants ask the Court to accept that the protection the LGTMP affords Park resources

is all NPS could provide because of "the fact that Congress allowed *these impacts*."[151] But

Congress has not "specifically blessed" or "allowed" degradation of Park resources, as

Defendants assert.[152] Rather, Congress directed NPS to reasonably regulate the use of stock

---

[148] *See Cascadia Wildlands v. U.S. Forest Serv.*, 937 F. Supp. 2d 1271, 1283 (D. Or. 2013).
[149] *Greater Yellowstone Coal. v. Kempthorne*, 577 F. Supp. 2d 183, 190 n.1 (D.D.C. 2008).
[150] NPS0000300.
[151] Fed. Br. 40 (emphasis added).
[152] Fed. Br. 39-40.

trails,[153] to manage grazing "to encourage the protection of the Park's natural and cultural resources values," and to conserve and prevent impairment to Park resources.[154]

Further, NPS's Policies require the agency to "always seek ways to avoid, or to minimize to the greatest extent practicable, adverse impacts on park resources and values.[155] Regarding statutorily-mandated uses, NPS "must manage and regulate the use to ensure, to the extent possible, that impacts on park resources from that use are acceptable."[156] Defendants point to nothing in the record to show the LGTMP meets these obligations. Rather than "proactively conserve" and "prevent detrimental effects" to listed species in harmony with agency policy, NPS instead provided reactive "adaptive management."[157] NPS's choice not to implement protections until after damage, disturbance, or further degradation occurs[158] underscores the fact that it has not, in fact, "ensure[d], to the extent possible," that impacts on Park resources remain acceptable,[159] nor "avoid[ed] or minimize[d] to the greatest extent practicable [] adverse impacts on park resources and values."[160]

A.    NPS's Unexplained Failure to Follow Its Wilderness Policy Is Arbitrary.

Defendants also fail to explain why consistency with Section 6.3.5 could not be achieved,[161] or why the agency did not conduct the mandatory "minimum requirements analysis"

---

[153] 16 U.S.C. § 273c.
[154] 54 U.S.C. § 100101(a).
[155] NPS Management Policies § 1.4.3.
[156] Id. § 1.4.3.1.
[157] NPS0000027; NPS0000077-78; NPS0000108-09; NPS0000113; NPS0000117; NPS0000128; NPS0000233; NPS0000238; NPS Management Policies § 4.4.2.3.
[158] NPS0000236-38.
[159] NPS Management Policies § 1.4.3.1.
[160] Id. § 1.4.3.
[161] NPS0000300.

before authorizing trammeling actions and infrastructure development within recommended wilderness.[162] Defendants further incorrectly contend that "wilderness is not a 'park resource' or 'value' subject to the Organic Act, and thus not part of the NID."[163] But the NPS Policies state that "additional attributes encompassed by the specific values for which the park was established" are "subject to the no-impairment standard,"[164] and impacts to "a resource or value whose conservation is identified in the park's general management plan as being of significance" are "more likely to constitute impairment."[165]

NPS recognized the Park's significance to include its "undeveloped landscapes" that "provide a rare opportunity for visitors to experience the wildness of nature, the quiet solitude of the backcountry, and the brilliance of the night skies."[166] Congress also directed the Interior Secretary to inventory the Park and make recommendations for potential wilderness in the enabling legislation.[167] For these reasons, wilderness is an "attribute[] encompassed by the specific values for which the park was established,"[168] and required consideration in the NID. Absent a "rational explanation for [NPS's] departure" from its own Policies, the LGTMP and NID are arbitrary and capricious, and must be set aside.[169]

//

//

---

[162] NPS Management Policies § 6.3.5.
[163] Fed. Br. 41 (citing NPS Management Policies § 1.4.6).
[164] NPS Management Policies § 1.4.6.
[165] Id. § 1.4.5.
[166] NPS0031663-64.
[167] Pub. L. No. 92-207 § 5(c) (Dec. 18, 1971), codified at 16 U.S.C. § 273d(c).
[168] NPS Management Policies § 1.4.6.
[169] Utahns for Better Transp. v. U.S. Dep't of Transp., 305 F.3d 1152, 1165 (10th Cir. 2002) (citation omitted).

**VIII.  FWS's Unlawful Biological Opinion Must Be Set Aside.**

    **A.  The Action Area Must Include Adjacent Federal Lands Affected by Trailing.**

Defendants ask the Court to ignore the fact that trailing across the Park serves no purpose but to make grazing on adjacent federal lands more economically viable.[170] The decision Defendants cite is quickly distinguishable.[171] In *Sierra Club v. BLM*, the Ninth Circuit held that impacts from the development of a wind project by a private company on private land[172] were not "indirect effects" of a potential road project requiring consideration within the meaning of 50 C.F.R. § 402.02.[173] In contrast, here, grazing on adjacent *federal* lands pursuant to *federally-*issued permits is made "possible, (or indeed more probable)" and economically viable by trailing cattle through the Park rather than trucking them onto allotments.[174] The livestock trails across the Park serve no independent utility and have no justification but to facilitate grazing on adjacent federal lands,[175] in contrast to the road project at issue in *Sierra Club*.[176] Indeed, FWS admits several of the trails at issue extend onto adjacent federal lands.[177] Access to and use of these trails would not occur without NPS permits for the Park portions, and the action area for the Biological Opinion must encompass these effects.[178]

//

---

[170] NPS0000068.

[171] *See* Fed. Br. 44.

[172] *Sierra Club v. Bureau of Land Mgmt.*, 786 F.3d 1219, 1222 (9th Cir. 2015).

[173] *Id.* at 1224-25 (citing 50 C.F.R. § 402.02).

[174] *See San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 1009 (9th Cir. 2014); *see also* NPS0000068.

[175] NPS0000068.

[176] *See Sierra Club*, 786 F.3d at 1225.

[177] FWS0000531.

[178] 50 C.F.R. § 402.02 (2018) (ESA regulations in place at the time FWS produced the Biological Opinion provided at Docket No. 60-2 (April 27, 2020).

### B. Degradation of Critical Habitat in Oak Creek Constitutes Adverse Modification.

Defendants wrongly attempt to minimize the adverse modification of Oak Creek in relation to the total amount of ESA critical habitat designated for the Mexican spotted owl.[179] Defendants also wrongly point to a definition of "adverse modification" not in place at the time FWS produced the Biological Opinion in question.[180] The term "as a whole" does not appear in the relevant definition of "adverse modification," nor in the case cited by Defendants.[181] FWS identifies NPS lands as especially important for the owl.[182] Within the Park, NPS admits only a fraction of the owl's critical habitat provide the necessary primary constituent elements.[183] Thus, Defendants improperly diminish the significance of impacts to Oak Creek's primary constituent elements for the owl.[184]

FWS acknowledges that Oak Creek provides "important foraging habitat" for the small number of "protected activity centers" in the Park, including one just 0.25 mile away.[185] In light of the downward trend in owl numbers, functioning foraging habitat at Oak Creek is especially key to the owl's continued presence in the Park.[186] Thus, the proper inquiry is whether NPS's authorization of trailing, failure to prevent trespass, and acceptance of on-going non-functional condition "appreciably diminishes the value of" Oak Creek as critical foraging habitat for the

---

[179] Fed. Br. 46.
[180] Fed. Br. 45.
[181] 50 C.F.R. § 402.02 (2018); *Butte Envtl. Council v. U.S. Army Corps of Engr's*, 620 F.3d 936, 948 (9th Cir. 2010).
[182] FWS0005514.
[183] NPS0000056.
[184] *See* Fed. Br. 45-47.
[185] FWS0000023.
[186] FWS0000023.

owl.[187] It does indeed, as even the agencies admit that livestock have degraded and altered Oak

Creek in an appreciably measureable way resulting in non-functional condition since at least

2014.[188] FWS's acceptance of this on-going adverse modification of Oak Creek, with no

commitment by NPS to remedy it until 2023,[189] violates Section 7 of the ESA,[190] and the

Biological Opinion must be set aside.

### C. FWS Arbitrarily Relied on Uncertain, Unspecific, and Ineffective Conservation Measures.

Defendants attempt to deflect attention away from NPS's inadequate conservation

measures by instead pointing to misleading percentages and calculations that minimize and

obscure the LGTMP's adverse impacts to listed species and critical habitat.[191] Such numbers are

irrelevant in considering whether FWS may lawfully rely on the conservation measures to

support its "no jeopardy or adverse modification" conclusions.[192] Despite the rosy picture

Defendants attempt to paint, FWS had no basis to find the conservation measures sufficiently

certain to occur, specific, or effective.[193]

In particular, NPS admitted it is "uncertain" whether it will be able to eliminate cattle

trespass in Oak Creek, given its unsuccessful previous attempts.[194] Defendants claim that NPS's

denial of trailing permits to the Sandy Ranch three weeks *before* adoption of the LGTMP

---

[187] 50 C.F.R. § 402.02 (2018).
[188] FWS0000023; NPS0000046; NPS0000392; NPS0028900.
[189] FWS0000004.
[190] *See* 16 U.S.C. § 1536(a)(2).
[191] Fed. Br. 48.
[192] *Ctr. for Biological Diversity v. Rumsfeld*, 198 F. Supp. 2d 1139, 1152 (D. Ariz. 2002) (citation omitted).
[193] *See id.*
[194] NPS0000408.

demonstrate "NPS is in fact taking action to eliminate trespass cattle."[195] But denial of trailing

permits to a single operator does not resolve what the agencies have long identified as the

primary source of trespass in Oak Creek: stray cattle from adjacent federal grazing lands where

no boundary fence is in place.[196] NPS cannot both admit uncertainty about its ability to stop

unauthorized cattle and simultaneously commit to doing so. FWS's reliance on this and NPS's

other uncertain, unspecific, and ineffective conservation measures to support its "no jeopardy or

adverse modification" conclusion is arbitrary and capricious, and the Biological Opinion must be

set aside.

## CONCLUSION

The resources of Capitol Reef National Park deserve—and the law demands—greater

protection from livestock than the LGTMP provides. For the foregoing reasons and those stated

in WWP's opening brief, WWP respectfully requests that this Court declare unlawful and set

aside the LGTMP, EA, FONSI, NID, Biological Opinion, and associated permits for grazing and

trailing within the Park; remand with instructions to NPS to cease issuance of permits that do not

comply with agency regulations or that allow livestock use not specifically authorized by

legislation; remand to NPS with instructions to prepare a full EIS for the LGTMP that complies

with Park-specific legislation, the Organic Act, agency policies, NEPA, and the ESA, and

remand with instructions to FWS to prepare a biological opinion for the LGTMP and associated

permits that complies with the ESA.

//

---

[195] Fed. Br. 51; NPS0033351.
[196] NPS0032338; FWS0000026; FWS0000815; FWS0004061; FWS0007382.

Respectfully submitted this 20th day of July, 2020.

/s/ John Persell

John Persell (Utah Bar # 17298)
P.O. Box 1775
Hailey, ID 83333
Tel: (503) 896-6472
Email: jpersell@westernwatersheds.org

Attorney for Plaintiff
Western Watersheds Project

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure Rule 32(g), District of Utah Local Rule 7-4(a), and the Court's Order granting Plaintiff up to 1,000 additional words (Docket No. 68 (July 13, 2020), I hereby certify that this brief complies with the type-volume limitations of Rule 32(a)(7)(B)(ii) and Local Rule 7-4 because it contains 7,463 words, excluding the parts of the brief exempted by Rule 32(f), calculated using the word count feature of the Microsoft Word software used to produce this document.

/s/ John Persell

John Persell
Attorney for Plaintiff
Western Watersheds Project


## CERTIFICATE OF SERVICE

I hereby certify that on July 20, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of this filing to all counsel of record.

/s/ John Persell

John Persell
Attorney for Plaintiff
Western Watersheds Project