John Persell (Utah Bar # 17298)
Western Watersheds Project
P.O. Box 1770
Hailey, ID 83333
Tel: (503) 896-6472

Attorney for Plaintiff
Western Watersheds Project

## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN REGION OF THE CENTRAL DIVISION, DISTRICT OF UTAH

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT,<br><br>Plaintiff,<br><br>v.<br><br>NATIONAL PARK SERVICE *et al.*,<br><br>Defendants,<br><br>STATE OF UTAH,<br><br>Defendant-Intervenor. | **Case No. 4:19-cv-00065-DN-PK**<br><br>**DECLARATION OF<br>LAURA WELP** |

I, Laura Welp, declare as follows:

      1.      I submit this declaration in support of Plaintiff's Second Amended Complaint for Declaratory and Injunctive Relief. The following facts are personally known to me, and if called as a witness I would and could truthfully testify to these facts.

      2.      I am a legal resident of the United States, and I reside in Kanab, Utah, where I have lived since 2001.

      3.      I have been a member and employee of Western Watersheds Project (WWP) since 2011.

4. From 1985 to 1994, I worked as a biological technician or botanist for federal agencies studying vegetation management and botany. This included work in Pinnacles National Monument (now Pinnacles National Park), Yukon-Charley Rivers National Preserve, Katmai National Park, Natural Bridges National Monument, Canyonlands National Park, Bering Land Bridge National Preserve, and the Arctic National Wildlife Refuge.

5. After obtaining a Master's degree in botany from the University of Wyoming in 1997, I worked for three years at the Wyoming Natural Diversity Database as a database manager and field technician. From there, I took a position as a botanist at Grand Staircase-Escalante National Monument from 2001 to 2005, assessing rangeland health conditions. My assessments were used to develop grazing management plans.

6. Since 2005, I have worked at non-profit conservation organizations or as a consultant for them, principally Western Watersheds Project and also the Grand Canyon Trust and Wild Utah Project.

7. I have a strong interest in the management of public lands, including Capitol Reef National Park. My interest is based on my lifetime as a botanist and recreationist who enjoys observing and studying native vegetation, wildlife, and the landscapes of public lands throughout the American West. I am very interested in the national forests, national parks, national monuments, and other public lands in Southern Utah, especially Capitol Reef National Park.

8. As a botanist and former federal resource manager, I have been trained to identify impacts to native vegetation, and I am particularly concerned with anthropogenic degradation of ecosystem functions. The negative effects on vegetation, hydrology, and soil ecosystem functions are distressingly evident to me when I visit areas that are degraded by livestock. These

degraded landscapes are characterized by things like high amounts of bare ground, damage to riparian areas, increased erosion, presence of non-native plant species, reduced biological soil crust, depauperate vegetation functional groups, lower biodiversity, excessive forage utilization and browse by livestock, unauthorized cattle use, and/or negative effects on native wildlife. Conversely, I get great enjoyment from observing native plant communities and photographing native species.

9. I most recently visited Capitol Reef National Park in April of 2019 with colleagues from WWP to observe plants, soil conditions, and the health of streams and riparian vegetation, and to enjoy the Park's fascinating scenery and desert ecosystems. I visited multiple locations throughout the entire length of the Park, including the Hartnet, Lower South Desert, Pleasant Creek, Oak Creek, and the Sandy 3 Allotment. I plan to return to the Park in October of this year, 2020.

10. Capitol Reef is by far my favorite national park. It was seldom visited in the late 1980s when I first came to Southern Utah, especially relative to the more well-known Zion and Arches national parks. I enjoy the vast vistas ranging from landscape-level Navajo cross-bedded sandstone buttes and Chinle badlands to the rare plants and animals on the rims and riparian areas. Capitol Reef National Park was designated in part to preserve its intact functioning natural ecosystems. Such areas are rare and getting rarer as more and more people crowd into these places and human activity impacts biological values.

**Concerns About Rare Plants in the Northern Part of Capitol Reef National Park**

11. In 1996, I worked on a rare plant survey in the Park. We were looking for populations of Last Chance townsendia (*Townsendia aprica*), Wright fishhook cactus (*Sclerocactus wrightiae*), and Winkler cactus (*Pediocactus winkleri*), among other plants.

12. Since then, I return to the Park from time to time to revisit some of these plant populations. As public lands in the vicinity of the Park experience increased off-highway vehicle, grazing, and recreational activity, the Park is an increasingly important refuge for these rare plants.

13. The rare plant survey took me throughout the Park, and extensive areas of the Park remain important to me, including Cathedral Valley and the Hartnet. This part of the Park has world-class vistas overlooking buttes and spires in fantastic shapes and vibrant colors. Last Chance townsendia occurs on the shaley rims there, and Wright fishhook cactus and Winkler cactus are present lower on the slopes.

14. The Lower South Desert and Jailhouse Rock portions of the Park are also very important to me. I enjoy taking in the vista of Jailhouse Rock and the South Desert, although a closer look at this area reveals more soil erosion, overutilization of vegetation, and destruction of biological soil crust relative to natural conditions. The failure of these areas to achieve their ecological potential within a national park, which must be managed for non-impairment under the Organic Act, is painful to see.

15. During my time working on the rare plant survey and in subsequent visits to the Park, none of my colleagues or companions with extensive historical knowledge of the area considered the wash through the Lower South Desert to be a traditional trailing route. This new route created by the Livestock Grazing and Trailing Management Plan (LGTMP) will create

additional disturbances in this area that already has non-functioning soils, hydrology, and vegetation resource conditions.

16. The well-documented effects of cattle trampling on rare plants (Winkler cactus, Wright fishhook cactus, and Last Chance townsendia) in the Lower South Desert, Hartnet area, and Cathedral Valley have been a concern for many years.

17. When I first learned the Hartnet Allotment would be retired, my heart leapt with the promise of much-needed relief for these rare populations of rare plants. While working in the Park, NPS staff told me grazing would be phased out due to its incompatibility with Park resources. I looked forward to watching the desert restore itself when the cattle were no longer degrading it. The retirement of the Hartnet Allotment was an important milestone in that effort. But this rare opportunity for natural resources to recover from decades of grazing damage will be squandered if trailing is allowed to continue. Trailing imposes resource damage that is unacceptable in a national park with a mandate to preserve the objects and values for which it was established.

18. My heart sank when it became clear soon after the Hartnet Allotment's retirement that the National Park Service (NPS) intended to allow continued trailing through the retired allotment. Despite the agency's characterization of trailing as "episodic" rather than "chronic" like grazing, trailing ultimately has similar effects to grazing. As WWP and others noted in comments on the LGTMP Environmental Assessment (EA), botanist Hope Hornbeck has explained that trailing is an "intense episodic disturbance" with similar effects on rare plants as "chronic disturbance" from grazing. When hundreds of cattle go by, even just one pass has a big

effect. These plants cannot afford the impacts from these trailing events, especially when considered along with other threats from climate change, insects, and rodents.

19. In addition, the Hartnet, Lower South Desert, and Cathedral Valley offer superlative hiking and photography. The spectacular Temple of the Sun and Temple of the Moon formations in Cathedral Valley and the Hartnet are photographed by visitors from all over the world. If there was ever a place to prioritize visual resources and viewsheds, it is here along these trailing routes. Destructive cattle along with the attendant flies and feces detract from the scenic vistas people travel such long distances to photograph and experience.

20. By authorizing trailing along the new Lower South Desert route and the Hartnet route, NPS is losing what would have been gained from the Hartnet Allotnment's retirement from grazing. NPS is required to ensure species listed under the Endangered Species Act (ESA), including Winkler cactus, Wright fishhook cactus, and Last Chance townsendia, not only survive but recover. The U.S. Fish and Wildlife Service (FWS) owes these species the same commitment. These species are already on downward population trends. Science shows that any impacts that increase mortality of the cacti decrease the likelihood of survival of their scattered populations. Rather than "arrest or reverse" these species' declines (as FWS defines "recover"), NPS perpetuates direct threats to these rare plants' survival by authorizing trailing through their known populations and habitat.

21. NPS uses the presumed future improvement in population status of these plants from the retirement of grazing in the Hartnet Allotment to justify increased and accumulating impacts from trailing along the Hartnet, Lower South Desert, and Gray Bench-Cathedral Valley routes. NPS inappropriately refers to the beneficial effects of the Hartnet buyout as somehow

balancing out the negative effects of trailing. Justifying a proposed harmful management action by comparing it to the previously even more harmful management is not appropriate. This action does not excuse the impacts to listed cacti from the poor management of grazing over the last 100 years. Furthermore, the action is not necessary. The Park can remove livestock impacts on the rare plants simply by removing the livestock. This will benefit rare plants much more quickly. Botanist Daniela Roth highlighted this in her letter commenting on the EA: "the retirement of the Hartnett Allotment . . . is an unrelated action and should not be used as a justification to continue livestock trailing through occupied habitat of endangered plants. Trailing livestock through occupied habitat has a negative impact on the recovery of these species. Retiring the Hartnett Allotment does not mitigate the impacts of trailing."

22. I was therefore astonished and saddened to see that NPS allowed continued cattle use in the retired Hartnet Allotment in contravention of the Endangered Species Act, the Park's enabling legislation, and the Organic Act. The permit had been purchased by conservation buyers who reasonably assumed that retirement of the allotment included cessation of all livestock presence and activity. NPS ignored this implied promise to the purchasers of the permit and to the public, not to mention abandoned its responsibility to prioritize natural resource protections through this back-door maneuver.

23. NPS Management Policy § 1.4.7.1 says NPS must not allow actions that cause "unacceptable impacts," which are impacts that are "not acceptable within a park's particular environment." But the degree of impacts trailing cattle cause in the Park go far beyond what botanists like myself would ever consider acceptable for this fragile desert ecosystem and its rare plants, especially when any further mortality of certain cactus individuals will reduce the chance

DECLARATION OF LAURA WELP - 7

of population survival. And feedback NPS received on its LGTMP EA from top researchers shows just how the authorized trailing is out of alignment with on-the-ground science and the understanding of plant experts.

24. The Park provides significant portions of the remaining populations of Wright fishhook cactus, Winkler cactus, and Last Chance townsendia. Multiple researchers submitted comments on the livestock trailing through their populations authorized by the LGTMP, listing their grave concerns with the imposition of livestock impacts to these rare plants if NPS authorized the LGTMP. The populations of Wright fishhook cactus and Winkler cactus on adjacent BLM land are declining due to off-highway vehicles and cattle grazing, so Capitol Reef is the best chance the plants have to persist.

25. But neither NPS in the EA nor FWS in the Biological Opinion even attempted to look at the bigger picture of how these plants are faring across their limited ranges, and how the combination of trailing impacts in the Park with multiple human impacts just outside the Park will lead to continued overall population declines and extirpation of local populations.

26. Researchers, private consultants, FWS, and NPS all agree that cattle negatively impact rare plants and their habitat in the Park. But NPS attempted to elide the facts by asserting past studies only looked at long-term presence of cattle in cactus habitat rather than shorter-term trailing events. NPS asserts that shortening the exposure to cattle grazing will result in fewer plants being trampled and that the Hartnet buyout will offset cactus deaths. There are no data presented to support this idea. The preponderance of evidence clearly shows livestock negatively affect these plants. Also, cattle continue to introduce and spread non-native plants and reduce

habitat quality by increasing erosion and soil compaction. Pollinators the plants require also are inhibited by cattle.

27. Endangered plant researcher Daniela Roth clearly told NPS in her comments that "considering the difficulties in managing other documented primary threats, including impacts of climate change and predation, it is essential that management actions are taken wherever possible to avoid impacts on endangered plant species and their habitat, even if it represents just a small fraction of the known plants and habitat." The cumulative impacts from cattle are a significant threat to these species at any level.

28. The post-trailing event monitoring proposed by NPS for damage and disturbance triggers is not reassuring given the chronic lack of staffing and funding NPS suffers, and the stated intention of NPS to reduce or eliminate monitoring if these rare plants are lucky enough to avoid damage or disturbance in certain years. Even if NPS were to uphold its promises, the plan falls short of adequate monitoring. As Roth states, the Park's plan to document damage and disturbance to the plants would be difficult and not likely statistically valid.

29. Also, allowing disturbance of up to 15% of plants annually could lead to local extinction in the foreseeable future and possibly even over the grazing permit period given cumulative impacts from other threats. NPS acknowledges that research shows trampled cacti that manage to survive have lowered reproduction, and disturbed cacti are much more likely to die in the next year than undisturbed cacti. This research comes from the very experts who have raised serious concerns about the impacts of trailing authorized by the LGTMP on these plants. Considering the active and substantial threats documented to these species, NPS should implement proactive management to avoid damage and disturbance in the first place, and halt the

decline rather than contribute to the plants' declines and implement adaptive management only after the fact.

30. I do not understand how NPS or FWS could conclude the monitoring plan proposed by NPS would be sufficient to prevent these rare plants from further sliding toward extinction. Monitoring and to-be-determined adaptive management after damage and disturbance has occurred certainly will not further recovery of these species, because damaged and disturbed individual cactus are at that point more likely to die and less likely to reproduce. That cannot be undone afterward.

31. My concerns about the rare plants at risk along the Gray Bench-Cathedral Valley, Hartnet, and Lower South Desert routes are exacerbated further because the Park's legislation limits livestock trailing to historic users and traditional routes. Certain users of the Gray Bench-Cathedral Valley route, and the Lower South Desert route itself, do not meet these criteria. Thus, livestock impacts to these rare plants could and should be reduced or eliminated by NPS in certain locations through adherence to the Park's enabling legislation.

## Concerns About Trailing Through Mexican Spotted Owl Habitat

32. Oak Creek and Pleasant Creek are also very important to me within the Park. They provide habitat for a diverse assemblage of plants and animals, and I enjoy spending time in the beautiful backdrops of their canyons quietly waiting for wildlife to appear.

33. I like knowing that Oak and Pleasant creeks provide foraging habitat for Mexican spotted owls. I derive pleasure from knowing that all components of an ecosystem are functioning naturally and normally independent of human interference. I am particularly happy when I know that rare species such as the Mexican spotted owl have a place to exist unmolested

by human impacts. Unfortunately, the Mexican spotted owl is declining, and needs human intervention and protection if it is to remain on Earth, so seeing prime habitat suitable for its needs is satisfying.

34. In my most recent visit to Capitol Reef in April of 2019, I visited Oak and Pleasant creeks. Unfortunately, I was disappointed by evidence in Oak Creek in particular of trespass cattle grazing, cattle trampling, soil erosion, vegetation damage, and water pollution from cow patties, as well as off-highway vehicle use. The cottonwood trees should be showing a range of age classes from saplings to old trees. However, during my recent visit I saw mostly older trees. The younger saplings and shoots were heavily browsed, resulting in less recruitment of the younger age classes. Without replacement, this iconic component of the riparian vegetation will die out.

35. Grasses and shrubs in Oak Creek have also been heavily used. My personal visual assessment is substantiated by the Park's own assessment of riparian conditions rating Oak Creek as non-functional due to cattle. Because of my professional experience with native vegetation and the damage that cattle can do, their presence in these areas diminishes my enjoyment of the Park in these creeks.

36. These and other nearby drainages have also been invaded by non-native tamarisk trees that outcompete native plants. The amount of riparian vegetation is much less than it should be due to grazing and trampling during trailing and by the failure of the permittees to adhere to permitted times and prescribed use levels. In larger drainages, channels are down-cutting, which reduces soil water availability to adjacent terraces and leads to a shift from riparian to upland vegetation.

37. The persistence of the unique, precious, and rare Mexican spotted owl is unfortunately not ensured by their protection in Capitol Reef National Park, because NPS has allowed and continues to allow degradation of Oak Creek, an already non-functional riparian system. This non-functional condition indicates foraging habitat for the owl is poor in Oak Creek. The habitat requirements of the owl should take precedence over other uses, especially commercial livestock uses.

38. I am dismayed that FWS glossed over this on-going degradation of Oak Creek in its Biological Opinion, and gave NPS a pass to allow trailing to continue until 2023 in nearly the same manner and numbers it has in the past that led to the creek's non-functional condition.

39. It is clear that NPS has not addressed the root of the problem regarding trespass cattle in Oak Creek: the lack of a fence across the Park's boundary where the creek flows down from Forest Service lands. Despite past promises to FWS it would address this trespass, it has failed to take any measures that keep trespass cattle from these adjacent grazing allotments out of Oak Creek's critical foraging habitat for Mexican spotted owls. I do not understand how FWS could consider this a true commitment by NPS in the Biological Opinion when NPS has made the same commitment over and over again and never followed through on it.

40. I feel distressed to learn that despite limitations on trailing in the Park's enabling legislation, NPS has and continues to allow non-historic users to trail cattle through routes that provide critical habitat for the Mexican spotted owl, including Oak and Pleasant creeks.

**Concerns About Continued Grazing in the Park**

41. The damage from livestock is most evident in comparisons between grazing exclosures and currently grazed or recently grazed lands adjacent to the exclosures in the Park.

The exclosures show what the potential state of vegetation and soils is relative to the present degraded conditions. They contain higher ground cover of grasses, shrubs, and intact biological soil crust and less bare ground compared to the grazed areas.

42. During my work on livestock issues as a botanist on the adjacent Grand Staircase-Escalante National Monument, I saw the comparison between grazed and ungrazed examples of the same vegetation communities as found in Capitol Reef National Park. In some areas, Capitol Reef is a refreshing change from the grazed and trampled BLM and Forest Service land that characterizes much of the rest of Southwest Utah. In some parts of the Park, I can still enjoy intact vegetation communities without evidence of non-native cattle trampling soils and vegetation, degrading springs and riparian areas, displacing wildlife, introducing weeds, and leaving hoofprints and cow patties.

43. Other parts of the Park, particularly the Sandy 3 Allotment, lack such intact vegetation communities, and show extensive evidence of soil compaction, bare ground, riparian degradation, and invasive weeds due to livestock.

44. I often access the Park from the south via the Burr Trail, which takes me on the Notom Road through the Sandy 3 Allotment. The road parallels the Waterpocket Fold, a stunning purple-hued north-south uplift in the landscape. The Muley Twist trail runs through this area, where my husband and I hiked and observed plants when we were courting. This area is very meaningful to me. We looked forward to the time when grazing would be removed from the Park and we could watch the wildflowers and grasses recover to a more natural state, as is appropriate for a national park

45. But in my observations, the soils, hydrology, and vegetation of the Sandy 3 Allotment have been severely degraded, and parts of this area of the Park are ecologically non-functional as a result. Parts of the allotment have been converted to non-native cheatgrass communities, which inhibit establishment of native biodiversity, reduce habitat quality for wildlife, and promote increased fire frequency. These vegetation changes can be irreversible, veering toward an unlawful and irretrievable commitment of resources by NPS.

46. Much of the Sandy 3 Allotment area is meant to display wilderness characteristics, but due to the presence of livestock infrastructure, I do not feel a strong sense of naturalness. Unfortunately, the LGTMP will further erode the area's wilderness character through additional fencing, stock ponds, and other human activities.

47. The General Management Plan for the Park states that grazing causes "significant" impacts to vegetation and wildlife, and introduces and spreads non-native plants.

48. Allowing these significant grazing impacts to continue in the Sandy 3 Allotment by unqualified individuals feels like a betrayal of the promise of Capitol Reef legislation. The interests of a few people are being promoted over those of millions of visitors, who love this land just as much as ranchers do.

**Harms to My Interests from Degradation of the Resources of Capitol Reef National Park**

49. I have lived and recreated in the Desert Southwest since the late 1980s. I am cognizant of all the components of a functioning ecosystem and feel most rejuvenated in those areas where natural processes can take place across landscapes where human presence rests more lightly.

50. My interest in these areas, including Capitol Reef National Park, is scientific and professional, because I am aware of what native plant and animal species should be here, and what natural ecosystems look like when they are functioning properly.

51. My interests are also aesthetic and spiritual due to the emotional value I attach to these places, objects, and their intrinsic right to exist and persist.

52. Much of the natural world has been relegated to living catch-as-catch-can in less disturbed nooks and crannies like national parks, where ecosystem processes have not been irretrievably altered. These refugia are one of the few ways left for people to enjoy how the world used to be.

53. Therefore, to see impacts from non-native cattle even here, in Capitol Reef National Park, where natural ecosystems and their components are supposed to be promoted and protected, is terribly disheartening.

54. The presence of livestock contributes to habitat degradation, non-native plant invasion, reduced water availability for wildlife, vegetation damage, and wildlife displacement.

55. Knowing these rare plants and animals are declining due to diminished habitat quality and direct impacts from cattle is distressing.

56. I fear that Capitol Reef is setting bad precedent for management both within the Park and in other parks by accommodating trailing and grazing at the expense of native species and natural resources.

57. To watch Capitol Reef succumb to further human interference through continued and increased imposition of livestock impacts that erode its natural values is injurious to me and negatively affects my experience of the Park.

58. My aesthetic, spiritual, scientific, and professional interests are injured by imposition of a new trailing route through the Lower South Desert where none previously existed, because many in the conservation community saw the retirement of the Hartnet Allotment as a real opportunity for recovery of rare plants.

59. Instead, this LGTMP unnecessarily imposes continued harm to Wright fishhook cactus, Winkler cactus, and Last Chance townsendia along the Lower South Desert, Hartnet, and Gray Bench-Cathedral Valley trailing routes, perpetuating the species' downward population trends within the Park and across their limited ranges on adjacent federal lands. This harms my interests in seeing the species survive, recover, and thrive.

60. My interests are further injured by livestock impacts to rare plants along the Gray Bench-Cathedral Valley route by a non-historic user of that trail, because NPS should not authorize such use in the first place.

61. My same interests are injured by continued livestock use of Oak Creek despite its on-going non-functional condition. My interests in observing Mexican spotted owls and healthy foraging habitat for the species in Oak Creek continue to be harmed by the level of degradation NPS has authorized there.

62. Further, NPS's authorization of cattle trailing to non-historic users of Oak and Pleasant creeks injure my interests, because impacts from such trailing to owl foraging habitat and the riparian ecosystems of the creeks need not and must not occur under the Park's enabling legislation.

63. The continued degradation of the wilderness character meant to be present in the Sandy 3 Allotment area also harm my interests, as the increased presence of livestock fencing,

stock ponds, and other infrastructure serve as a reminder that NPS has prioritized livestock interests at the expense of those who value and wish to see a return to natural conditions.

64. My interests in seeing a return to functioning, natural conditions on the Sandy 3 Allotment, with native vegetation dominant and bare ground reduced, are injured by NPS allowing livestock grazing impacts from individuals Congress did not intend to continue to impose such impacts under the Park's legislation. If NPS followed the letter and spirit of the law, livestock impacts within the Park would be greatly reduced, as would degradation of the Park's natural resources that I cherish and wish to see thrive.

65. The adoption of the LGTMP without full examination and disclosure of the impacts to Park resources harms my interests. I have invested much effort and time over the last twenty-some years studying and appreciating the rare plants and natural vegetation conditions of Capitol Reef National Park. I have a right to have federal agencies comply with laws concerning public land management like the National Environmental Policy Act (NEPA) and ESA.

66. If NPS had completed a more thorough NEPA analysis through an environmental impact statement (EIS), it might have more fully considered the effects that Park resources face from this LGTMP, including cumulative impacts to rare plants.

67. NPS might also have more thoroughly addressed its policies in an EIS, and shown how it would ensure none of the actions authorized by the LGTMP would cause "unacceptable" impacts to the Park's resources.

68. If NPS had followed the requirements of NEPA, it might have made a different choice for the ultimate LGTMP, and adopted a plan that prioritized Park resource protection over the livestock uses, as Congress intended.

69. Similarly, if FWS had followed the requirements of the ESA, it might have produced a Biological Opinion that properly considered the scope of impacts to rare plants and the level of protection provided—or not—by the LGTMP to protected species and habitat. FWS might have directed NPS to implement stronger measures to protect species and habitat in light of a more thorough examination of how the LGTMP would continue degradation and downward population trends. Or FWS might even have told NPS it could not go ahead with the LGTMP because the level of impacts to species and habitat is too great.

70. If the Court ordered NPS to complete an EIS, it would help redress my injuries and protect my interests by ensuring NPS only authorizes livestock use in the Park based on full information about the effects trailing and grazing will continue to impose on Park resources.

71. If the Court ordered NPS to restrict any grazing and trailing permits to people and locations that Congress and agency regulations and policies specifically allow, it would help redress my and injuries protect my interests by limiting impacts to the Park's resources.

72. And if the Court ordered FWS to complete a Biological Opinion that considers the full scope of impacts to rare plants and properly considers the protections provided—or not—by the LGTMP to rare plants and the Mexican spotted owl and its habitat, it would help redress my injuries and protect my interests by ensuring any impacts from livestock use will not lead to the demise of these species or their habitat.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 20th day of July, 2020, in Kanab, Utah

*Laura Welp*

Laura Welp